# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

## Case No. 1: 07-CV-223

_____

### *IN RE: JEANNE A. DUVALL*
### *(Bankruptcy Case No. 04-1519)*
### *(Adversary Proceeding No. 04-1519)*

### JEANNE A. DUVALL

**Appellant,**

### v.

### KEVIN BUMBRAY

### and

### SHARON B. WATTS

**Appellees,**

_____

## Appeal from the United States Bankruptcy Court for the
## District of Columbia

_____

## BRIEF FOR APPELLANT

_____

Dated:  July 12, 2007                    Respectfully submitted,

/s/ *Paul M. Toulouse*

Paul M. Toulouse (205526)
1320 19th Street, NW  Suite 202
Washington, DC 20036
(202) 347-4020

/s/ *Joseph M. Goldberg*
Joseph M. Goldberg (337766)
1115 Massachusetts Ave., NW
Washington, DC 20005
(202) 638-0606

Attorneys for Appellant

# TABLE OF CONTENTS

Page

Table of Authorities                                                          1

Statement of Appellate Jurisdiction                                          2

Issues Presented                                                              2

Standard of Appellate Review                                                  3

Statement of the Case                                                         3

Statement of the Facts                                                        4

Argument                                                                     10

THE BANKRUPTCY COURT ERRED IN OVERRULING APPELLANT'S
OBJECTIONS TO THE CLAIMANTS' CLAIMS.

I.   The claims have been previously adjudicated and are
     barred by principles of *res judicata.*                                 10

II   The claimants' third party beneficiary rights were rescinded            16

III  The debtor's assertion of legal defenses in the bankruptcy
     proceeding is not inequitable conduct.                                  19

Conclusion                                                                   34

Certificate of Service                                                       35

## TABLE OF AUTHORITIES

<u>CASES</u>                                                                        <u>Page</u>

Elmer Bumbray v Jeanne Duvall
    CA  2434-99 (Sup Crt)                                          11

Sharon Bumbray Watts, et al v Jeanne Duvall
    CA  1155-03 (Sup Crt)                                          11

Faulkner v. GEICO
    618 A.2d 181 (D.C. 1992)                                       14

Stutsman v. Kaiser Found. Health Plan,
    546 A.2d 367 (D.C. 1988);                                      14

Smith v. Jenkins
    562 A.2d 610 (D.C. 1989                                        14

Molovinsky v. Monterey Coop., Inc.
    689 A.2d 531, 533 (D.C. 1997);                                 14

Washington Med. Ctr. Inc. v. Holle
    573 A.2d 1269 (D.C. 1990)                                      14

Fields v Tillerson
    726 A.2d 670 (D.C. 1999)                                       17


<u>PUBLICATIONS</u>

17A American Jurisprudence, Contracts § 461 (1991)                 19

Restatement (Second) Contracts § 311 (2) & (3) (1981)              19

## STATEMENT OF APPELLATE JURISDICTION

Jurisdiction of this Court is based on a federal question pursuant to 28 USC § 1331.

## STATEMENT OF ISSUES PRESENTED

1.       Whether the Bankruptcy Court made an error of law when it overruled the Debtor's objections to the Claimants' claims on the basis that they were barred by *res judicata* where there was undisputed evidence that their claims were raised and rejected by the jury's verdict in an earlier case and there was no evidence to support the Bankruptcy Court's ruling.

2.       Whether the Bankruptcy Court made an error of law when it overruled the Debtor's objections to the Claimants' claims on the basis that the claimants' intended third party beneficiary rights were rescinded where there was undisputed evidence that the original contracting parties rescinded the claimants' rights prior to the claimants' knowledge of their third party beneficiary rights and prior to the contract being accepted or acted upon by the claimants and there was no evidence to support the Bankruptcy Court's ruling.

3.       Whether the Bankruptcy Court made an error of law when it overruled the Debtor's objections to the Claimants' claims on the basis that it was inequitable for the Debtor to assert her legal right of rescission  as a legal defense in the bankruptcy proceedings where there was no evidence to support the Bankruptcy Court's ruling.

## STANDARD OF APPELLATE REVIEW

On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings.  Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

(Bankruptcy Rule 8013)

## STATEMENT OF THE CASE

On January 6, 2005, Appellee, Kevin Bumbray filed Claim #1 in the amount of $46,973.10. **Record 1** (hereinafter referred to as **R**) and on January 10, 2005, Appellee, Sharon B. Watts  filed Claim #2 in the amount of $46,973.10. **R.2**.  On June 9, 2005, Appellant filed Objections to Claim #1 and Claim #2. **R 3 and R 5**. On July 7, 2005, Appellees filed an Opposition to Appellant's Objections to Claim #1 and Claim #2. **R 6**. On August 15, 2005, Appellant filed her Reply to the Appellees' Opposition to Appellants Objections to Claim #1 and Claim #2.  On May 25, 2006 the Bankruptcy Court conducted a hearing upon the two claims (R.21) and on May 31, 2006 issued its Order overruling the Appellant's Objections to Claim #1 and Claim #2. **R 23 and R 24**. On June 12, 2006 Appellant filed her Motion to Supplement the Record and Reconsider, Alter or Amend the Order overruling the Appellant's Objections to Claim #1 and Claim #2. **R 25**. On June 19, 2006 the Bankruptcy Court's Preliminary Order denying the Motion to Supplement the Record and Reconsider, Alter or Amend the Order Except for the Part of the Motion entitled "Amount of the Claim" was docketed. **R. 26**.  On July 24, 206 the Bankruptcy Court's Further Order Granting in Part the Motion to Reconsider was docketed

**R. 27**.  On October 19, 2006 the Bankruptcy Court conducted a hearing on the Order Granting in

Part the Motion to Reconsider to Present Evidence Regarding the Receipt or Non Receipt of

Funds and the Date of their Receipt and on December 7, 2006, issued its Memorandum Decision

and Order, Granting in Part and Denying in Part the Motion for Reconsideration and Directing

Related Relief, including vacating its prior Orders Overruling Objections to Claim #1 and Claim

#2 and Ordering that Appellant's Objections to Claim #1 and Claim #2 are Sustained in Part and

Overruled in Part and Ordering that Claim #1 is allowed in the amount of $39,756.74 and that

Claim #2 is allowed in the amount of $39,756.74 **R 28 and R 29**  Appellant filed her Notice of

Appeal on December 18, 2006. **R 30**.


## STATEMENT OF THE FACTS

In 1980 Edward Bumbray was fatally injured in a work related accident in Maryland.  His

wife was Henrietta Duvall Bumbray (hereinafter referred to as Henrietta Duvall).  Edward

Bumbray had six children, including the two Claimants and their four siblings.   Henrietta Duvall

had one child, the Debtor.   The Claimants and their four siblings are step brothers and step

sisters of the Debtor. **Testimony of Debtor at May 25, 2006 claims hearing**, **Transcript pp 5-7**

**(hereinafter referred to as T).  Testimony of Sharon Bumbray Watts at May 25, 2006**

**claims hearing**, **T pp 49 -50.**

In 1982, the Maryland Workers' Compensation Commission (hereinafter referred to as"

the WCC") awarded a $1,200 monthly annuity to Henrietta Duvall payable for 20 years. The

Hartford Accident and Indemnity Company (hereinafter referred to as "The Hartford") was

required to pay the annuity, and it began making payments to Henrietta Duvall in 1982.

Henrietta Duvall died in the District of Columbia in 1990. The Debtor was her only heir and was

appointed personal representative of her mother's estate.  **Testimony of Debtor, T p 6.**

4

After her mother's death, the Debtor received a letter from The Hartford informing her that its contract to make monthly payments to her mother terminated at the death of the payee and nothing more was due or payable. **Testimony of Debtor, T p 6, 7**.

The Debtor testified at the claims hearing that in 1995 one of the Claimant's siblings, Elmer Bumbray approached her and asked what was going on with the workers compensation annuity and she told him about the letter she had received advising that the annuity was cut off upon her mother's death.   The Debtor testified that Elmer Bumbray wanted to see if he could pursue the claim as a child of Edward Bumbray and being led to believe by The Hartford that there were no payments due to her mother's estate, she agreed.  The Debtor testified that in 1996 Elmer Bumbray asked her to come to his lawyer, Barry Chasen's office where the Debtor, Mr. Bumbray and Mr. Chasen had a meeting.  At that meeting, she discussed the letter she had received from The Hartford. **Testimony  of Debtor, T pp 7-9**.

At that meeting, the Debtor was asked to resign as personal representative of her mother's estate so that Elmer Bumbray could be appointed as her successor and was told that she cold lose her home if she did not resign.  She was later asked to sign some papers to resign but she refused to do so because she didn't understand what was going on.  **Testimony of Debtor, T pp 10-12**.

Some time went by and in March of 1997, Elmer Bumbray asked the Debtor to attend another meeting in Mr. Chasen's office with him.  At that meeting Elmer Bumbray made her an offer that if she would pursue the workers compensation claim as personal representative of her mother's estate, she would receive 16% of the proceeds.   Still believing that the workers compensation proceeds in arrears belonged to Elmer Bumbray and his sibling, she agreed and retained Mr. Chasen to represent her as personal representative before the WCC. **Testimony of**

**Debtor, T pp 12 – 14.**

There was a hearing before the WCC in the summer of 1997 and the claim was successful. Shortly after the hearing, Mr. Chasen asked the Debtor to come to his office to sign some checks for the workers compensation proceeds in arrears which had been delivered to Mr. Chasen so that he could deposit them..   The Debtor did not understand why Mr. Chasen wanted her to sign the checks and deposit them into his account.  She made some phone calls and contacted independent counsel, Paul M. Toulouse who advised her that contrary to what she had been led to believe by Elmer Bumbray, the proceeds actually belonged to the estate and not Elmer Bumbray or his siblings.  **Testimony of Debtor, T pp 14 -16**.

The Debtor retained Mr. Toulouse and by counsel's letter dated September 25, 1997 to Mr. Chasen,  the Debtor demanded copies of all of the relevant WCC documents and that all of the proceeds checks in arrears which Mr. Chasen had received from the workers compensation carrier  and all future checks from the insurance carrier be delivered to Mr. Toulouse so that the checks could be deposited into an estate account.  **Testimony of Debtor, T pp 16 -17 and Debtor's Exhibit A**.  Mr. Chasen did not comply with the request and another demand letter dated October 1, 1997 was forwarded to Mr. Chasen. **Testimony of Debtor, T p 17 and Debtor's Exhibit B**.  Mr. Chasen still did not comply and on October 7, 1997, Mr. Toulouse wrote to Howard Miller, The Hartford's counsel, advised Mr. Miller that he represented the personal representative and demanded all of the relevant WCC documents and that all of the proceeds checks in arrears from the insurance carrier be delivered to Mr. Toulouse so that the checks could be deposited into an estate account.  **Testimony of Debtor, T p 18 and Debtor's Exhibit C**.  On October 8, 1997 the Debtor wrote to Mr. Chasen, discharged him and demanded her file. **Testimony of Debtor, T pp 17-18 and Debtor's Exhibit D**.  The checks for the

workers compensation proceeds in arrears in Mr. Chasen's possession were finally delivered to Mr. Toulouse and were deposited by the personal representative into an estate account. All subsequent checks received from the insurance carrier directly were also deposited into the estate account. **Testimony of Debtor, T p 19**.

On April 9, 1999 in a case by the name of Elmer Bumbray v Jeanne Duvall, Superior Court of the District of Columbia,, CA 2434-99, Elmer Bumbray filed his complaint in the Superior Court of the District of Columbia for breach of contract against the Debtor for the workers compensation proceeds in arrears, alleging that he and the Debtor had agreed in the summer of 1995 that "(1) Plaintiff would pursue a claim for the aforesaid monthly payments of $1,200 pursuant to the aforesaid Maryland Workers' Compensation Commission order, as well as any monies to be due in the future; and (2) such monies as were recovered would be the exclusive property of the Plaintiff and not of the Defendant." **Testimony of Debtor, T pp 19-20 and Debtor's Exhibit E at ¶10.**

In his complaint, Mr. Bumbray alleged that at a meeting in Mr. Chasen's office on March 13, 1997 "…Plaintiff and Defendant amended their agreement set forth in Paragraph 10, above. The amendment provided that Plaintiff would receive Eighty four Percent (84%) of any monies received from the aforesaid workers compensation claim, and Defendant would receive Sixteen Percent (16%) for her work in processing said claim." **Testimony of Debtor, T pp 19-20 and Debtor's Exhibit E at ¶13.**

During direct examination at the claims hearing before the Bankruptcy Court, Elmer Bumbray identified his complaint, reviewed it and testified that it correctly stated that 84% of the WCC award of workers compensation proceeds in arrears which he claimed were due to him totaled $192,578.40. **Testimony of Elmer Bumbray at May 25, 2006 claims hearing, T p 74**

7

**–75 and Debtor's Exhibit E at ¶¶ 15, 21 and 25.** During cross examination, Elmer Bumbray again identified his complaint, reviewed it and testified, as he did in the Superior Court case that his agreement with the Debtor was that he and he alone was to receive 84% of the workers compensation proceeds in arrears and that his agreement with the Debtor had nothing to do with his siblings and that agreement never changed. **Testimony of Elmer Bumbray, T pp 76-77 and 79.**

The Debtor defended the suit by claiming that her original agreement with Elmer Bumbray in 1995 was not for Elmer Bumbray alone but was for the benefit of Elmer Bumbray and his five siblings and furthermore, was conditioned upon their being legally entitled to the workers compensation proceeds. **Claimants' Exhibit 9 at A 4.** She also claimed that Elmer Bumbray never told her after their 1995 agreement that he, by Mr. Chasen initiated a claim with the WCC falsely claiming to be an heir of his mother's estate and was unable to proceed before the WCC because he was not the personal representative of the estate. Furthermore, all of these facts were withheld from the Debtor when Elmer Bumbray thereafter unsuccessfully sought her resignation as personal representative and in anticipation of that event, had signed, under oath and without the Debtor's knowledge, a petition for his appointment as successor personal representative on the false basis that he was the son of Henrietta Duvall and an heir of the estate. **Claimants' Exhibit 9 at A 4. Testimony of Elmer Bumbray, T pp 77-79.** The Debtor claimed that Mr. Bumbray continued to mislead her into believing that neither she nor the estate had a claim for the workers compensation proceeds in arrears and on that basis Elmer Bumbray persuaded the Debtor to meet with him in Mr. Chasen's office in March of 1996 to amend their earlier agreement in order to solicit her cooperation in prosecuting the claim. **Claimants' Exhibit 9 at A 4.**

The case went to trial in July of 2001 and the jury was instructed to find whether Elmer Bumbray brought the case in his own behalf or in behalf of himself and his siblings. The jury found that he brought the case in his own behalf and returned a verdict in the amount of $26,960.98. Elmer Bumbray's argument to the trial judge, by counsel for a special jury instruction, the special jury instruction read to the jury and the jury verdict form were introduced into evidence at the Bankruptcy Court hearing. **Claimants' Exhibit 5, 6 and 7.** Because a copy of the original jury verdict form was unavailable, the parties stipulated that as to question 1, the jury found in favor of the Plaintiff on his claim for breach of contract against the Defendant and as to question 2, the jury found that the Plaintiff brought the lawsuit on his own behalf to use at his sole discretion and not on behalf of himself and his biological siblings.

The two Claimants, Kevin Bumbray and Sharon Bumbray Watts testified at the Bankruptcy Court hearing. Kevin Bumbray testified that he never had a conversation with the Debtor about her version of what was going on with the workers compensation case. **Testimony of Kevin Bumbray at May 25, 2006 claims hearing, T p 41.** Nor was he a party to any conversation between Elmer Bumbray and the Debtor about the workers compensation proceedings. **Testimony of Kevin Bumbray, T p 42.** He did testify that although he knew that Elmer Bumbray and the Debtor had something going on, he did not become aware that he might have a claim for the workers' compensation proceeds until Elmer Bumbray told him after the Superior Court trial and he was summoned to the office of Elmer Bumbray's lawyer's Jonathan Shurberg to discuss the matter. **Testimony of Kevin Bumbray, T pp 40 and 42.**

Sharon Bumbray Watts testified that sometime in the late 1990s Elmer Bumbray told her that there may be workers' compensation benefits to pursue. **Testimony of Sharon Bumbray Watts at May 25, 2006 claims hearing, T p 52.** Ms. Watts further testified that she became

aware of Elmer Bumbray's suit against the Debtor in the late 1990s and that she testified at the

trial. **Testimony of Sharon Bumbray Watts, T p 55.** Ms. Watts also testified that she had a

conversation with Elmer Bumbray's lawyer, Mr. Shurburg and another lawyer at the courthouse

after the jury returned its verdict on July 13, 2001 and it was during this conversation that she

first learned that she might have a claim with respect to the workers compensation proceeds.

**Testimony of Sharon Bumbray Watts, T p 56.**

On February 14, 2003 in a case by the name of Sharon Bumbray Watts, et al v Jeanne

Duvall, Superior Court of the District of Columbia,, CA 03-1155, the two Claimants along with

three additional Bumbray siblings filed their complaint for breach of contract against the Debtor.

**Testimony of Debtor, T pp 20-21 and Debtor's Exhibit F.** That case was stayed by the filing

of the Debtor's bankruptcy petition and two of the Bumbray siblings, Sharon Bumbray Watts

and Kevin Bumbray thereafter filed their claims in the bankruptcy proceeding. **R 1 and R 2.**

## ARGUMENT

The Bankruptcy Court erred in overruling the Debtor's objections to the Claimants'

claims.

## Res Judicata

### The Special Jury Instruction

The Claimants' bankruptcy claims were based upon assertions that, pursuant to principles

of *res judicata*, they were third party beneficiaries of the agreement between their brother,

Elmer Bumbray and the Debtor, which status the Claimants contended was established by the

jury's verdict in an earlier Superior Court case known as Elmer Bumbray v Jeanne Duvall, CA

99-2434, wherein Elmer Bumbray sued the Debtor for breach of contract.

This Claimants' theory of recovery in the bankruptcy proceeding was first raised in their Superior Court case known as Sharon Bumbray Watts, et al v Jeanne Duvall, CA 03-1155, wherein the two Claimants and three of their siblings sued the Debtor for alleged breach of their third party beneficiary rights and wherein they claimed, as they did in the bankruptcy proceeding, that their third party beneficiary rights were conclusively established by virtue of the jury's verdict in the earlier Superior Court case known as Elmer Bumbray v Jeanne Duvall, *supra*.

However, the Claimants' reliance upon the Superior Court jury verdict as the basis for their third party beneficiary claims results from not simply a misreading but a significant misrepresentation of the jury's verdict.

In the second of the two Superior Court cases mentioned above, the Bumbray siblings, (including the two bankruptcy Claimants) alleged in their complaint against Jeanne Duvall that: " 11. The jury expressly found that the contract sued upon by ELMER BUMBRY was not for his own sole benefit but was for the joint benefit of all of his siblings, the Plaintiffs herein." Sharon Bumbray Watts, et al v Jeanne Duvall, CA 03-1155. **Debtor's exhibit F, ¶ 11.**

Then, in their Opposition to the Debtor's Objections to their claims in the bankruptcy proceeding the two Claimants' bald misrepresentations concerning the jury's findings were again repeated as follows:   "…the jury in the earlier case specifically found that the agreement was made for the benefit of Elmer Bumbray and his siblings…"   and later on page 3,  "…Once the jury concluded that in fact the Plaintiffs herein were third party beneficiaries … " **R 6 pp 2-3.**

While it is true that the Bumbray siblings' third party beneficiary claims (including the two Claimants before the Bankruptcy Court) were raised during the Superior Court trial, contrary to the Claimants' assertions, the jury considered and rejected those claims.  Relying upon the

Debtor's testimony concerning her understanding of the agreement in behalf of herself, Elmer

Bumbray and his siblings; Elmer Bumbray, by counsel[1] argued for a special instruction to the

jury wherein they could find that Elmer Bumbray had either brought the Superior Court case in a

representative capacity on behalf of himself and all of his siblings or in his own behalf.

**Claimant's Exhibit 5, pp 62-66.**  The special instruction was adopted by the Superior Court trial

judge, as follows:

> A party to a contract made for the benefit of other parties not named in the
> lawsuit may sue in that person's own name without joining the parties for whose
> benefit the action is brought.  If you find that Elmer Bumbray brought this action
> on behalf of some or all of his siblings, you should award him the amount of
> damages, if any, that you find to have been rightfully due to either Mr. Bumbray
> or to his siblings. The fact that the action was brought solely by Mr. Bumbray
> standing alone is not a proper basis for reducing the amount of money awarded to
> him.
> If you find that Elmer Bumbray brought this action in his own behalf to
> use at his sole discretion you may use that fact as a basis for reducing the amount
> of money awarded to Elmer Bumbray. **Claimant's Exhibit 6, p 118.**

### The Jury Verdict Form

The jury's verdict form tracked the special instruction.  The jury could have but did not

find in favor of the Bumbray siblings, including the Claimants under the agreement.   In

paragraph 1, the verdict form required a finding for the plaintiff or the defendant.  In paragraph

2, the verdict form required the jury to find " 2. On whose behalf did plaintiff Elmer Bumbray

bring this lawsuit?"  The jury then had two choices. "On behalf of himself (Bumbray) and his

biological siblings" or "On his own behalf to use at his sole discretion."  The jury then was asked

in paragraph 3 "What sum of money does the jury award as damages for Breach of Contract?"

At the bankruptcy claims hearing, it was undisputed that the jury found for the plaintiff in

paragraph 1 and awarded damages of $26,960.98 in paragraph 3.  The parties, by counsel also

---

[1] It is noteworthy that Elmer Bumbray's counsel, Jonathan Shurburg is now the Claimants' counsel

stipulated that the jury answered paragraph 2 "On his own behalf to use at his sole discretion" **T**

**pp 90 –91. Claimants' exhibit 7.**

Elmer Bumbray, by counsel argued to the Superior Court trial judge that he was suing in

a representative capacity in behalf of himself and his siblings. The special instruction which

Elmer Bumbray advocated adopted that position, was accepted by the trial judge and was read to

the jury. Mr. Bumbray's argument to the trial judge, the special instruction which was read to

the jury and the jury's findings as revealed in the verdict form demonstrate that the jury could

have found on behalf of Elmer Bumbray and his siblings and awarded damages on that basis but

did not.

Because the Claimants' third party rights were raised, considered and rejected by the jury

in the earlier Superior case, the assertion of those rights before the Bankruptcy Court is barred

by principles of *res judicata.*

> Under the doctrine of *res judicata* (claim preclusion), a final judgment on
> the merits of a claim bars relitigation in a subsequent proceeding of the same
> claim between the same parties or their privies. *Faulkner v. GEICO*, 618 A.2d
> 181, 183 [*870] (D.C. 1992) (citations omitted); *Stutsman v. Kaiser Found.*
> *Health Plan*, 546 A.2d 367, 369-70 (D.C. 1988); *Smith v. Jenkins*, 562 A.2d 610,
> 613 (D.C. 1989). The doctrine operates to bar in the second action not only claims
> which were actually raised in the first, but also those arising out of the same
> transaction which could have [**9] been raised. *Molovinsky v. Monterey Coop.,*
> *Inc.*, 689 A.2d 531, 533 (D.C. 1997); *Faulkner*, 618 A.2d at 183 (citing *Stutsman*,
> 546 A.2d at 369-70); *Washington Med. Ctr., Inc. v. Holle*, 573 A.2d 1269, 1280-
> 81 (D.C. 1990) (citing *Smith*, 562 A.2d at 613). "If there is a common nucleus of
> facts, then the actions arise out of the same cause of action." *Faulkner*, 618 A.2d
> at 183. "The nature and scope of a 'cause of action' is determined by 'the factual
> nucleus, not the theory on which a plaintiff relies.'" *Id.* (citation omitted). In
> determining whether the claim arises from the same factual nucleus, we consider
> the nature of the two actions, the facts necessary to prove each and "whether the
> facts are related in time, space, origin, or motivation, whether they form a
> convenient trial unit, and whether their treatment as a unit conforms to the parties'
> expectations or business understanding or usage." *Smith*, 562 A.2d at 613
> (quoting Restatement (Second) of Judgments § 24 (2) (1982)). In order for *res*
> *judicata* to apply, there must be identity of claims and identity of parties. 562

A.2d at 613-15. *Patton v. Klein*, 746 A.2d 866; 1999 D.C. App. LEXIS 116 (1996.)

The contract the Claimants are attempting to enforce is precisely the same contract as in Elmer Bumbray's Superior Court trial against the Debtor. Both Elmer Bumbray there and the Claimants here proceeded under a theory of breach of contract.

Claimants admitted in this proceeding that they were in privity with Bumbray because "It is claimants' position that, prior to July 13, 2002, the date the jury rendered its verdict in the earlier case, they were unaware of the particulars of the oral agreement between Elmer Bumbray and the debtor, and to the extent they were aware of the agreement, they believed, reasonably, that Elmer Bumbray was representing their interests in a representative capacity. " **Claimant's Opposition to Debtor's Objection to Claim, R 6, p 2.**

In the Superior Court case Elmer Bumbray, by counsel argued to the Superior Court trial judge that he was suing in a representative capacity in behalf of himself and his siblings. The special instruction which Elmer Bumbray advocated adopted that position, was accepted by the trial judge and was read to the jury. During jury instruction argument, in response to the trial court's question as to whether Mr. Bumbray was bringing the suit in his own behalf or in behalf of himself and his siblings, Mr. Shurberg responded, " No, your Honor, and, and I'm sorry if I misspoke. Mr. Bumbray is bringing this suit on behalf of those people" **Debtor's Exhibit 6, pp 62 - 63.**

The jury had every opportunity to find for the Bumbray siblings but did not and in any event, the doctrine operates to bar not only claims which were actually raised but also those arising out of the same transaction which could have been raised. All the jury found was that Elmer Bumbray was entitled to $26,960.98 pursuant to his agreement with the Debtor. The jury made no findings as to what amount the Debtor was entitled to under the agreement. Not having

found for the Bumbray siblings and having awarded Elmer Bumbray $26,960.98, application of *res judicata* compels the logical inference that the Debtor is entitled to the balance.

Principles of *res judicata* bar these Claimants from litigating their claims anew in the bankruptcy proceeding and the Bankruptcy Court made errors in its findings and conclusions of law in that regard.

In its findings, the Bankruptcy Court devoted two paragraphs to this defense, as follows:

> Finally, there's an argument that the third party beneficiary claims are barred by res judicata because there was privity and the claim should have been raised by Elmer Bumbray in the litigation. But Elmer Bumbray was taking a position adverse to the third party beneficiaries who had a right to sue in their own interest and were not aware of their right to sue. And I don't think that there is privity in those circumstances.

> Elmer was entitled to sue on his own rights. He was not obligated to sue in a representative capacity. And these siblings are entitled to sue in their own right in enforcement of the third party beneficiary contract. **Bankruptcy Court's Findings T p 120.**

Contrary to the Court's findings, Elmer Bumbray was in privity with his siblings because he argued to the Superior Court trial judge that he was suing in a representative capacity in their behalf and the jury instruction and the jury verdict form gave the jury the opportunity to find in the siblings favor on that basis. Contrary to the Court's finding that the Claimants were not aware of their right to sue, Sharon Bumbray Watts testified that she became aware of Elmer Bumbray's suit against the Debtor in the late 1990s and she even testified at the trial. **Testimony of Sharon Bumbray Watts, T p 55.** Furthermore, the Claimants' admitted in their Opposition to Debtor's Objections to their Claims in this proceeding that they believed Elmer Bumbray was suing in a representative capacity in their behalf. **R 6 at p 2.**

In addressing the Debtor's *res judicata* defense, the Bankruptcy Court made no findings which demonstrated 1) any consideration of Elmer Bumbray's argument to the trial judge in the

earlier Superior Court case that he brought that case in a representative capacity on behalf of his

siblings and was therefore in privity with them, 2) any consideration of the Claimants' admission

in this proceeding that they believed Elmer Bumbray was representing their interests in a

representative capacity in the Superior Court case, 3) any consideration of the special jury

instruction or jury verdict form which gave the jury the opportunity to find for the Bumbray

siblings, 4) any consideration of the jury verdict form which revealed that the jury did not so

find, and finally, 5) any consideration of the fact that the jury only found for Elmer Bumbray in

the amount of $26,960.98, returned no verdict for the siblings and made no determination as to

how much the Debtor was due or the logical inference that she was entitled to the balance.

**Bankruptcy Court's Findings, T pp 114- 120.**

### The Claimants' Third Party Beneficiary Rights Were Rescinded

If this Court concludes that the Bankruptcy Court did correctly conclude that the claims

were not barred by *res* judicata, then it should find that the Bankruptcy Court erred in finding

and concluding that the Claimants' rights were not revoked or rescinded by Elmer Bumbray and

the Debtor because the undisputed factual record shows that by the time the Claimants knew of

their alleged claims, both the Debtor and Elmer Bumbray had rescinded whatever rights the

claimants may have previously enjoyed, without their knowledge of either the creation or the

recession of those rights.

The Bankruptcy Court's findings and conclusions appear at T p 114 – 120 and are a

mixture of legal and equitable reasoning .  The Court acknowledged that *Fields v Tillerson*,, 726

A.2d 670; 1999 D.C. App. LEXIS 47 (D.C. 1999) is the leading case in this jurisdiction

regarding the rescission of third party beneficiary rights.   That case requires the agreement of

the original contracting parties to rescind a contract intended to benefit third parties at some point in time before the contract is accepted or acted upon by the intended third parties.

The Claimants agreed that the Claimants did not learn of their third party beneficiary rights until after that point in time when the Debtor argued that she and Elmer Bumbray rescinded those rights. The Claimants testified that they learned from Mr. Bumbray's and now their own lawyer, Jonathan Shurburg of their alleged claims pursuant to the agreement shortly after the Elmer Bumbray v Jeanne Duvall Superior Court trial which concluded in July of 2001. **Testimony of Kevin Bumbray at T p 46. Testimony of Sharon Bumbray Watts at T p 56**

Indeed, the timing of the Claimants' knowledge of their third party beneficiary rights was the basis of the Claimants' argument that their claims were not barred by the three year statute of limitations by virtue of the discovery rule. The Court accepted that testimony and overruled the Debtor's Statute of Limitation defense. **Bankruptcy Court's Findings T 116 – 117.**

The Bankruptcy Court credited the Debtor's testimony that she and Elmer Bumbray reached an agreement in Mr. Chasen's Office in March of 1997 whereby the Debtor would receive 16% of the workers compensation proceeds and Elmer Bumbray and his siblings would share the remaining 84%. **Bankruptcy Court's Findings T p 115 – 116.** In doing so, the Court discredited Elmer Bumbray's testimony, a witness called by the Claimants, who testified that the agreement was that he was to receive all 84% of the proceeds, as evidenced by the complaint which he filed in the Superior Court case. **Testimony of Debtor at T pp 19-20 and Debtor's Exhibit E at ¶13. Testimony of Elmer Bumbray at T p 74 –75 and Debtor's Exhibit E at ¶¶ 15, 21 and 25. Testimony of Elmer Bumbray at T pp 76-77. Bankruptcy Court's Findings T p 116.**

17

The undisputed evidence revealed that in September and October of 1997, after she learned that her mother's estate and not the Bumbray siblings were entitled to the workers compensation proceeds, the Debtor, by counsel demanded all of the workers compensation proceeds in arrears from attorney Barry Chasen and all future proceeds from The Hartford.

**Debtor's exhibits A, B, C and D.**

Furthermore, it was undisputed that on April 9, 1999, Elmer Bumbray filed his complaint in Superior Court and thereafter served the Complaint upon the Debtor, wherein he unequivocally asserted that all 84% of the siblings' alleged share of the workers compensation proceeds belonged to him.  **Debtor's exhibit E.**

The Debtor takes the position that whatever third party beneficiary rights the Claimants may once have enjoyed by virtue of the March 1997 agreement with Elmer Bumbray those rights were revoked once she and Elmer Bumbray rescinded them.  The Debtor by her letters in September and October of 1997 demanding all of the proceeds and Elmer Bumbray by the filing of his complaint against the Debtor in April of 1999 demanding all 84% of the remaining proceeds. [2]

Once the Debtor filed his complaint, although the Debtor and Elmer Bumbray may have disagreed as to which of them was entitled to that percentage of the workers compensation proceeds which the Bankruptcy Court found that they had previously agreed belonged to Elmer Bumbray's siblings there was no question that they did agree that Elmer Bumbray's siblings, including these Claimants no longer had any rights to those proceeds.

> The parties to a contract entered [**9]  into for the benefit of a third person may rescind, vary, or abrogate the contract as they see  [*673]  fit, without the assent of the third person, at any time before the contract is accepted, adopted, or acted

_____

[2] Debtor's counsel misspoke at argument during the Bankruptcy Court's questioning when he stated that only one party was needed to revoke for the recission to be binding but then corrected himself by reading the relevant portion of Fields v Tillreson, *infra* **T, pp 102 – 103.**

upon by him, and such rescission deprives the third person of any rights under or because of such contract.  17A Am. Jur. 2d *Contracts* § 461 (1991). *See also* Restatement (Second) Contracts § 311(2)&(3) (1981) ("(2) . . . the promisor and promisee retain power to discharge or modify the duty by subsequent agreement.

The only distinction between the recession in this case and that in *Fields v. Tillerson* is that the Debtor  and Elmer Bumbray did not rescind the  third party rights in precisely the same manner.  Nonetheless, the evidence is undisputed that both the Debtor and Elmer Bumbray unequivocally rescinded those rights before the siblings ever knew of those rights, much less "accepted, adopted, or acted upon" them. And furthermore, both the Debtor and Elmer Bumbray knew that the other had rescinded those  rights and neither objected or sought to reaffirm those rights but rather pursued their own claims for the proceeds.  The Debtor, by demanding through counsel all of the proceeds, including the siblings' alleged 84% and Elmer Bumbray, through counsel by later suing the Debtor in Superior Court for that same 84%. in his own behalf.

Nonetheless, the Bankruptcy Court found that "However, that decision [Fields v Tillerson] (brackets supplied) refers to the parties to the contract revoking the third party beneficiary contract, and that was not done here" **Bankruptcy Court's Findings T p 118.** However, given the above undisputed evidence, this factual finding by the Bankruptcy Court was clearly erroneous and led to an error of law, namely there was no recission, which was without evidence to support it.

### Debtor's Assertion Of Her Legal Right Of Rescission Is Not Inequitable Conduct

The Bankruptcy Court was obviously troubled by the legal result which flowed from the Debtor's and Elmer Bumbray's exercise of their rights of rescission, namely the revocation of the siblings' third party beneficiary rights.

The Debtor seeks to have the best of all worlds to limit Elmer Bumbray to only 14 percent and for the other parties not to receive anything, the other siblings not to receive anything, and even though the agreement clearly was for her to

receive only 16 percent…That's just not fair and it wasn't the intention of the parties [the Debtor and Elmer Bumbray] (brackets supplied) to revoke any third party agreement that existed. You can't infer that from the fact that the Debtor now says that there is no such agreement that is enforceable, and that Elmer Bumbray took the position that it was all for him.  You can't infer from that that the two parties, Elmer Bumbray and the debtor reached an agreement that they would revoke the third party beneficiary aspects of the contract…. You just can't take the two of those positions and tie them together and come up with a repudiation by the two parties.  That's not what they were doing."" **Bankruptcy Court's Findings T p. 118**

Despite the Bankruptcy Court's discomfort with the legal result, an agreement to rescind based upon the Debtor's and Elmer Bumbray's conduct is precisely what occurred.  How else does one characterize the legal significance of their actions other than a mutual agreement to rescind the siblings' alleged third party beneficiary rights?

The Bankruptcy Court first found that in March of 1997 the Debtor and Elmer Bumbray intended to reach a third party beneficiary agreement in behalf of the siblings by believing the Debtor's testimony and discrediting Elmer Bumbray's testimony.   Then, however the Court found that the Debtor did not intend to rescind the siblings' third party beneficiary rights pursuant to the earlier agreement when in September and October of 1997 she forwarded her letters, by counsel demanding all of the proceeds from Mr. Chasen and The Hartford, including the 84% allegedly claimed by the siblings .  **Testimony of Debtor, T pp 14- 19 and Debtor's exhibits A, B, C and D,** *supra.*   Furthermore, the Court found that Elmer Bumbray did not intend to rescind the siblings' third party beneficiary rights under the earlier agreement when in April of 1999 he filed his complaint demanding all of the 84% of the proceeds for himself. **Testimony of Debtor, T pp 12 -14, 19-20 and Debtor's Exhibit E at ¶13.  Testimony of Elmer Bumbray, T p 74 – 77 and 79 and Debtor's Exhibit E at ¶¶ 15, 21 and 25.**   The testimony of the Debtor and Elmer Bumbray, as well as the Debtor's letters and Bumbray's complaint was the only evidence of their intentions at the bankruptcy hearing and the Bankruptcy

Court found no evidence to the contrary.  Contrary to the Court's findings, the undisputed

evidence indicates a recission and the Court points to, nor is there any evidence to the contrary

which supports its findings.

The contracting parties in *Fields v. Tillerson* reached their agreement to rescind by

praecipe, signed by the contracting parties' counsel whereas the Debtor and Elmer Bumbray

reached their agreement to rescind by a letter and a complaint, respectively signed by their

counsel. What form the agreement takes has no legal significance as to the issue before the court.

What is dispositive is whether there was an agreement to rescind.   And the undisputed evidence

shows that there was.

The Bankruptcy Court's displeasure with the legal result caused by the rescission

apparently caused the Court to resort to perceived equitable reasons to overrule the Debtor's

objections to the claims. The Bankruptcy Court's findings in this regard follow:

> And indeed what happened in the Superior Court was the Debtor took the
> position that Elmer was only entitled to 14 percent, he wasn't entitled to the full
> amount and suing only in his own right, not on behalf of the third party
> beneficiaries, and therefore he ought to be limited to 14 percent and that's what
> the jury concluded.

> It would certainly be a miscarriage of justice for the Debtor now to turn
> around and say that her position in the Superior court should be disregarded and
> she should be treated as having revoked the third party beneficiary status along
> with Elmer Bumbray, who took a position that the third party beneficiary contract
> didn't exit. That's just not an equitable argument. It's distasteful and repugnant to
> the court's sense of equity.  **Bankruptcy Court's Findings, T p. 118**

However, these findings reveal a fundamental misunderstanding of the Debtor's legal

position during the Superior Court trial and a failure to fully appreciate the significance of Elmer

Bumbray's 11th hour legal maneuvering during jury instruction argument before the Superior

Court judge.

In its findings, the Bankruptcy Court suggested that the Debtor took inconsistent positions during the Superior Court trial and during the bankruptcy proceedings.  But the Debtor did not take inconsistent positions before the Superior Court and the Bankruptcy Court, nor did she argue that her position in the Superior Court trial should be disregarded during the bankruptcy proceedings. Rather, the Claimants, by counsel made this argument.

The argument was factually and legally flawed, misstated the record and was misleading to the Court.  So misleading that the Bankruptcy Court adopted the argument in its findings.  The Bankruptcy Court even adopted Claimants' counsel's "turn around" language in its findings.  Here's what the Claimant's counsel argued to the Bankruptcy Court:

> …to allow the Debtor to argue what she argued in the Superior Court that in fact this agreement was not for Mr. Bumbray himself but for Mr. Bumbray and his siblings to then prevail on that argument in terms of the jury verdict form, and now to <u>turn around</u> (emphasis supplied) and say, 'That's not really what I meant,' that is the essence, Your Honor, and we've cited it in our earlier briefs, of judicial estoppel. You can't say one thing in Court today, win, and then say something else tomorrow and try to take the contrary position. **T, pp 111**

From the day she was served with Elmer Bumbray's complaint the Debtor understood that he was willing to lie under oath concerning the terms of the agreement so that he could recover all of the 84% of the Bumbray siblings' proceeds for himself.  Moreover, from that moment, she and Elmer Bumbray were in agreement that the siblings' third party beneficiary rights under the agreement were now rescinded.

Elmer Bumbray's conduct was consistent with his prior conduct in first claiming to be her mother's son and an heir of the estate in order to pursue the claim before the WCC without her and when that failed, also consistent with Elmer Bumbray's misleading her into believing that the workers compensation proceeds belonged to the Bumbray siblings so as to enlist her support in prosecuting the claim for the price of 16% of the proceeds.

The Debtor knew what the terms of the agreement were and she has always been forthright as to what those terms were in every tribunal where these matters have been raised However, she also knew that she had been deceived and misled by Elmer Bumbray and believed that she had viable defenses to his breach of contract suit for those reasons, as well as reasons relating to the terms of the contract.  This is evidenced by the Debtor's answer to the complaint. **Claimant's Exhibit 8.**

. The Debtor did not bring the complaint, Elmer Bumbray did.  She defended based upon the allegations and demands made in the complaint.  The subject of the siblings' third party beneficiary claims was never raised by Elmer Bumbray in the complaint or at any time throughout the Superior Court proceedings, including extensive discovery, motions practice, pretrial or the trial itself.  The complaint in that regard speaks for itself.  Had those issues been raised during Elmer Bumbray's Superior Court case the Debtor would have raised the same defenses she has raised in the bankruptcy proceeding – as she did when the siblings later sued her in Superior Court.

It was only after the trial had concluded that Elmer Bumbray, by counsel unveiled his 11th hour request for a special jury instruction on the basis that Elmer Bumbray was suing in a representative capacity in behalf of himself and his siblings.

A review of the transcript of that discussion reveals the utter shock and surprise which the Debtor's counsel exhibited when confronted with Elmer Bumbray's totally unfair 11th hour special instruction request..  **Claimant's Exhibit 5, pp 59 - 61, 66 - 67.**   It was obvious what Elmer Bumbray was trying to do. Barry Chasen's trial testimony and documents subpoenaed from his office file had corroborated the Debtor's version of the agreement.

Elmer Bumbray saw the writing on the wall.  Given the Debtor's and Mr. Chasen's testimony and the documents, the jury would probably credit the Debtor's version of the agreement, and the Debtor's testimony concerning Elmer Bumbray's deceptions.  Elmer Bumbray ran the risk of a defense verdict unless he could salvage his credibility by convincing the trial judge to instruct the jury that he was championing his siblings interests by suing in a representative capacity in behalf of himself and his siblings. If the jury did not find for himself and all of his siblings, perhaps they would at least award him a compromise verdict for some portion of the proceeds.

It was Elmer Bumbray who "wanted the best of all worlds" and got them during the Superior Court trial not the Debtor in the bankruptcy proceedings.  Furthermore, if the denial of the Debtor's *res judicata* defense is not overruled before this Court, it will be the Bumbray siblings, including the Claimants who got "the best of both worlds" by having two bites of the apple as to their third party beneficiary claims, first in the Superior Court trial and then in the Bankruptcy Court hearing.

The transcript reveals that the Superior Court  trial judge was confused and troubled by Elmer Bumbray's inconsistent position regarding whom he was representing, himself only or himself and his siblings. **Claimant's Exhibit 5, pp 62, 64, 65.**  Despite the Debtor's counsel's animated and vociferous objections, the trial judge permitted the special instruction and the jury verdict form. The effect of the instruction was to give Elmer Bumbray's siblings an opportunity for a jury verdict in their behalf upon their third party beneficiary claims without giving the Debtor an opportunity to defend those claims with the very defenses which have been raised in the bankruptcy proceeding, including the rescission argument.

24

The tactic was partially successful for Elmer Bumbray. He was denied the 84% which he sought but received a verdict for approximately 14%. However, it's the Debtor's position that the tactic was fatal for his siblings' claims, including the Claimants here, because having been raised by the special jury instruction and verdict form, they are precluded and barred by *res judicata* from relitigating their claims anew here. **Appellant's Brief**, *supra,* **pp 10 - 16**,

At the risk of repetition, it is helpful to focus on two separate parts of the Court's following findings in order to understand the confusion which the Claimants' had sown in the Bankruptcy Court's findings by their counsel's misleading argument.   The first part is in bold.

> **It would certainly be a miscarriage of justice for the Debtor now to turn around and say that her position in the Superior Court should be disregarded** and she should be treated as having revoked the third party beneficiary status along with Elmer Bumbray, who took a position that the third party beneficiary contract didn't exit. That's just not an equitable argument. It's distasteful and repugnant to the court's sense of equity. **Bankruptcy Court's Findings T,  119.**

It was simply incorrect to say and there was no evidence to support the Bankruptcy Court finding that the Debtor was now turning around and saying that her "position in the Superior Court should be disregarded." Her position in the Superior Court trial was that her agreement with Elmer Bumbray was unenforceable.  The jury found otherwise and the Debtor does not dispute that.

Moreover, there is simply nothing inconsistent about her position concerning the defense of Elmer Bumbray's breach of contract claim during the Superior Court trial and the defense of the siblings' third party beneficiary claims during the bankruptcy proceedings.  The claims were different and they required different defenses.  The Debtor did not repudiate the original agreement in either forum.  She testified truthfully what it was and the Bankruptcy Court found that the siblings were third party beneficiaries on that basis.

The Debtor never had an opportunity to present her defenses to the siblings' third party beneficiary claims in the Superior Court case because they were never at issue until Elmer Bumbray put them at issue after the trial was over during jury instruction argument. All that the Superior Court trial established was that the Debtor had an agreement with Elmer Bumbray for some portion of the proceeds. There were no findings in behalf of the siblings. When the siblings later sued the Debtor in Superior Court and these two Claimants sued her in the Bankruptcy Court, the Debtor raised her defenses to their claims, as was her right, including the statute of limitations, *res judicata,* whether they were intended third party beneficiaries and whether their third party beneficiary rights were rescinded by the subsequent actions of Elmer Bumbray and the Debtor.

The Court second part of this portion of the Court's findings follows, again in bold.

It would certainly be a miscarriage of justice for the Debtor now to turn around and say that her position in the Superior Court should be disregarded and **she should be treated as having revoked the third party beneficiary status along with Elmer Bumbray, who took a position that the third party beneficiary contract didn't exit.** That's just not an equitable argument. It's distasteful and repugnant to the court's sense of equity. **Bankruptcy Court's Findings, T pp 119.**

The Bankruptcy Court appears to be saying that because Elmer Bumbray took the position that the third party beneficiary contract didn't exist that the Debtor and Elmer Bumbray were incapable of reaching an agreement to rescind it. That clearly was Elmer Bumbray's position in both the Superior Court trial and his testimony during the bankruptcy hearing, but the Bankruptcy Court discredited his testimony, credited the Debtor's testimony and found that the agreement was indeed a third party beneficiary contract. Having so found, the Debtors' letters and Elmer Bumbray's complaint were an agreement to revoke the third party beneficiary rights and the Debtor was entitled to and did raise her that defense to the third parry beneficiary claims.

It was an error of law, plainly wrong and without supporting evidence for the Bankruptcy Court to characterize the Debtor's assertion of these defenses in the bankruptcy proceeding as a "miscarriage of justice…distasteful and repugnant to the court's sense of equity." It was further error to use those characterizations as an equitable basis for overruling the Debtor's objections to the claims.

Furthermore, in finding the Debtor's conduct unjust or inequitable, the Bankruptcy Court erred in failing to consider or make any findings concerning the following undisputed facts which were in evidence, **Appellant's Brief, Statement of the Facts,** *supra* **at pp 4 - 11.**

The evidence showed that the Debtor's agreement with Mr. Bumbray that he could pursue the workers compensation claim in behalf of the Bumbray siblings was based upon her mistaken belief that the estate was not entitled to the proceeds because of The Hartford's 1990 letter of denial of further benefits.  The Debtor was mislead by the insurance company. Certainly that was not inequitable conduct on the Debtor's part..

At the time of the original agreement with Mr. Bumbray in 1995, the Debtor reasoned that if her mother's estate was not entitled to the proceeds perhaps the children of the deceased worker might be and she chose not to deny them the opportunity to pursue the claim if they were entitled to it and the estate was not.   Such conduct on the Debtor's part is hardly inequitable.

Unknown to both the Debtor and Mr. Bumbray in 1995, Mr. Bumbray and his siblings were not entitled to the proceeds and therefore the Debtor and Elmer Bumbray were not only mutually mistaken as to a material term of the agreement, a material condition of the agreement failed.  Mr. Bumbray testified that after his original agreement with the Debtor in 1995 he later retained Barry Chasen in 1996 to investigate the claim to the workers compensation proceeds. Mr. Bumbray learned from Chasen that yes, the claim was viable and it belonged to the estate.

Elmer Bumbray then hatched his scheme to collect the proceeds.  He admitted during cross examination that he told Mr. Chasen he was the son of Henrietta Duvall and on the strength of that deception Mr. Bumbray not only misled Mr. Chasen who thought he was an heir of Henrietta Duvall but further misled the Workers Compensation Commission when he tried to proceed before the WCC on that basis.  Mr. Bumbray further testified that this effort failed because the WCC rightly required not an heir of Henrietta Duvall but the personal representative of her estate to pursue the claim and Mr. Bumbray, of course was not the personal representative - the Debtor was.

Mr. Bumbray figured that if he could only convince the Debtor to resign as personal representative and have himself appointed by falsely claiming to be Henrietta Duvall's son and heir then he could pursue the claim and control the proceeds.  Both Mr. Bumbray and the Debtor testified that Mr. Bumbray asked the Debtor to come to Mr. Chasen's office where she was asked to resign as personal representative of her mother's estate.  During cross examination, Mr. Bumbray admitted that he had already signed, under oath a petition for probate wherein he claimed to be the son and an heir of the decedent when in fact he was not.

When the Debtor refused to resign as personal representative of her mother's estate Mr. Bumbray knew that he could not proceed without her.  Mr. Bumbray then came up with another idea.  He offered the Debtor 16% of the proceeds in consideration for  prosecuting the claim. Mr. Bumbray convinced the Debtor to meet with him once again in Mr. Chasen's office.  It was at this meeting that she agreed to what she thought was an amendment of the original agreement.

However, what Mr. Bumbray and Mr. Chasen knew, but the Debtor did not was that the estate was entitled to all of the proceeds.  Had she known this she would have understood that as sole heir of her mother's estate, she would have been entitled to all of the proceeds.  Her lack of

knowledge is evidenced by common sense.  Why would the Debtor have agreed to 16% of the proceeds if she was entitled to 100%?  And what only Mr. Bumbray knew was that he intended to keep all 84% of the remaining proceeds for himself.  Clearly there is nothing inequitable about the Debtor's conduct or her mistaken belief – especially in light of Mr. Bumbray 's continuing deceptions.

Both Elmer Bumbray and the Debtor testified that at the March 1997 meeting, Mr. Chasen was retained by the Debtor in order to prosecute the claim.   What Mr. Chasen didn't know was that Henrietta Duvall had only one child, the Debtor and as such, she was the sole heir of the estate.  What the Debtor didn't know was that as sole heir of the estate she was entitled to all of the proceeds and Mr. Bumbray and his siblings were entitled to nothing.  Mr. Bumbray had successfully deceived both Mr. Chasen and the Debtor.[3]   The only inequitable conduct here was Mr. Bumbray's not the Debtor's.

When the checks came in after the successful workers compensation hearing in July of 1997 Mr. Bumbray testified that he and Mr. Chasen met at Mr. Chasen's office without the Debtor to discuss the case.  While it is professionally problematic that Mr. Chasen would have this meeting without the Debtor or any of the other siblings, Mr. Chasen had never communicated with Mr. Bumbray's siblings, much less met them, as evidenced by the claimants' testimony that they first learned of their alleged rights from Mr. Shurburg, after the July 2001 trial.  When the checks were delivered, Mr. Chasen still believed that he was dealing with seven brothers and sisters because he was unaware of Elmer Bumbray's deceptions, including his intention to keep all of the remaining proceeds for himself.

---

[3]   The details of Mr. Bumbray's deceptions only emerged during extensive discovery, including document production and depositions of Mr. Bumbray, Mr. Chasen and Mr. Chasen's staff in the Superior Court case.  The Debtor thought that Mr. Chasen was part of the scheme, but it turned out that he too had been deceived by Mr. Bumbray and the Debtor's third party complaint against Mr. Chasen was dismissed.

Matters came to a head in August of 1997 when the Debtor was asked by Mr. Chasen to come to his office and sign the proceeds checks so they could be deposited into his account. Why were the checks payable to the personal representative when the Debtor understood that she, individually and the siblings, not the estate were entitled to the proceeds? And if payable to the personal representative, why were the checks not being deposited into an estate account?

The Debtor testified that she became suspicious and retained the services of independent counsel in September of 1997. It was only then that she learned that all of the proceeds belonged to the estate. The Debtor felt angry, used and betrayed. She had given Mr. Bumbray an opportunity to pursue the claim if it did not belong to the estate and in return, he deceived her and betrayed her trust.. On the advice of counsel, the Debtor promptly demanded all of the proceeds checks for payments in arrears from Mr. Chasen and all future payments from The Hartford. Having been deceived by Mr. Bumbray and now being suspicious of Mr. Chasen's motives as well, the Debtor asserted her own and the estate's rights to the proceeds and rescinded any third party rights to the proceeds which the siblings may have enjoyed.

In considering the equities of this case, it is important to view the continuum of events through the prism of 17 years of unfolding facts and circumstances as the Debtor understood them at the time. These events began in 1990 with The Hartford's letter falsely informing her that her mother's annuity was terminated. They continued in 1995 with her agreement with Mr. Bumbray which was caused by that misinformation. The events continued throughout 1996 and 1997 when the Debtor was unrepresented by counsel and Elmer Bumbray was represented by counsel, at a time when he and his counsel knew that the workers compensation proceeds belonged to the estate and the Debtor did not. Throughout this period of time, Elmer Bumbray had superior knowledge and deliberately misled both his own lawyer and the Debtor in his

efforts to collect all 84% of the proceeds for himself by first seeking the Debtor's resignation as personal representative of her mother's estate and failing that, soliciting her cooperation by offering his own lawyer as her counsel and then by offering 16% of the proceeds when he knew the estate and ultimately, the Debtor, as sole heir of the estate was entitled to all 84% of the remaining proceeds. Elmer Bumbray's deception continued until the Debtor finally retained independent counsel and was fully informed of her rights in September of 1997.

By the time the Debtor demanded the proceeds from Mr. Chasen in September of 1997, the WCC hearing proved that the insurance carrier had misled her. She also now knew that she had been deceived by Mr. Bumbray. Furthermore, she was suspicious of Mr. Chasen's involvement in Mr. Bumbray's scheme. Who wouldn't be? First Mr. Chasen had been Mr. Bumbray's lawyer, then he became her lawyer. Why hadn't Mr. Chasen advised her of her own and the estate's rights and explained the impossible conflict of interest in which he found himself. Given this conflict, why hadn't Mr. Chasen advised her to seek the advice of independent counsel? Why did Mr. Chasen ask her to deposit the proceeds checks into his escrow account when he knew the proceeds belonged to the estate? And once she retained independent counsel, why wouldn't Mr. Chasen promptly respond to her requests for first information and then the checks themselves, which she now knew belonged to the estate? Why was it inequitable for the Debtor to assert her rights against Mr. Bumbray and his siblings under these circumstances? She did what any reasonable person would do.

All of the above was undisputed evidence at the bankruptcy hearing, either testimonial or through pleadings and discovery documents. The Claimants had every opportunity to rebut this evidence but did not. They even called Elmer Bumbray as a witness during their case in chief and had every opportunity to rebut these facts through his testimony but did not. Perhaps the

Debtor was naïve and foolish in trusting Elmer Bumbray and Mr. Chasen, but based upon the undisputed evidence established at the bankruptcy claims hearing, there is simply no basis for finding the Debtor's conduct inequitable. Surely, asserting her rights, by counsel based upon the circumstances confronting the Debtor in September of 1997 is hardly inequitable, nor was it inequitable to asserting her defenses, including her rescission defense in the bankruptcy proceeding.

In its findings, the Bankruptcy Court did not consider any of above undisputed facts and they demonstrate that the Debtor's conduct was not inequitable, unfair or unjust.

While there was no evidence that the Claimants were aware of Mr. Bumbray's deceptive conduct or participated in it, it is hardly equitable that they profit from his conduct at the Debtor's expense, especially when they neither knew of the creation of their status as third party beneficiaries or the recision of that status and despite that lack of knowledge, were nonetheless given an opportunity to share in the proceeds, had the jury found in their favor in Elmer Bumbray's Superior Court case.

But there can be no question about Mr. Bumbray's inequitable conduct.  Indeed, it was his conduct which ultimately caused his siblings' loss.  Pursuant to the Court's findings regarding the agreement,  Bumbray and his siblings were to equally share 84% of the proceeds. Assuming Bumbray ever intended to share the proceeds with his siblings, had Mr. Bumbray honored the agreement, he would not have rescinded his siblings' rights as he did when he claimed all of their proceeds for himself.

The Debtor had good reason to rescind.  She had been systematically deceived by Elmer Bumbray, now distrusted Mr. Chasen and now knew the proceeds did indeed belong to her as personal representative of her mother's estate.   Again, assuming he ever intended to share the

32

proceeds and although he had the absolute right to do so, Mr. Bumbray had no good reason to rescind except that he wanted to cut his brothers and sisters out of any recovery.

Why should the Claimants' brother's inequitable conduct be laid at the Debtor's doorstep when all the Debtor did was assert her legal rights and defenses as the deceptions and deceit of Elmer Bumbray unfolded through investigation and litigation?   It was Elmer Bumbray who filed suit for all 84% of the siblings' alleged proceeds and thereby rescinded his agreement with the Debtor regarding the siblings' third party claims.  And it was Elmer Bumbray who fatally prejudiced his siblings' claims by trying to have it both ways when he argued that the jury in the Superior Court case could find that he either brought the complaint in his own behalf or in behalf of his siblings

And Elmer Bumbray's counsel is also now the Claimants' counsel, Jonathan Shurburg, who was on notice and understood full well the nature and extent of Elmer Bumbray's deceptions and bad faith because the documentary evidence and testimony in that regard during the depositions and trial in the Superior Court case was and continues to be unequivocal and unrebutted.

Upon this record, it was clearly erroneous for the Bankruptcy Court to find the Debtor's conduct inequitable because she asserted her right to rescind the Claimants' third party beneficiary rights or defended herself at the bankruptcy claims hearing with the rescission defense or any other defense.  It was further error to make such findings without considering and making findings concerning the inequitable nature of Elmer Bumbray's conduct in this matter and to what extent that conduct caused the Court's perception of the Debtor's conduct as being inequitable.

The fact that the Superior Court jury rejected the Claimants' third party beneficiary claims and that Elmer Bumbray and the Debtor rescinded the Claimants' third party beneficiary status are not sufficient reasons for the Bankruptcy Court to overrule the Debtor's Objections to the Claimants' claims. Indeed, they are the very reasons why the Objections should be sustained.

### CONCLUSION

Based on the foregoing, Appellees were not entitled to judgment upon their claims and the Bankruptcy Court erred in overruling the Debtor's objections to the claims and entering judgment. Appellant respectfully asks this Court, as a matter of law to reverse the Bankruptcy Court's entry of judgment for Appellees, sustain the Debtor's objections and dismiss the claims. In the alternative, Appellant asks this Court to remand this case to the Bankruptcy Court for further proceedings consistent with such an Order.

July 12, 2007                           Respectfully submitted,


                                        */s/ Paul M. Toulouse*
                                        Paul M. Toulouse  205526
                                        1320 19th Street, N.W.
                                        Suite 202
                                        Washington, D.C.  20036
                                        (202) 347-4020


                                        */s/ Joseph M. Goldberg*
                                        Joseph M. Goldberg (337766)
                                        1115 Massachusetts Ave., NW
                                        Washington, DC 20005
                                        (202) 638-0606

                                        Attorneys for Appellant

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing Appellant's Brief was mailed, postage

prepaid or sent via ECF this 12th day of July, 2007  to:

 Jonathan S. Shurberg, Esquire
 8720 Georgia Avenue, Suite 700
 Silver Spring, MD 20910


*/s/ Paul M. Toulouse*
Paul M. Toulouse

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - -x
In Re:                      :
                            :
    JEANNE A. DUVALL        :
                            :
        Debtor             : Case No. 04-01519
                            :
        (Chapter 7 ) :
                            : Washington, D.C.
- - - - - - - - - - - - - -x May 25, 2006
```

TRANSCRIPT OF HEARING ON OBJECTION
TO CLAIMS 1 AND 2
BEFORE THE HONORABLE S. MARTIN TEEL, JR.
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

On behalf of the Debtor:

PAUL M. TOULOUSE, ESQ.

On behalf of Claimants:

JONATHAN SHURBERG, ESQ.

Proceedings recorded by the Court, transcript produced
By Pro-Typists, Inc., 1012-14th Street, N.W., Suite 307,
Washington, D.C. 20005, 202-347-5395, www.pro-typists.com
B1227C/bf

# C O N T E N T S

## W I T N E S S E S

| **Debtor's** | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Jeanne Duvall | 5 | 21 | -- | 87 |
| **Claimants'** | | | | |
| Kevin Bumbray | 37 | 44 | -- | -- |
| Sharon Bumbray Watts | 49 | 57 | 59 | 60 |
| Elmer Bumbray | 64 | 76 | -- | -- |

- - -

**E X H I B I T S**

| Debtor's | ID'd | Received |
|----------|------|----------|
| A | 16 | 37 |
| B | 17 | 37 |
| C | 18 | 37 |
| D | 17 | 37 |
| E | 19 | 37 |
| F | 20 | 37 |

| Claimants' | | |
|----------|------|----------|
| 1 | 34 | -- |
| 2 | 71 | -- |
| 3 | 71 | -- |
| 5 | -- | 94 |
| 6 | -- | 94, 97 |
| 7 | -- | 94 |
| 8 | -- | 88 |
| 9 | -- | 88 |
| 11 | -- | 88 |

- - -

4

1    **P R O C E E D I N G S**

2              THE CLERK:  Next case will be Case 04-1519,

3    Jeanne A. Duvall.  Matter before the Court is an objection

4    to Claim of Kevin Bumbray, filed by Jeanne Duvall, and

5    objection to the claim of Sharon B. Watts, filed by Jeanne

6    Duvall.

7              The parties would please come forward and state

8    your names for appearance.

9              MR. TOULOUSE:  Paul Toulouse, attorney for Debtor

10   Jeanne Duvall.

11             MR. SHURBERG:  Good morning, Your Honor.

12   Jonathan Shurberg on behalf of the Claimants Kevin Bumbray

13   and Sharon Bumbray Watts.

14             MS. DUVALL:  Jeanne Duvall.

15             THE COURT:  Your clients don't have to state

16   their appearances, thank you.

17             Mr. Toulouse, you're pursuing the objection on

18   behalf of your client.  I'll hear your evidence.

19             MR. TOULOUSE:  Very well, Your Honor.  At this

20   time I call Jeanne Duvall to the stand, Your Honor.

21   JEANNE DUVALL WAS SWORN AND TESTIFIED AS FOLLOWS:

22             THE CLERK:  Please be seated, then state your

23   name.

24             THE WITNESS:  Jeanne Duvall.

25             MR. TOULOUSE:  Your Honor, before I get started,

5

1    I have copies of my exhibits for the Court.  Would you

2    prefer to see them now?

3              THE COURT:  Sure.

4              THE CLERK:  Do you have a list, Mr. Toulouse,

5    for me?

6              MR. TOULOUSE:  I do.

7                        **DIRECT EXAMINATION**

8    BY MR. TOULOUSE:

9        Q    Good morning, Ms. Duvall.

10       A    Good morning.

11       Q    Would you please state your name?

12       A    Jeanne A. Duvall.

13       Q    And your address?

14       A    2615 Newton Street, Northeast, Washington, D.C.,

15   20018.

16       Q    Who is Edward Bumbray?

17       A    My stepfather.

18       Q    And he's deceased, is he not?

19       A    Correct.

20       Q    When did he die?

21       A    Twenty-six years ago, in 1980.

22       Q    And did he die in a work-related accident?

23       A    Yes.

24       Q    Who is Henrietta Duvall?

25       A    My mother.

```
 1        Q    Was she marred to Edward Bumbray when he died?

 2        A    Yes.

 3        Q    After Edward Bumbray's death, did your mother

 4   begin to receive a monthly workers compensation annuity of

 5   $1200.00 per month?

 6        A    Yes.

 7        Q    And how long did she receive that annuity?

 8        A    Ten years, I believe.

 9        Q    And is she now deceased?

10        A    Yes.

11        Q    When did she die?

12        A    In 1990.

13        Q    And at that time were you your mother's sole

14   heir?

15        A    Yes.

16        Q    Were you appointed personal representative of

17   her estate?

18        A    Yes.

19        Q    Did you, at that time, receive any communications

20   from the insurance company that had been paying the workers

21   compensation annuity to your mother?

22        A    Yes.

23        Q    What was the substance of that communication?

24        A    The letter said --

25             MR. SHURBERG:  Objection.
```

7

```
 1              THE WITNESS:  That upon my mother's death --
 2              THE COURT:  What's the objection, Mr. Shurberg?
 3              MR. SHURBERG:  Your Honor, if she's going to talk
 4    about the substance of the communication, I think that
 5    that's hearsay.
 6              THE COURT:  Overruled.
 7              THE WITNESS:  The letter said that upon my
 8    mother's death there would be no more checks coming.
 9    BY MR. TOULOUSE: (Resuming)
10         Q    Who is Elmer Bumbray?
11         A    My stepbrother.
12         Q    Is he a child of Edward Bumbray?
13         A    Yes.
14         Q    Did there come a time in 1995 when Elmer Bumbray
15    approached you and asked what was going on with the workers
16    comp annuity?
17         A    Yes.
18         Q    And what did you tell him?
19         A    And I told him that -- what the letter said,
20    that there was no more money, that they cut it out upon my
21    mother's death.  And that if he wanted to pursue it, he
22    could.
23         Q    Did he ask to pursue it?
24         A    Yes.
25         Q    Was he of the view that the payment or the
```

1    annuity could be paid to him as a child of Edward?

2            MR. SHURBERG:  [Not on microphone]  Objection,

3    Your Honor.  As to what Mr. Bumbray's views were.

4            THE WITNESS:  Yes.

5            MR. SHURBERG:  And if I could be heard briefly at

6    the bench at this point?  Because I think we're beginning

7    to rehash matters that were litigated in the Superior Court

8    and resulted in a judgment in favor of Mr. Bumbray, and I

9    would obviously propose we not do that.

10           THE COURT:  Overruled.  I'm not going to receive

11   it for the truth of what he said, but for the purposes of

12   understanding how the litigation ensued.  It seems to me

13   it's necessary background.

14           Go ahead.  Ask the question again, Mr. Toulouse.

15   BY MR. TOULOUSE: (Resuming)

16       Q    Ms. Duvall, was Mr. Bumbray -- based on your

17   conversations with him at that time, in 1995, was he of

18   the view that the workers comp payments might belong to him

19   as a child of Edward Bumbray?

20       A    Yes.  Well, he and Kevin were both named in the

21   original suit, so I believe that he thought that they could

22   probably pursue something.

23       Q    Did there come a time in late 1996 when

24   Mr. Bumbray asked you to come to his lawyer's office?

25       A    Yes.

1    Q    Who was Mr. Bumbray's lawyer at that time?

2    A    Barry Chasen.

3    Q    Did you go to that meeting?

4    A    Yes.

5    Q    Who was at the meeting?

6    A    Me, Elmer and Barry Chasen.

7    Q    Was there a discussion about the workers

8    compensation payment in arrears that had stopped after

9    your mother's death at that meeting?

10    A    Yes.

11    Q    Did you discuss the letter that you had received

12    from the insurance company?

13    A    Yes.

14    Q    At that meeting, were you told about who the

15    payments in arrears belonged to?

16    A    Yes.

17    Q    And what were you told?

18    A    I was told that they belonged to Elmer.

19         THE COURT:  Who told you that?

20         THE WITNESS:  Barry Chasen.

21         MR. SHURBERG:  Your Honor, if I may, just for

22    purposes of the record.  I understand Your Honor's ruling.

23    We're now going deeper into matters which were litigated in

24    the Superior Court as far as certain allegations that were

25    raised by Ms. Duvall as to whether she was properly advised

1  and all sorts of things; those resulted in a judgment.

2  I understand Your Honor wants background, and I think that

3  that is appropriate.  But now we're moving into allegations

4  as to what Mr. Chasen did or didn't do, properly or

5  improperly, and those matters were all aired fully, and I

6  think we want -- if we want to do background I think that's

7  fine, but if we're going to rehash the whole case we could

8  be here for the next several days.  The trial lasted five

9  days.

10          THE COURT:  I'll receive it into evidence, but

11  not for the truth.

12  BY MR. TOULOUSE: (Resuming)

13      Q    Ms. Duvall, at that meeting in Mr. Chasen's

14  office were you asked to resign as personal representative

15  of your mother's estate?

16      A    Yes.

17      Q    And was the purpose of that so that Mr. Bumbray

18  could be appointed in your stead?

19      A    Yes.

20      Q    Did you resign?

21      A    No.

22      Q    What was your understanding of why you were asked

23  to resign as personal representative?

24      A    So that he could pursue getting the funds.  I

25  wasn't really sure what was going on.

1    Q    What were you told would happen if you did not

2  resign as personal representative?

3    A    That I --

4             MR. SHURBERG:  Objection.

5             THE WITNESS:  -- that I would lose my house.

6             MR. SHURBERG:  Your Honor, just so I don't keep

7  interrupting, if I can just place a continuing objection on

8  the record to what other people told her.  I understand

9  Your Honor's earlier statement, just so the record is

10  clear, placing a continuing objection as to what others

11  told her and to matters that were litigated in the Superior

12  Court and that resulted in a judgment in favor of

13  Mr. Bumbray.  Because I don't want to keep interrupting.

14             THE COURT:  The objection is overruled, but it's

15  not being received for the truth of the contents.

16  BY MR. TOULOUSE: (Resuming)

17    Q    Did a period of time go by during which you had

18  no further communications with Mr. Bumbray?

19    A    Yes.

20    Q    Did he later, after that meeting in late 1996,

21  in Mr. Chasen's office, later get in touch with you --

22  Mr. Bumbray, that is?

23    A    Yes.

24    Q    And what did he want?

25    A    Me to sign some papers.  I guess to sign the

1    papers over as personal representative.

2        Q    Did you sign those papers withdrawing as personal

3    representative?

4        A    No.

5        Q    Did he, Mr. Bumbray, ask you to attend another

6    meeting in Mr. Chasen's office?

7        A    Yes.

8        Q    Was that meeting some time in March of 1997?

9        A    I believe so, yes.

10       Q    At that time, who attended that meeting?

11       A    Me, Elmer and Barry Chasen.

12       Q    When you walked through the door of Mr. Chasen's

13   office for that meeting, who did Mr. Chasen represent?

14       A    Elmer.

15            MR. SHURBERG:  Objection as to who -- that's a

16   legal conclusion.

17            THE WITNESS:  Elmer.

18   BY MR. TOULOUSE: (Resuming)

19       Q    At that time --

20            THE COURT:  Just -- I haven't ruled on the

21   objection yet, counsel.

22            MR. TOULOUSE:  Forgive me.

23            THE COURT:  Lay the foundation.  The objection's

24   sustained.

25   BY MR. TOULOUSE: (Resuming)

1      Q    Ms. Duvall, when you walked through the door of

2  Mr. Chasen's office at the time of that meeting in March

3  of 1997, did Mr. Chasen represent you?

4      A    No.

5      Q    Was it your understanding that he represented

6  Mr. Bumbray?

7      A    Yes.

8      Q    At that time was it still your understanding

9  that the workers comp proceeds and arrears belonged to

10  Mr. Bumbray and the siblings?

11      A    Yes.

12      Q    Did Mr. Bumbray make an offer to you at that

13  meeting?

14      A    Yes.

15      Q    And what was his offer?

16      A    Sixteen percent and 94 percent.  For him,

17  16 percent for me.

18      Q    What percent for you and what --

19      A    Sixteen, 94.

20      Q    Ninety-four?

21      A    Yes.

22      Q    I'd ask you to think about the arithmetic.

23      A    Hmm?  Sixteen -- I mean, oh.  Eighty-four.

24      Q    Thank you.  And why were you now offered

25  16 percent of the workers comp proceeds?

1           MR. SHURBERG:  Objection as to what the reason

2    was that somebody else made her an offer.

3           THE COURT:  Sustained.

4    BY MR. TOULOUSE: (Resuming)

5      Q    What was your understanding of why you were

6    offered 16 percent of the proceeds?

7           THE COURT:  Same ruling.  You can ask her what

8    was said, but I don't think you can ask her what she

9    understood.

10   BY MR. TOULOUSE: (Resuming)

11     Q    What were you asked to do at that meeting?  In

12   terms of the workers compensation proceeds proceeding?

13     A    To represent my mother's estate.

14     Q    All right.  And who represented you in that

15   matter?

16     A    Barry Chasen.

17     Q    Did Mr. Chasen bring the claim in behalf of the

18   estate?

19     A    Yes.

20     Q    And was there a hearing before the Workers Comp

21   Commission?

22     A    Yes.

23     Q    That was in the summer of 1997?

24     A    Yes.

25     Q    Was the claim successful?

15

1    A    Yes.

2    Q    Did there come a time in August of 1997 when

3    Mr. Chasen asked you to come to his office?

4    A    Yes.

5    Q    For what purpose?

6    A    To sign some checks.

7    Q    Were these checks from the workers compensation

8    proceeds?

9    A    Yes.

10    Q    And what was your understanding of what was going

11    to happen to those checks?

12    A    That Barry Chasen was going to take the checks

13    and put them into an account.

14    Q    Did you go to Mr. Chasen's office?

15    A    No.

16    Q    Why not?

17    A    Because it started occurring to me that -- why he

18    wanted me to sign the checks, and so I made some phone

19    calls and was advised not to do it.

20    Q    Did you call me?

21    A    Yes.

22    Q    And what did you learn from me?

23    A    That I shouldn't sign the checks and that --

24    I'm not exactly sure that, that I could -- that the money

25    belonged to me, and that I needed to come and see you so we

1   could talk about it.

2        Q    When you say "belong to you," do you mean you,

3   Jeanne Duvall, or you, personal representative of your

4   mother's estate?

5        A    Personal representative.

6        Q    Did you, in September of 1997, instruct me to

7   demand from Mr. Chasen all the workers compensation

8   proceeds --

9        A    Yes.

10        Q    -- checks in arrears -- let me finish.

11        A    Oh, I'm sorry.

12        Q    The proceeds checks in arrears?

13        A    Yes.

14                          (Whereupon, Debtor's Exhibit A

15                           was identified.)

16   BY MR. TOULOUSE: (Resuming)

17        Q    I show you what has been marked as Defendant's

18   Exhibit A for identification and if you can identify this.

19        A    This is a letter --

20        Q    First of all, can you identify it?

21        A    Yes.

22        Q    And what is it?

23        A    It's a letter to Barry Chasen from you.

24        Q    What's the date of the letter?

25        A    September 25th, 1997.

17

1    Q    Did Mr. Chasen send me the workers comp proceeds

2  checks?

3    A    No.  Not right away.

4                              (Whereupon, Debtor's Exhibit B

5                                was identified.)

6  BY MR. TOULOUSE: (Resuming)

7    Q    I show you what's been marked as Exhibit B for

8  identification, and ask if you can identify this exhibit.

9    A    Yes.

10   Q    What is that?

11   A    It's another letter from you to Barry Chasen.

12   Q    And what's the date of the letter?

13   A    October 1st, 1997.

14   Q    Did Mr. Chasen comply with the demand in that

15  letter that the checks be forwarded to me?

16   A    I don't believe so.

17                              (Whereupon, Debtor's Exhibit D

18                                was identified.)

19  BY MR. TOULOUSE: (Resuming)

20   Q    I show you what's been marked as Debtor's D for

21  identification, and ask if you can identify this.

22   A    This is a letter from --

23   Q    Can you identify it?

24   A    Yes.

25   Q    What is it?

1      A     It's a letter from me to Barry Chasen.

2      Q     And what are you asking him to do?

3      A     I'm asking him -- that I'm firing him, basically,

4    and I'm asking him to deliver my legal file to you.

5      Q     You know if he did that?

6      A     Eventually.

7                              (Whereupon, Debtor's Exhibit C

8                               was identified.)

9    BY MR. TOULOUSE: (Resuming)

10     Q     I show you what's been marked Debtor's Exhibit C

11   for identification, and ask you if you can identify this

12   document.

13     A     Yes.

14     Q     What's that?

15     A     This is a letter from a Mr. Miller from you.

16   And it's stating -- it's to the Hartford.

17     Q     That's the insurance company?

18     A     Yes.

19     Q     That's the carrier that was paying the workers

20   comp proceeds?

21     A     Correct.

22     Q     Were the proceeds checks finally delivered to

23   my office?

24     A     Yes.

25     Q     And to whom were those checks payable?

```
 1        A     To my mother's estate.

 2        Q     And where did you deposit those checks?

 3        A     In Riggs Bank.

 4        Q     And did you open a separate account for them?

 5        A     Yes.

 6        Q     Was it an estate account?

 7        A     Yes.

 8        Q     Did you receive subsequent checks from the

 9   Hartford?

10        A     Yes.

11        Q     Where did you deposit those?

12        A     In the estate account.

13        Q     Did you deposit all sums received from the

14   Hartford in the estate account?

15        A     Yes.

16        Q     Did Mr. Elmer Bumbray subsequently sue you for

17   the workers compensation proceeds which you received from

18   Mr. Chasen and the insurance company?

19        A     Yes.

20                         (Whereupon, Debtor's Exhibit E

21                          was identified.)

22   BY MR. TOULOUSE: (Resuming)

23        Q     I show you what's been marked as Debtor's

24   Exhibit E for identification, and ask you if you can

25   identify this.
```

1    A    Yes.

2    Q    What is that?

3    A    It's a complaint for damages, for Elmer versus

4  me.

5    Q    That's his lawsuit against you.

6    A    Yes.

7    Q    In that suit, did Mr. Bumbray claim that all the

8  workers compensation proceeds which you had received from

9  Mr. Bumbray -- strike that -- from Mr. Chasen and the

10  insurance company belonged to Mr. Elmer Bumbray alone?

11    A    Yes.

12    Q    Did there come a time when Mr. Bumbray's

13  siblings, including Kevin and Sharon Bumbray, the Claimants

14  here today, subsequently sued you for their proportionate

15  share of the workers compensation proceeds which you'd

16  received from Mr. Chasen and the insurance company?

17    A    Yes.

18                    (Whereupon, Debtor's Exhibit F

19                     was identified.)

20  BY MR. TOULOUSE: (Resuming)

21    Q    I show you what's been marked as Debtor's

22  Exhibit F for identification.  And ask if you can identify

23  that.

24    A    Yes.

25    Q    What is that?

1      A    It's another complaintant for damages against me

2  from Kevin, Eric, Sanita and Sharon Bumbray.

3      Q    Thank you, Ms. Duvall.

4           MR. TOULOUSE:  I have no further questions of

5  this witness, Your Honor.

6                        **CROSS EXAMINATION**

7  BY MR. SHURBERG:

8      Q    Ms. Duvall, Mr. Bumbray sued you, correct?

9      A    Yes.

10     Q    Okay.  And that case went to trial?

11     A    Yes.

12     Q    In July of 2001?

13     A    Yes.

14     Q    Okay.  And as part of that lawsuit, you claimed

15 that Mr. Bumbray had tricked you into this agreement,

16 correct?

17     A    Correct.

18     Q    Okay.  And that he had lied to you, correct?

19     A    Correct.

20     Q    And he'd done all sorts of things that you

21 considered were improper, is that correct?

22     A    Correct.

23     Q    Okay.  And, but you don't deny that you made the

24 agreement that Elmer, on behalf of his siblings, would get

25 84 percent of the proceeds of the workers comp proceeding,

1   isn't that right?

2        A    I don't disagree.

3        Q    Okay.  You testified to that in your deposition

4   in the earlier case?

5        A    Yes.

6             MR. TOULOUSE:  Your Honor?  Forgive me.  I just

7   noticed that Elmer Bumbray is in the courtroom.  I don't

8   know if he's going to be called as a witness or not, but he

9   certainly wasn't on any witness list.  I'd just like to

10  clarify that.

11            MR. SHURBERG:  Your Honor, he's been here at

12  every time that I've been here, with the one -- in fact,

13  I think he was here the one time I wasn't here.  I've made

14  it clear all along that Mr. Bumbray was going to be a

15  witness in the case.  I'm happy to have him step out at

16  this point, but I think the horse is kind of out of the

17  barn at this point.  But if you want him to step out at

18  this point, I'll be happy to have him do so.

19            THE COURT:  Mr. Bumbray, if you're going to be a

20  witness you'll have to step out of the courtroom and not

21  discuss what's transpired in the proceeding with anybody

22  until you're called as a witness.

23            MR. BUMBRAY:  Yes, sir.

24            THE COURT:  Thank you, sir.

25            MR. TOULOUSE:  Thank you, Your Honor.

23

 1 | BY MR. SHURBERG: (Resuming)

 2 |     Q    Now, Ms. Duvall, you testified that there was an

 3 | agreement that you and Elmer came to with Mr. Chasen back

 4 | in March of 1997, correct?

 5 |     A    Correct.

 6 |     Q    And when the jury heard the whole case, back in

 7 | 2001, the jury rejected your claims that Mr. Bumbray had

 8 | tricked you and had lied to you --

 9 |          MR. TOULOUSE:  [Not on microphone]  Objection,

10 | Your Honor.

11 | BY MR. SHURBERG: (Resuming)

12 |     Q    -- correct?

13 |          MR. TOULOUSE:  Objection.  It's a legal

14 | conclusion what the jury thought or --

15 |          THE WITNESS:  Yeah, I don't know.

16 |          MR. TOULOUSE:  -- how it thought.  We've got

17 | a judgment.  The judgment speaks for itself.  How can she

18 | know what the jury thought?

19 |          MR. SHURBERG:  Well, Your Honor, my point being,

20 | there were a bunch of affirmative defenses raised and yet

21 | a judgment was -- a verdict was rendered in Mr. Bumbray's

22 | favor as to whether there was a contract, and so I think by

23 | implication the jury rejected the defenses that Ms. Duvall

24 | had raised, and I'm simply asking her factually.  I'm not

25 | asking her for a legal conclusion.  And if you like, I can

1  try and do it a little bit of a different way than that

2  particular question.

3          THE COURT:  Why don't you try a different way.

4          MR. SHURBERG:  Okay.

5  BY MR. SHURBERG: (Resuming)

6      Q    Now, Ms. Duvall, one of the questions the jury

7  was asked was, "Do you find in favor of Mr. Bumbray or

8  Ms. Duvall," correct?

9      A    Uh-huh, correct.

10     Q    Okay.  And who did the jury find in favor of?

11     A    They found in favor of Mr. Bumbray.

12     Q    Okay.  And do you recall that there was another

13  question asked as to whether Mr. Bumbray was acting on his

14  own behalf or whether he was acting on behalf of his

15  siblings in that litigation?

16         MR. TOULOUSE:  Excuse me, Your Honor.  A question

17  asked by who?  I mean --

18  BY MR. SHURBERG: (Resuming)

19     Q    The jury was asked that question.  Do you recall

20  that?

21     A    No.

22     Q    Okay.  Now, you've indicated that you went to see

23  Mr. Toulouse in September of 1997, correct?

24     A    Correct.

25     Q    Okay.  Now, did you tell him about the 84/16

1    agreement that you've just testified to?

2        A    Yes.  I'm sure I did.

3        Q    Okay.  And do you recall Mr. Chasen giving a

4    deposition in the Superior Court case as well?

5        A    Yes.

6        Q    Okay.  And Mr. Chasen was of the view, as well,

7    in his deposition that this agreement was for Mr. Bumbray

8    on behalf of his siblings, wasn't it?

9        A    I don't know --

10            MR. TOULOUSE:  Object.

11            MR. SHURBERG:  Okay.

12            MR. TOULOUSE:  Objection.  He's asking what

13   Mr. Chasen thought the agreement was?

14            MR. SHURBERG:  Well, I'm asking what he testified

15   to, actually.

16            THE WITNESS:  I don't remember what he testified

17   to.

18            THE COURT:  That takes care of that.

19   BY MR. SHURBERG: (Resuming)

20        Q    There you go.  Absolutely.

21            MR. TOULOUSE:  Your Honor, may I be heard on the

22   topic of documents?

23            THE COURT:  Come on up.

24            MR. TOULOUSE:  I deposed the Claimants.

25            THE COURT:  Come up to the microphone, please.

1          MR. TOULOUSE:  I deposed the Claimants.  At that

2    deposition, it was a subpoena, notice of deposition duces

3    tecum.  I asked for any documents that they had which were

4    relevant to this case or that they would introduce at this

5    hearing.  They had no documents.  Mr. Shurberg, on the

6    record, said that the only document that was going to be

7    relevant to this hearing was the famous transcript of the

8    trial that he was going to order, which has never been

9    ordered, and for him -- he's never submitted a witness,

10   either a witness list or an exhibit list, Your Honor.

11         And I see a stack of papers here that are about

12   three inches thick, and under these circumstances, Your

13   Honor, I've never had an opportunity to examine the

14   Claimants about these documents at deposition, and I've

15   never gotten a document exhibit list.

16         So I will simply make a standing objection to

17   these documents, Your Honor, for that purpose -- for that

18   reason.  Thank you.

19         THE COURT:  There was not a request to produce,

20   do I understand that correctly?  There was not a request to

21   produce?

22         MR. TOULOUSE:  It was a --

23         THE COURT:  Subpoena duces tecum, right?

24         MR. TOULOUSE:  It was a notice of deposition

25   duces tecum, and I was told there would be no documents

1  produced.  There would be no documents at trial.  If there

2  were going to be some documents at trial, then he should

3  have brought them, and if he hadn't brought them and he

4  told me that there were going to be some, well, then I

5  could have done my request for production of documents.

6  But none of that happened.

7           And again, as I say, all I was told -- and I've

8  got the transcript -- was that there would be -- I have the

9  deposition transcript, wherein Mr. Shurberg says the only

10  thing -- document would be this famous transcript, which

11  was never ordered.

12           THE COURT:  All right.  Mr. Shurberg?

13           MR. SHURBERG:  Your Honor, two hearings ago we

14  were here before Your Honor -- I believe across the hall,

15  in Courtroom Number 2.  On the morning of the hearing,

16  Ms. Duvall was ill and the case was postponed by consent.

17  At that point in time I handed Mr. Toulouse an entire set

18  of every document I have here.  I had four copies at that

19  time.  I handed him an entire set of those documents.  So

20  for him to stand here now and say to Your Honor that he's

21  never received documents from me is, um, shocking, let's

22  just put it that way.  Because at that hearing -- because

23  we were ready to go that morning, Your Honor may recall

24  Ms. Duvall was ill, I was here, I was prepared, I handed

25  him the exhibits that I was prepared to use.

1          Now, Your Honor, let me represent, as well.

2     These documents are all out of the Superior Court case.

3     These are not documents that are coming out of nowhere.

4     They're documents that are coming out of the underlying

5     litigation.  Virtually all of them were exhibits of one

6     form or another, either in a deposition or at trial or in

7     one form or another were exhibits.  These are not new

8     documents.

9          The one exception, Your Honor, which -- it's not

10    a new document, is when I checked the Court file, just to

11    be complete, when I checked the Court file in the Superior

12    Court case the actual executed verdict sheet is missing.

13    I don't know why, and that's been true for several years

14    now.  I found, in my file, the copy that the Court handed

15    us, Judge Dixon handed us, as a courtesy, and I believe

16    that that would obviously shed some light, because it would

17    -- we do have a portion of the transcript, Your Honor.

18         Mr. Toulouse is wrong in indicating that there's

19    no transcript.  I have a portion of the transcript of some

20    argument before Judge Dixon, which is in the packet of

21    documents here and which was part of the documents that

22    were provided to Mr. Toulouse two hearings ago.  And so

23    none of this should be new to him.

24         As I said, the one other -- the one document,

25    which was the blank verdict sheet, simply augments and

1    illustrates how we get from the argument before Judge Dixon

2    about the issue of Mr. Bumbray acting on his own behalf or

3    on behalf of his siblings, how we get from the argument to

4    the verdict.  I also have a portion of Judge Dixon's

5    instructions to the jury, which again sort of fill out the

6    point.

7              Those documents were all provided to

8    Mr. Toulouse.  I don't recall the date.  I believe it was

9    in March.  When we were -- not the last time we were here,

10   because that's the time that I wasn't here, but the time

11   before that.  I pulled out one copy of everything and I

12   handed them to Mr. Toulouse and I said, "Here are my

13   exhibits."  So -- and again, Your Honor, all the documents

14   are out of the underlying Court file.

15             THE COURT:  Mr. Toulouse?

16             MR. TOULOUSE:  Well, I followed Your Honor's

17   scheduling order.  I submitted a witness list, I submitted

18   document list, I played by the rules that Your Honor has

19   set down.  Mr. Shurberg has chosen not to do that.  It puts

20   the Debtor at a disadvantage.  In the first instance.  I

21   certainly should have had the opportunity to depose these

22   Claimants as to these documents.  Mr. Shurberg was on

23   record that he was not going to submit any documents at

24   this hearing, other than the full transcript.  Those were

25   his words, at the deposition.

1          Now he's changing the rules.  Not only is he not

2    following your scheduling order, he's not produced that

3    transcript, and he's not doing what he said he would do.

4          MR. SHURBERG:  Your Honor, if I might respond to

5    one sentence.  Listen for what Mr. Toulouse did not just

6    say.  He did not deny receipt of the documents from me two

7    hearings ago.  That's all I wanted to say.  Thank you.

8          THE COURT:  The objection's overruled.  The

9    Debtor's attorney proceeded by way of a subpoena duces

10   tecum.  At that time what was produced -- let me ask you,

11   Mr. Shurberg, did you have these documents in your

12   possession when you represented to Mr. Toulouse that all

13   you were going to rely upon was the transcript of the

14   trial?

15         MR. SHURBERG:  Your Honor, that was my intention.

16   I was not able to get the transcript.  As Your Honor

17   recalls, I had real problems getting transcripts on a

18   timely basis.  I asked for assurances that I could it.

19   I didn't get those assurances.  It was going to cost me in

20   the neighborhood of 1500 to 2,000 dollars, and we were, of

21   course, planning on going in March at that point in time,

22   not in May; for various reasons we didn't go forward.  At

23   that time, my intention was to produce the transcript.

24         What I did instead, Your Honor, and I will

25   represent that my file in this case, both this case and the

31

1    Watts litigation and the Bumbray litigation run to about

2    four wide file drawers in my office.  I went through the

3    entire file to find the documents that would make the

4    points that were in the file that would otherwise be made

5    very clearly with a transcript, but because I didn't have

6    the transcript I had to proceed by other means.

7            Had I had the transcript, Your Honor, what I

8    would have done and what we had originally planned to do,

9    was for me to submit a motion with the transcript as an

10   exhibit, and we would then orally argue what the meaning of

11   that transcript was.  Because I was not able to get the

12   assurances that my client's substantial investment in the

13   transcript would be received in time, I then proceeded to

14   cull documents from the file, from the same file that

15   Mr. Toulouse would have had access to.  None of these

16   documents, Your Honor, are new to him.  That's what I did,

17   and I provided all the documents, Your Honor.

18           There's, by my count, about 18 documents.  I'm

19   not even completely sure that I'll use all of them.  Quite

20   frankly, I think Ms. Duvall has conceded certain points of

21   certain of the documents that I might have used, but there

22   are approximately 18 documents that I had prepared to use,

23   that make the points that the transcript would otherwise

24   have made, and that's what I provided to Mr. Toulouse two

25   hearings ago.

1          THE COURT:  The objection's overruled.  There

2    was no request to produce which would have required a

3    seasonable curing of the incomplete representation at the

4    deposition that only the transcript would be relied upon.

5    And the transcript was the subject of discussions back in

6    August of 2005, I believe, when the Court entered its

7    scheduling order, at which time the creditors were of the -

8    - through Mr. Shurberg were of the opinion that they could

9    move for summary judgment.

10          The problem was, they didn't get the transcript

11   that was going to form the basis for that motion for

12   summary judgment.  And obviously, without the transcript,

13   they'd have to rely upon other evidence of what transpired

14   in the proceeding.

15          And Mr. Shurberg changed his intention,

16   understandably since he couldn't get the transcript, and

17   decided to piece it together through documents that had

18   been exhibits in the Superior Court case.  And he handed

19   those to Mr. Toulouse back in March, I believe it was, when

20   Jeanne Duvall was sick.

21          I don't think this has caught the Debtor by

22   surprise, and these are documents that were involved in

23   the Superior Court case.  As I understand it, Mr. Toulouse

24   participated in the Superior Court case, so he's not being

25   caught by surprise as to these documents.  The objection's

1  overruled.

2          THE CLERK:  Mr. Shurberg, do you have a list of

3  the documents that you're going to be using?

4          MR. SHURBERG:  I can -- I don't have a list

5  because I'm not a hundred percent sure I'm going to use all

6  of them.  But I will certainly hand you one that has all

7  the ones that I'm going to use.  Well, I mean, I can go

8  through them now, if you want.

9          THE COURT:  Why don't you do your examination.

10  If you don't have them numbered, we may have to take a

11  recess.

12          MR. SHURBERG:  All right.

13  BY MR. SHURBERG: (Resuming)

14      Q    Well, let me try and do -- Ms. Duvall -- let me

15  just do this one at this point, Your Honor, if I can.

16          MR. TOULOUSE:  Well, Your Honor, before we begin,

17  Mr. Shurberg is going to ask my client about an exhibit to

18  Mr. Chasen's deposition in the prior proceeding in Superior

19  Court.  The only point, Your Honor, forgive me, is your

20  scheduling order required designations of depositions.  And

21  if he was going to do this, I certainly had the right to

22  know what he was going to designate.  So that I could at

23  least _____.

24          THE COURT:  Mr. Shurberg, ask a question, please.

25          MR. SHURBERG:  Thank you, Your Honor.

34

```
 1                    (Whereupon, Claimants' Exhibit 1
 2                    was marked for identification.)
 3   BY MR. SHURBERG: (Resuming)
 4       Q    Ma'am, I'm showing you what the Clerk has marked
 5   as Plaintiff's -- or, Creditors' Exhibit Number 1.  Can you
 6   take a look at the first paragraph of that document?
 7       A    Yes.
 8       Q    Have you ever seen that document before?
 9       A    No.
10       Q    What does it say at the top.  It says "Law
11   Offices --"
12            MR. TOULOUSE:  Objection.  It speaks -- it speaks
13   for itself.
14            THE COURT:  Sustained.
15            MR.        :  It's going (inaudible).
16            THE COURT:  She can't read from a document that's
17   not in evidence, Mr. Shurberg.
18            MR. SHURBERG:  Certainly, Your Honor.
19   BY MR. SHURBERG: (Resuming)
20       Q    Ms. Duvall, considering that the jury rendered
21   a verdict in Mr. Bumbray's favor back in 2001, can you tell
22   me why you are objecting to Mr. Kevin Bumbray and
23   Ms. Sharon Bumbray Watts's claim in this case?
24            MR. TOULOUSE:  Objection, Your Honor.  It calls
25   for legal conclusions.  I think he needs to address factual
```

1    issues with the witness.

2              THE COURT:  Sustained.

3    BY MR. SHURBERG: (Resuming)

4        Q    Well, let me ask this, Ms. Duvall.  What facts

5    are you aware of that support your objection that has been

6    filed on your behalf in this case?

7              MR. TOULOUSE:  Your Honor, she's testified on

8    direct.  Those are the facts that we've elicited.  He was

9    here, I don't know (inaudible).

10             MR. SHURBERG:  I'm just asking her, Your Honor,

11   if I may just --

12             THE WITNESS:  I don't understand.

13             MR. SHURBERG:  -- direct my attention and your

14   attention to what are the facts --

15             THE COURT:  It calls for a legal conclusion in

16   the sense of she has to know what facts are relevant to her

17   objection, and I don't think you can ask the question in

18   that broad-gauged fashion.  The objection is sustained.

19   BY MR. SHURBERG: (Resuming)

20       Q    All right, Ms. Duvall, let me try a little bit

21   differently.

22             MR. SHURBERG:  Actually, Your Honor, I think I am

23   finished with this witness.

24             THE COURT:  The Court will take a recess.

25   Number your exhibits.

```
 1            THE CLERK:  All rise.  This Court will stand in
 2  a brief recess.
 3            (Whereupon, a brief recess was taken.)
 4            THE CLERK:  All rise.  This Court is again in
 5  session.  Please be seated and come to order.
 6            THE COURT:  Does the Debtor rest?
 7            MR. TOULOUSE:  I would just like to move the
 8  exhibits -- Debtor's exhibits into evidence.
 9            MR. SHURBERG:  Your Honor, I don't have an
10  objection to -- I don't recall the numbers right offhand,
11  but Mr. Bumbray's complaint, I'm not sure what relevance
12  that the A, B, C and D have.  I think E and F are relevant
13  and I have no objection to them.
14            THE COURT:  I'll receive Exhibits A through E
15  into evidence.  Exhibit F is incomplete.  It's only got
16  pages 1, 4 and 5.
17            MR. TOULOUSE:  Let me see if I have another copy.
18  I'm sure I do.
19            THE COURT:  Mr. Shurberg, do you have a copy of
20  the complaint for your exhibits?
21            MR. SHURBERG:  I have a copy of Mr. Bumbray's
22  complaint, Your Honor.  I don't have a copy of _____.
23            MR. TOULOUSE:  Bear with me, Your Honor.  I'll
24  find it.  (Inaudible)
25            THE COURT:  All right.  All right, Exhibits A
```

37

1   through F are received into evidence.

2                          (Whereupon, Debtor's Exhibits A

3                              through F were received into

4                              evidence..)

5          MR. SHURBERG:  Your Honor, shall I call a

6   witness?

7          THE COURT:  Yes, please.

8          MR. SHURBERG:  Your Honor, I would call

9   (inaudible).

10  KEVIN BUMBRAY WAS SWORN AND TESTIFIED AS FOLLOWS:

11         THE CLERK:  Please have a seat, then state your

12  name.

13         THE WITNESS:  Kevin Bumbray.

14                     **DIRECT EXAMINATION**

15  BY MR. SHURBERG:

16     Q    Mr. Bumbray, do you know Elmer Bumbray?

17     A    Yes.

18         THE CLERK:  Mr. Shurberg, would you please come

19  to the podium?

20  BY MR. SHURBERG:  (Resuming)

21     Q    Do you know Elmer Bumbray?

22     A    Yes.

23     Q    And how do you know him?

24     A    My brother.

25     Q    Okay.  And do you know Jeanne Duvall, the Debtor

1   in this case?

2       A    Yes.

3       Q    And how do you know her?

4       A    Sister.  Stepsister.

5       Q    Stepsister.  Now, how long have you known

6   Ms. Duvall?

7       A    Years.  I can't -- let me see, 25 years.  A little

8   longer.

9       Q    Okay.  And what is your father's name?

10      A    Edward Bumbray.

11      Q    Okay.  And did he die in a work-related accident

12  back in 1980?

13      A    Yes.

14      Q    How old were you at the time?

15      A    I was 17.

16      Q    And are you aware that there were some workers

17  comp -- workers compensation proceeds that arose out of

18  your father's death?

19      A    Yes.

20      Q    Okay.  Did you get some money back in, say, the

21  early 1980s yourself?

22      A    Yes.

23      Q    How much money did you get, if you remember?

24      A    I think it was like $5,000.00.

25      Q    Now --

```
 1              THE COURT:  Off the street?  Where did this 5,000
 2   come from?
 3   BY MR. SHURBERG: (Resuming)
 4        Q     Did you get some money from the workers
 5   compensation proceeding?
 6        A     Yes.
 7        Q     Okay.  And was that because you were the son of
 8   Edward Bumbray?
 9        A     Yes.
10        Q     And at the time of his death were you under the
11   age of 18?
12        A     Yes.
13        Q     Now, were you aware, back then, that -- well,
14   strike that.
15              Your father was married to whom?
16        A     Jeanne -- I mean, Henrietta Duvall.
17        Q     Okay.  And that's Jeanne Duvall's mother?
18        A     Mother.
19        Q     Now, were you aware back then that Henrietta
20   Duvall was getting some money from the workers compensation
21   proceedings?
22        A     Yes.
23        Q     Okay.  And were you aware that somewhere around
24   1990 Henrietta Duvall died?
25        A     Yes.
```

40

1    Q    Do you know -- did you know back then what

2  happened to the money that was coming to Henrietta Duvall

3  at the time of her death?

4    A    No.

5    Q    Okay.  Now, did there come a time when Elmer

6  Bumbray, your brother, told you that he had reached some --

7  well, that he had something going on with Jeanne, with

8  respect to this workers compensation case?

9    A    He had mentioned it.

10    Q    Okay.

11    A    You know.

12    Q    Now, what did Mr. Bumbray tell you about what he

13  had going on with Jeanne Duvall?

14        MR. TOULOUSE:  Objection, hearsay.

15        THE COURT:  Overruled.

16        THE WITNESS:  Him and Jeanne had something going

17  on between them two.  And that was it, basically.

18  BY MR. SHURBERG: (Resuming)

19    Q    Okay.  Did Mr. Bumbray -- Elmer Bumbray -- tell

20  you that this had anything to do with you?

21    A    No.

22    Q    When did you first become aware that there might

23  be something in all of this to do with you?

24    A    Had to be like 2002.

25    Q    Okay.  And what happened in 2002?

41

```
 1        A     He was awarded -- he won his case.

 2        Q     "He," being who?

 3        A     Elmer Bumbray.  And he said that we have to pursue

 4   ours, you know.  Because there was something left for us.

 5   And he told us he had to pursue ours, our part.

 6        Q     All right.  And did you do that?

 7        A     Yes.

 8        Q     Okay.  Now, prior to that time -- well, at any

 9   time, ever, had you had a conversation with Jeanne Duvall

10   about her version of what was going on in this case?

11        A     No.

12        Q     During the period from, let's say, 1995 to the

13   present, how would you characterize your relationship with

14   Jeanne Duvall?

15        A     Me and Jeanne had a good relationship.  You know,

16   I hardly never seen her, though, you know.

17        Q     Did you see her regularly?

18        A     No.

19        Q     Okay.  How often would you see her?

20        A     I'd say like three times a year.

21        Q     And how about now.  Do you see her at all now?

22        A     No.

23        Q     Okay.  At least in part because of this whole

24   case?

25        A     Right.
```

42

1    Q    Okay.  Now, were you ever part of any

2    conversations between Elmer and Jeanne Duvall about the

3    workers compensation proceedings.  Were you ever present?

4    A    No.

5    Q    Did Elmer ever, prior to 2002, tell you anything

6    about the specifics of his conversation with Jeanne Duvall

7    with respect to the workers compensation proceedings?

8    A    No.

9    Q    Okay.  Who first told you, in 2002, about this?

10   That there might be something left for you, to use your

11   words.

12   A    Elmer mentioned it to me, and we had a -- we was

13   summonsed to meet you at your office to talk about it.

14   Q    And did you come to that meeting?

15   A    Yes.

16   Q    Okay.  And eventually you filed a lawsuit?

17   A    Yes.

18   Q    Against Ms. Duvall in 2003?

19   A    Yes.

20   Q    Did you testify at Mr. Bumbray's trial in 2001?

21   A    No.

22   Q    Okay.  Was your deposition taken?

23   A    Yes.

24   Q    In the case in 2001, in the Superior Court case.

25   A    Oh, no.  No.

43

```
 1      Q    I'm sorry, I wasn't clear.  Prior to this
 2   conversation with Elmer where he told you there might be
 3   something left for you, had you ever looked at any of the
 4   documents in Elmer's case?
 5      A    No.
 6      Q    Had you ever had a conversation with myself about
 7   the case prior to this conversation you described with
 8   Elmer?
 9      A    No.
10      Q    Did you ever have a conversation with any other
11   attorney?
12      A    No.
13      Q    About this case, prior to 2002.
14      A    No.
15      Q    Do you know who Steve Katz is?
16      A    I believe he's one of the attorneys before you
17   took the case.
18      Q    And, now, did you meet with Mr. Katz after this
19   conversation with Mr. Bumbray?  Where he told you what was
20   going on?
21      A    Nnn --
22      Q    In 2002?
23      A    Yes.
24      Q    Okay.  Did you ever meet with Mr. Katz before
25   that conversation with Elmer?
```

44

1       A    No.

2   BY MR. SHURBERG: (Resuming)

3       Q    No further questions, Your Honor.

4                      **CROSS EXAMINATION**

5   BY MR. TOULOUSE:

6       Q    Good morning.

7       A    Good morning.

8       Q    Mr. Bumbray.  You mentioned, during your direct

9   examination, that you had a meeting with Elmer -- you had

10  a conversation, I think you said, with Elmer sometime in

11  2002, about the case.  Correct?

12      A    Correct.

13      Q    Now, at that meeting Elmer never told you that he

14  was going to share anything with you from that case, did

15  he?

16      A    No.

17      Q    Okay.  In fact, he has never said that he would

18  share anything from this, this case in Superior Court, with

19  you, did he?

20          MR. SHURBERG:  [Not on microphone]  Your Honor,

21  I'm going to object at this point because I think that the

22  question -- the issue of this question goes to his

23  res judicata in the Superior Court, based on the jury's

24  verdict.  And I would proffer -- and I have the exhibit --

25  that the jury was asked, and I'm paraphrasing here, "Was

45

1   there a contract," then they asked "Who did Mr. Bumbray act

2   on behalf of in this case," and they answered, "For himself

3   in this case," and then they awarded only a portion of the

4   damages.

5          So, in other words, there was a dispute in the

6   underlying case between Ms. Duvall on the one hand,

7   Mr. Elmer Bumbray on the other hand, as to who this

8   contract was for, and that was the subject of much

9   discussion that we're going to get to here this morning.

10  But the question of what Mr. Bumbray's position was, and he

11  can testify _____ himself, I think it best to

12  establish it from Mr. Bumbray.  And in addition to which,

13  the jury concluded he was acting on his own behalf in the

14  Superior Court case.

15          THE COURT:  The objection's overruled.

16  BY MR. TOULOUSE: (Resuming)

17      Q    I'm not sure if you answered the question.

18          THE COURT:  He didn't.

19          MR. TOULOUSE:  He did?

20          THE COURT:  He did not.

21          MR. TOULOUSE:  All right.

22  BY MR. TOULOUSE: (Resuming)

23      Q    Let me repeat it.  Elmer never told you that he

24  would share anything with you from the proceeds of that

25  Superior Court case, either before he filed it, during the

46

1  time he was involved in it, or after he got the judgment,

2  correct?

3      A    Correct.

4      Q    In other words, he didn't promise you anything,

5  did he?

6      A    No.

7      Q    And he didn't -- to your knowledge, he never

8  promised any of your brothers and sisters anything, did he?

9      A    No.

10     Q    You have seen your claim that you filed in this

11 case, have you not?

12     A    Yes.

13     Q    Okay.  And in that claim, if I'm not mistaken,

14 I think you say that prior to the -- specifically, you say

15 prior to July 13th, 2001, which was when the jury rendered

16 a verdict in the Superior Court case, you were unaware of

17 the particulars of the agreement between Elmer and Jeanne,

18 right?

19     A    Right.

20     Q    Okay.  And in fact, you learned about the

21 particulars at the meeting that you had in Mr. Shurberg's

22 office, correct?

23     A    Correct.

24     Q    So it was Mr. Shurberg who told you that you

25 might have a claim, correct?

1      A    Correct.

2      Q    Was Elmer at that meeting?

3      A    I can't recall.

4      Q    Was Sharon there?

5      A    Yes.

6      Q    Okay.  Was it your understanding that

7  Mr. Shurberg was representing Elmer at that time?

8           MR. SHURBERG:  Objection, Your Honor.  As to --

9  first off, as to relevance; second off, as to what his

10  understanding was or wasn't.

11          THE COURT:  Sustained.

12  BY MR. TOULOUSE: (Resuming)

13     Q    Did you hire Mr. Shurberg at that meeting?

14  As your lawyer?

15     A    Yes.

16          THE COURT:  How did it come about that

17  Mr. Shurberg happened to contact you, or that you were put

18  into contact with him?

19          THE WITNESS:  He call the family members.  And

20  ask to agree to meet with him about this.

21          THE COURT:  And how was it that he knew to call

22  the family members, if you have personal knowledge.

23          THE WITNESS:  I can't really -- 'cause at that

24  time I was living out of town.  Right?  And then my sister

25  called me and told me we had to come down here and meet

48

1  with him.

2          THE COURT:  All right.  Thank you.

3  BY MR. TOULOUSE:  (Resuming)

4      Q    Now, you actually heard about the trial from

5  Mr. Shurberg, right?

6          MR. SHURBERG:  Objection, Your Honor.

7          THE COURT:  Overruled.

8  BY MR. TOULOUSE:  (Resuming)

9      Q    The trial in the Superior Court.

10         THE COURT:  Overruled.

11         THE WITNESS:  No.

12 BY MR. TOULOUSE:  (Resuming)

13     Q    But you heard about the trial in Superior Court

14 some time after the trial, right?

15     A    Yes.

16     Q    When you were in Mr. Shurberg's office, did you

17 see Elmer Bumbray's complaint against Jeanne Duvall?

18 The piece of paper where she sued him?

19     A    No.

20     Q    Have you ever seen it?

21     A    I probably have, but I can't recall.

22     Q    Okay.

23         MR. TOULOUSE:  I have no further questions, Your

24 Honor.

25         THE COURT:  Any redirect?

49

```
 1              MR. SHURBERG:  (Inaudible)

 2              THE COURT:  You may step down.  Thank you.

 3              MR. SHURBERG:  Call Sharon Bumbray Watts.

 4   SHARON BUMBRAY WATTS WAS SWORN AND TESTIFIED AS FOLLOWS:

 5              THE CLERK:  Please have a seat, then state your

 6   name.

 7              THE WITNESS:  Name is Sharon Bumbray Watts.

 8                        DIRECT EXAMINATION

 9   BY MR. SHURBERG:

10        Q    Ms. Watts, good morning.

11        A    Good morning.

12        Q    Do you know Elmer Bumbray?

13        A    Yes, I do.

14        Q    How do you know him?

15        A    He's my brother.

16        Q    How many siblings do you have?

17        A    I'm sorry?

18        Q    How many siblings do you have all together?

19        A    Total, six; one deceased.

20        Q    Okay.  And who's the oldest?

21        A    Glenn, who's deceased.

22        Q    Okay.  And who's the youngest?

23        A    Elmer.

24        Q    Now, your father was Edward Bumbray?

25        A    Yes.
```

1      Q    He died back in 1980?

2      A    Yes.

3      Q    In a work accident?

4      A    Yes.

5      Q    And as a result of his death were there some

6    workers compensation benefits that came out of that

7    unfortunate incident?

8      A    Yes.

9      Q    Did you get any money directly?

10     A    No.

11     Q    How old were you at the time, do you recall?

12     A    I think I was 19 or 20.

13     Q    And were you aware, back then -- well, strike

14   that.

15          Your father, who was he married to at the time of

16   his death?

17     A    Henrietta Duvall.

18     Q    And she was not your mother, correct?

19     A    No.

20     Q    Okay.  And Henrietta Duvall had a daughter?

21     A    Yes.

22     Q    And what was her name?

23     A    Jeanne Duvall.

24     Q    And that's the lady sitting over here?

25     A    Yes.

1    Q    Now, were you aware, back then -- and when I say

2    "then," that date of the 1980s -- that Henrietta Duvall was

3    receiving money from the Workers Compensation Commission

4    arising out of your father's passing?

5    A    Was I aware of it?

6    Q    Were you aware of it.

7    A    No.

8    Q    Okay.

9         THE COURT:  That Elmer was?  Or that --

10        MR. SHURBERG:  No, that -- Henrietta Duvall, Your

11   Honor.  I'm sorry.

12        THE COURT:  I'm sorry.  Thank you.

13        MR. SHURBERG:  Trying to keep all the players in

14   order.

15   BY MR. SHURBERG: (Resuming)

16   Q    Now, did there come a time when you became aware

17   that Henrietta Duvall had passed away?

18   A    Yes.

19   Q    And do you know when that was, approximately?

20   A    I don't recall the date.

21   Q    If I said it was in 1990, would that sound about

22   right?

23   A    Yeah, somewhere in that ballpark.

24   Q    And at that time, at the time of her death, were

25   you still unaware of the fact that there had been money

52

1  passing from an insurance company to Henrietta as a result

2  of your father's death?

3      A    Yes.

4      Q    Did there come a time when you became aware that

5  there had been money passing from an insurance company to

6  Ms. Duvall?

7      A    Yes.

8      Q    Henrietta Duvall.

9      A    Yes.

10     Q    Okay.  When did you become aware just of that

11 very basic fact?

12     A    Elmer mentioned it to me.

13     Q    Do you remember when that was?

14     A    Maybe late, end of 1990s.

15     Q    Okay.  And did Elmer also tell you anything about

16 having had some conversations with Jeanne Duvall about

17 trying to go get that money?

18     A    Yes.

19     Q    What did Mr. Elmer Bumbray tell you in that

20 conversation in the late 1990s?

21          MR. TOULOUSE:  Objection.

22          THE COURT:  Overruled.

23          THE WITNESS:  Elmer told me that he had spoken

24 with Jeanne and that there may be worker compensation

25 benefits that he may be able to pursue.

```
 1   BY MR. SHURBERG: (Resuming)

 2        Q    "He," being who?

 3        A    "He," being Elmer.

 4        Q    Okay.

 5        A    So him and Jeanne were talking about it.

 6        Q    At that time, did Elmer say anything to you about

 7   your having any part of that process of trying to get the

 8   money?

 9        A    No.

10        Q    Did he say anything else about the process he was

11   involved in with Ms. Jeanne Duvall?  At that particular

12   conversation.

13        A    Basically he wanted to pursue it, and I think he

14   just came to me for my opinion.  And I basically told him if

15   that's what he wanted to do, then he should go forward.

16        Q    At any time prior -- well, strike that.  Let me -

17   - did you testify -- well, strike --

18             Oh, did you become aware Mr. Elmer Bumbray had

19   filed a lawsuit against Jeanne Duvall?

20        A    Yes.

21        Q    Okay, when you become aware of that lawsuit?

22        A    Late '90s, I think.  And --

23        Q    It was filed in April of 1999.

24             MR. TOULOUSE:  I didn't hear the answer.

25             THE WITNESS:  Late '90s.
```

1          MR. TOULOUSE:  Late '90s?

2          THE WITNESS:  Uh-huh.

3    BY MR. SHURBERG: (Resuming)

4     Q    Now, do you know, in relation to when it was

5    filed, when you found out about it?  Was it shortly

6    thereafter, was it a little ways after, long ways after --

7    if you know.

8     A    When it was actually filed?

9     Q    Well, when did you become aware of it, in

10   relation to when it was filed.  Had the process just

11   started?  Had it been going on for a while?  If you know.

12   A    I don't recall.

13   Q    Okay.  What did Elmer tell you about the lawsuit

14   when he first told you about it?

15   A    Basically what he told me was he was going to

16   pursue the law -- the workers compensation monies with

17   Jeanne, because Jeanne was the estate holder, so together

18   they had to do this.  In order to find out whether there

19   were actual benefits left, the two of them had to go

20   forward with it.  If there was anything that came out of

21   it, fine; if not, fine.

22        He did mention to me that if there was anything,

23   then, you know, he would give Jeanne a part and maybe, you

24   know, depending upon what it was, he would share it with us.

25   But we didn't know.

55

```
 1      Q    Did he ever tell you he had made this agreement
 2  on your behalf with Ms. Duvall?
 3      A    No.  Never.  It was solely what he wanted to do.
 4      Q    Now, did you become aware at some point that some
 5  money had been received by somebody from the Workers
 6  Compensation Commission in the late 1990s?
 7      A    Yes.
 8      Q    Okay.  And who told you that?
 9      A    Elmer.
10      Q    And what did he tell you?
11      A    He told me that benefits -- monies were actually
12  coming in, but there was some confusion with where the
13  monies were going.  I don't know.
14      Q    Did he eventually file a lawsuit against Jeanne
15  Duvall?
16      A    Yes.
17      Q    Okay, were you aware of that?
18      A    Yes.
19      Q    When did Elmer tell you about that?
20      A    I think a lot of this all happened in the late
21  1990s.
22      Q    Okay.  Did you testify at Mr. Bumbray's trial in
23  the Superior Court?
24      A    Yes.
25      Q    Do you recall what you testified about?
```

56

1      A      What Elmer had told me prior to him filing the

2   lawsuit with Jeanne, basically, and what the deal was

3   between him and Jeanne.  I think.

4      Q      Do you remember the date of the trial?

5      A      No.

6      Q      Remember what year it was?

7      A      It's just been going on so long.  No.

8      Q      Now, were you present in the courthouse, or in

9   the courtroom, when the jury rendered its verdict in your

10  brother's lawsuit against Jeanne Duvall?

11     A      Yes.

12     Q      And did you have a conversation with myself and

13  another attorney after leaving the courtroom that day?

14     A      Yes.

15     Q      Do you remember what that conversation was about?

16     A      About the fact that the siblings may have to go

17  forward with receiving our part as a result of the case.

18     Q      Now, prior to that time had you ever received any

19  information from anybody that suggested that you yourself

20  might have a claim with respect to these workers

21  compensation --

22     A      No.

23     Q      -- proceeds.

24     A      Never.

25            MR. SHURBERG:  Court's indulgence.

57

1    BY MR. SHURBERG: (Resuming)

2        Q    Ms. Watts, have you ever had a conversation with

3    Jeanne Duvall with respect to the workers compensation

4    proceeds or the lawsuit or any of the issues that we've

5    been discussing here this morning?

6        A    No.

7        Q    Other than what you've testified to with

8    Mr. Elmer Bumbray, the conversations you had, have you ever

9    had any conversation -- and the one conversation with

10   myself and the other attorney -- did you ever have any

11   conversations with anybody else about the lawsuit, the

12   workers compensation proceeds, any of the issues that bring

13   us here today?

14       A    No.

15       Q    Do you remember when you filed suit against

16   Ms. Duvall, you and your siblings?

17       A    It was after the actual trial that Elmer and

18   Jeanne were at.

19       Q    If I said it was February 2003, would that sound

20   about right?

21       A    Yes.

22           MR. SHURBERG:  No further questions, Your Honor.

23                      **CROSS EXAMINATION**

24   BY MR. TOULOUSE:

25       Q    Good morning.

```
 1        A    Good morning.

 2        Q    You've seen your claim filed in this case, have

 3   you not?  You've read it?

 4        A    Yes.

 5        Q    And in that claim you state, do you not, that you

 6   did not know the particulars of the agreement between

 7   Jeanne and Elmer prior to the judgment in the Superior

 8   Court case on July 13, 2001, correct?

 9        A    Specifically?  No.

10        Q    That's not stated in your claim?

11        A    You're saying -- can you repeat it again?

12        Q    Certainly.  Do you not state in the claim that

13   you filed in this case, as Kevin testified to, that you did

14   not know anything about the particulars of the agreement

15   between Jeanne and Elmer prior to July 13, 2001, which was

16   when the judgment was rendered.

17        A    Correct.

18        Q    Were you present at the meeting that Kevin

19   testified to when he met with Mr. Shurberg in his office?

20        A    Yes.

21        Q    At that meeting, it was discussed that you might

22   have a claim, correct?

23        A    Correct.

24             MR. SHURBERG:  Objection, Your Honor.  Privilege.

25             THE COURT:  It's already out.  Overruled.
```

1  BY MR. TOULOUSE: (Resuming)

2       Q    But for Mr. Shurberg's opinions and advice, you

3  did not know that you had a claim, correct?

4            MR. SHURBERG:  Objection (inaudible).

5            THE COURT:  Overruled.

6  BY MR. TOULOUSE: (Resuming)

7       Q    Would you like me to restate the question?

8       A    Please.

9       Q    It was Mr. Shurberg who told you you had a claim,

10 correct?

11      A    Yes.

12      Q    You knew, did you not, because you'd testified at

13 Elmer's trial, that his case was about he, Elmer, claiming

14 all of the proceeds for his benefit, correct?

15      A    Correct.

16      Q    And you did not testify at that trial that that

17 was not so, did you?  You didn't dispute that, did you?

18      A    No.

19      Q    In fact, you were a witness in his behalf for

20 that case, right?

21      A    Yes.

22           MR. TOULOUSE:  Thank you.  I have no further

23 questions.

24           MR. SHURBERG:  Brief redirect, Your Honor.

25                         **REDIRECT EXAMINATION**

60

BY MR. SHURBERG:

    Q   Before you met with me at my office in 2002, I
believe your brother testified to, did you talk to Elmer?

    A   Prior to the meeting?

    Q   Well, did you talk to Elmer about the issues in
his case and whether you had a case?

    A   Yes.

    Q   All right.  And, so in addition to whatever
I told you, you also talked to Elmer, correct?

    A   Correct.

    MR. SHURBERG:  Nothing further.  Oh, I'm sorry,
Your Honor.  If I may (inaudible).

BY MR. SHURBERG: (Resuming)

    Q   Those conversations after the trial and before
the meeting, was Elmer at that point in time of the opinion
that you might have a claim?

    MR. TOULOUSE:  Objection.

    THE COURT:  Overruled.

    THE WITNESS:  Yes.

    MR. SHURBERG:  Thank you.  Nothing.

**RECROSS EXAMINATION**

BY MR. TOULOUSE:

    Q   So, just so I understand who was at the meeting
after the trial?  It was Elmer, it was you, and it was
Mr. Shurberg?

61

1     A    Who was at the meeting after -- ?

2     Q    I think -- forgive me.  I think you testified,

3 right after the trial Mr. Shurberg asked you, and correct

4 me if I'm wrong, "Did we meet right after the trial?"

5     A    Correct.

6     Q    Right.

7         THE COURT:  "Did we meet"?  Who are you --

8         THE WITNESS:  We.  Who, who are you, who is --

9 BY MR. TOULOUSE: (Resuming)

10    Q    I'm paraphrasing what Mr. Shurberg said.  You and

11 Mr. Shurberg literally met, the day of the trial, the last

12 day of the trial at Superior Court.

13    A    Did we meet that day?

14    Q    Yes.

15    A    We discussed something that day, but we -- that

16 was just him and I on the way out.  'Cause I was there.

17    Q    So that wasn't a discussion about your claim?

18    A    No.  Right.

19    Q    That discussion took place at his office.

20    A    Correct.

21    Q    And was Elmer at that meeting?

22    A    Yes.

23        THE COURT:  Elmer was at the meeting at

24 Mr. Shurberg's office?

25        THE WITNESS:  Correct.

1           THE COURT:  All right.

2    BY MR. TOULOUSE: (Resuming)

3        Q    So when you learned from, I think you said --

4    testified, from Elmer that you might have a claim?  Is that

5    what you testified to?

6        A    Yes.

7        Q    Was that when Mr. Shurberg was present?

8        A    I don't recall.

9           THE COURT:  Was it in the Superior Court

10   courtroom?

11          THE WITNESS:  No.

12          THE COURT:  Where was it?

13          THE WITNESS:  It was probably outside the --

14   after the case, after the Court was over.

15          THE COURT:  But in the Superior Court courthouse?

16          THE WITNESS:  Yes.

17          THE COURT:  And what did Elmer say?

18          THE WITNESS:  Basically because of the result of

19   the ruling that his portion, being that it was just awarded

20   to his portion, the others, the rest of the siblings, would

21   have to actually intervene.  Because it was only broken

22   down for him.

23   BY MR. TOULOUSE: (Resuming)

24       Q    Now, Mr. Shurberg was present at that meeting,

25   was he not?  With you and Elmer.

63

1    A    Yes.

2    Q    I mean, it was Elmer's case, and his lawyer --

3    A    Yes.

4    Q    -- was with him after the verdict.

5    A    Yes.

6    Q    And Mr. Shurberg talked about that, didn't he?

7  That now the siblings could proceed.

8    A    Yes.

9    Q    So it really was Mr. Shurberg's idea, wasn't it?

10        MR. SHURBERG:  Objection, Your Honor,

11  (inaudible).

12        THE COURT:  Overruled.

13        THE WITNESS:  Combination of the two.

14  BY MR. TOULOUSE: (Resuming)

15    Q    Excuse me?

16    A    A combination of Mr. Shurberg and Elmer.

17    Q    Who brought it up first?

18    A    Elmer.

19    Q    And Mr. Shurberg agreed?

20    A    Yes.

21    Q    Who asked you to come to Mr. Shurberg's office

22  later?

23    A    For the meeting?  Elmer.

24        MR. TOULOUSE:  No further questions, Your Honor.

25        MR. SHURBERG:  Nothing further.

64

1          THE COURT:  You may step down.  Thank you.

2          THE WITNESS:  Thank you.

3          MR. SHURBERG:  Your Honor, if I may step out

4   (inaudible) Mr. Elmer Bumbray to come in.

5          THE COURT:  Yes.

6   ELMER BUMBRAY WAS SWORN AND TESTIFIED AS FOLLOWS:

7          THE CLERK:  Have a seat, then please state your

8   name.

9          THE WITNESS:  Elmer Bumbray.

10                    **DIRECT EXAMINATION**

11  BY MR. SHURBERG:

12     Q    Good morning, Mr. Bumbray.

13     A    Good morning.

14     Q    You filed a lawsuit against Jeanne Duvall in the

15  Superior Court of the District of Columbia back in 1999 --

16  1999, is that correct?

17     A    Yes.

18     Q    And just a little bit of background.  Sharon

19  Bumbray Watts is your sister?

20     A    Correct.

21     Q    And Kevin Bumbray is your brother?

22     A    Yes.

23     Q    And your father was Edward Bumbray?

24     A    Correct.

25     Q    And your father died back in 1980?

1      A     Yes.

2      Q     And that was a work accident?

3      A     Yes.

4      Q     Do you remember how old you were at the time?

5      A     Seventeen, I think.  Just (inaudible).

6      Q     Now, did you receive some money way back then

7   from the Workers Compensation Insurance Company as a result

8   of your father's having died on the job?

9      A     Yes, I did.

10     Q     Do you remember how much you received?

11     A     Five thousand dollars.

12     Q     Okay.  Now, at that same time were you -- well,

13  your father was married to a woman named Henrietta Duvall?

14     A     Correct.

15     Q     And Henrietta's daughter is Jeanne Duvall?

16     A     Yes.

17     Q     The Debtor in this case?

18     A     Yes.

19     Q     Now, were you aware, back in the 1980s, that

20  Henrietta Duvall was receiving money from the insurance

21  company as a result of your father's having died on the

22  job?

23     A     No.  Not specifically, no.

24     Q     Did you find out later on --

25     A     Yes.

1     Q     -- that she had been receiving some money?

2     A     Yes.

3     Q     When did you find out that she had been receiving

4  some money?

5     A     After I spoke to Jeanne Duvall about it, actually.

6     Q     When was that?

7     A     Guess it was in the '90s, mid-90s.

8     Q     Now, at that point in time, did there come a

9  point in time when Henrietta Duvall died?

10    A     Yes.

11    Q     Do you remember when that was?

12    A     Oh, 1990, we were all at the hospital together.

13    Q     And at that point in time, did you know then,

14 at the time of her death, that Henrietta was receiving --

15 had been receiving some money from the insurance company?

16    A     No.

17    Q     You found out later on?

18    A     Yes.

19    Q     And you had a discussion with Jeanne Duvall?

20    A     Correct.

21    Q     Can you tell the Court, as best you can remember,

22 what that discussion -- what happened in that discussion?

23    A     Sure.  The discussion was I had asked Jeanne in

24 regards to the money that Henrietta was receiving, was she

25 receiving it, because me and my brother had gotten

1  $5,000.00.  And I had asked her if it was okay if I could

2  pursue the remaining monies and if she had did anything with

3  the money.  And she said that her attorney had told her

4  there was nothing she could do, and if I would pursue it,

5  and if anything I could get from it, I could go ahead and

6  have it.  That's what she informed me of.

7       Q    All right.  And subsequently -- well, did you

8  hire an attorney?

9       A    Yes.

10      Q    Okay.  What was the attorney's name?

11      A    Barry Chasen.

12      Q    And did you and Mr. Chasen pursue the Workers

13 Compensation Insurance Company for some money?

14      A    Yes.

15      Q    And did there come a point in time when

16 Mr. Chasen advised you that Ms. Duvall needed to be

17 involved in that process?

18      A    Well, she was involved the whole time, but, yes.

19      Q    Okay.  Formally involved.

20      A    Yes.

21      Q    As the party in the case?

22      A    Correct.

23      Q    Not actually her personally, but her as the

24 personal representative of the estate of her mother's --

25 of her mother's estate?

1       A     Yes.

2       Q     Now, were you ultimately -- were you and Jeanne --

3   well, strike that.

4             In 1997, did you reach a new agreement with

5   Ms. Duvall about the workers compensation proceeds?

6       A     We had actually made, I guess, two agreements,

7   if I'm not mistaken.

8       Q     Right.

9       A     One originally that I could pursue the case, we

10  sat down and she said I could and I could, you know, receive

11  the money.

12            The second one was at, if I'm not mistake, at

13  Mr. Chasen's office, where it would be a 84-16 split.

14      Q     Okay.  And your understanding was that the

15  16 percent was for who?

16      A     Was for Jeanne.

17      Q     Okay, and the 84 percent was for who?

18      A     For myself.

19      Q     Okay.  Now, your opinion was then that this --

20  that your 84 percent was for you alone or for you and your

21  siblings?

22      A     It was for me.

23            MR. TOULOUSE:  Objection.  (Inaudible).

24  BY MR. SHURBERG: (Resuming)

25      Q     Well, let me ask a different question.  Based on

1  your recollection and your testimony in the subsequent

2  Superior Court lawsuit, did your siblings, in your view,

3  have any interest in the 84-16 split directly?

4      A    No.

5      Q    And you testified to that in deposition, correct?

6      A    Correct.

7      Q    And you testified to that at trial.

8      A    Yes.

9      Q    Now, do you recall that Ms. Duvall had a

10  different opinion as to what the 84 percent was for?

11      A    I don't know.  It's been 11 years.  Her

12  recollection, I can't really recall, it's been such a long

13  time now.

14      Q    Do you remember the trial in 2001?

15      A    Oh, yes.

16      Q    Do you remember the argument being put forward

17  that the 84 percent was not for you --

18          MR. TOULOUSE:  Objection, Your Honor.

19  BY MR. SHURBERG: (Resuming)

20      Q    -- but was for you and your --

21          MR. TOULOUSE:  Objection, Your Honor.

22  BY MR. SHURBERG: (Resuming)

23      Q    Well.  Well, do you remember there being a

24  discussion about the --

25          THE COURT:  Rephrase the --

70

```
1           MR. SHURBERG:  I'm asking a different question,
2   Your Honor.  Excuse me.
3   BY MR. SHURBERG: (Resuming)
4       Q    Do you recall there being testimony from
5   Ms. Duvall that was different than your understanding of
6   what that 84 percent was for?
7       A    I can't recall -- I know that the agreement was
8   I was to get 84 and she was to get 16.  There's been
9   depositions, lawyers, so.
10      Q    Do you remember Mr. Chasen being deposed?
11      A    Yes.
12      Q    And do you remember his deposition being read to
13  the jury at the trial in July of 2001?
14      A    Yes.
15      Q    Do you recall what Mr. Chasen said the 84 percent
16  was for?
17      A    It was for myself.
18      Q    Mr. Chasen said that?
19      A    Yes.  Actually, Mr. Toulouse's attorney acted as
20  Mr. Chasen.
21      Q    Do you recall ever having an opportunity to read
22  Mr. Chasen's deposition in the Superior Court lawsuit?
23      A    I guess I did.  Maybe I did.
24           THE CLERK:  Mr. Shurberg?  (Inaudible).  Thank
25  you.
```

```
 1              MR.          :  (Inaudible) Exhibit Number 2.
 2    BY MR. SHURBERG: (Resuming)
 3        Q    Mr. Bumbray, I'm going to show you what's been
 4    marked as Claimants' Exhibit Number 2.
 5              MR. TOULOUSE:  May I be heard, Your Honor?
 6              THE COURT:  Not yet.
 7                        (Whereupon, Claimants' Exhibit 2 was
 8                         identified.)
 9    BY MR. SHURBERG: (Resuming)
10        Q    I want to direct your attention -- well, first
11    off, what is Exhibit Number 2?
12        A    Superior Court of District of Columbia Civil
13    Division, Elmer Bumbray the plaintiff versus Jeanne Duvall,
14    Defendant.  This is a deposition of Barry Chasen.
15        Q    Okay.  Can you turn to the second page.  I would
16    like you to read silently to yourself the questions
17    beginning at Line 15 on page 147, and continuing --.
18              I'm sorry, Your Honor.
19              Let me refer you to Exhibit Number 3.
20              MR. TOULOUSE:  May I ask what the last exhibit
21    number was?
22              MR. SHURBERG:  Two.  I apologize, Your Honor.
23                        (Whereupon, Claimants' Exhibit 3 was
24                         identified.)
25    BY MR. SHURBERG: (Resuming)
```

72

1    Q    Mr. Bumbray, and again, if you can just identify

2  for the record Exhibit Number 3 on the first page?

3    A    In the Superior Court of District of Columbia

4  Civil Division, Elmer Bumbray, Plaintiff, versus Jeanne

5  Duvall, Defendant, deposition of Barry Chasen.

6    Q    Now, turning to page -- the one page of the

7  actual transcript, page 175, if you can look at lines 1

8  through 15, to yourself.

9    A    Okay.

10    Q    Now, you testified earlier that your recollection

11  was that Mr. Chasen had said the agreement was for you.

12  Having read, Exhibit Number 3 --

13    A    Yes.

14    Q    -- does that refresh your recollection as to what

15  Mr. Chasen's testimony was?

16    A    Yes.  It was --

17    Q    Who was the --

18    A    -- was to be --

19    Q    -- 84-16 for?

20    A    -- was supposed to be split.

21    Q    Between who?

22    A    To the Bumbray siblings.

23    Q    That being you and who else?

24    A    The brothers and sisters of Edward Bumbray.

25    Q    Including Sharon Bumbray Watts?

73

1        A    Yes.

2        Q    And Kevin Bumbray?

3        A    Yes.

4        Q    Now --

5             THE COURT:  And 16 percent to Ms. Duvall?

6             THE WITNESS:  Yes, sir.  And actually, I think

7    that's how Mr. Chasen came up with the math, because it was

8    16 percent between everybody, if I'm not mistaken.

9    BY MR. SHURBERG: (Resuming)

10       Q    How many siblings did you have as of 1997?

11       A    There was six of us, total.

12       Q    And just so the record is clear, can you name

13   them all, please?

14       A    Glendell Bumbray, who's passed; Sharon Bumbray

15   Watts, Sanita Bumbray, Eric Bumbray, Kevin Bumbray, and

16   myself.  And Jeanne Duvall.

17       Q    So a total of seven people.

18       A    Yes.

19       Q    Including Ms. Duvall.

20       A    Yes.

21       Q    Now, do you recall -- now, in the trial in the

22   Superior Court in 2001, Ms. Jeanne Duvall raised a lot of

23   defenses to your claim that there was an agreement between

24   the two of you, correct?

25       A    Yes.

74

1    Q    She claimed that you had lied to her.

2    A    Yes.

3    Q    And tricked her and a whole bunch of other

4   things.

5    A    Correct.

6    Q    And as to your claim of a breach of an oral

7   agreement, did the jury rule in your favor or hers?

8    A    They ruled in my favor.

9    Q    And do you recall the jury being asked a question

10   as to whether or not you were acting on behalf of yourself

11   alone or on behalf of you and your siblings?  Do you recall

12   that?

13    A    They asked -- yes, I do.

14    Q    Do you remember what the jury concluded in its

15   verdict?

16    A    They believed that I had acted for myself.

17    Q    And do you remember the approximate amount of the

18   judgment that you received?

19    A    If I'm not -- I'm not sure.  I think maybe

20   14 percent?  Something?  I'm not sure.

21    Q    Do you remember the dollar number?

22    A    Twenty thousand, maybe.  Eighteen thousand?

23    Q    Now, let me show you (inaudible) show you

24   (inaudible) Exhibit E (inaudible).

25         Let me ask you first if you can identify that

1  document.

2      A    Superior Court District of Columbia Civil

3  Division, Elmer Bumbray, Plaintiff, versus Jeanne Duvall,

4  Defendant, and I guess this is the legal document stating

5  that I'm suing Jeanne Duvall.

6      Q    Does it have a title in big bold letters there

7  underneath the caption?

8      A    "Complaint for Damages"?  Legal jargon.

9      Q    (Inaudible) direct your attention to page 5, and

10 specifically to paragraph -- paragraphs 21 and 25.  How

11 much were you asking for in your claim for breach of

12 damages?

13     A    $192,578.40.

14     Q    And that was based on this 84-16 split we talked

15 about earlier?

16     A    Correct.

17     Q    And instead you received 20-something thousand

18 dollars.

19     A    Correct.

20     Q    Okay.  Now, is that document signed by you?

21 On the last page?

22     A    Yes, it is.

23          MR. SHURBERG:  I don't have -- well, I don't have

24 any further questions, Your Honor.

25                         **CROSS EXAMINATION**

76

1   BY MR. TOULOUSE:

2        Q    Good morning, Mr. Bumbray.

3        A    Good morning, Mr. Toulouse.

4        Q    You have before you Debtor's Exhibit E, your

5   complaint against Jeanne Duvall, correct?  The one you were

6   just reading from.

7        A    Okay, yes.

8        Q    I direct your attention to page 5, same page you

9   were on, paragraph 23.  Would you read paragraph 23 to

10  yourself?

11       A    Sure.

12       Q    And let me know when you're done.

13       A    Okay, I'm done.

14       Q    Now, your complaint requested that the 84 percent

15  be paid to you and you alone, correct?

16       A    Yes.

17       Q    Because it's your testimony today, as it was a

18  few years ago in Superior Court, that that's the agreement

19  you had with Jeanne, right?

20       A    Yes, that is the agreement I had with Jeanne.

21       Q    Had nothing to do with your siblings, did it?

22            MR. SHURBERG:  Objection, Your Honor.  And again

23  I (inaudible) res judicata in the Superior Court.

24            THE COURT:  Overruled.

25  BY MR. TOULOUSE: (Resuming)

77

```
 1        Q     It had nothing to do with your siblings, did it,
 2   Mr. Bumbray?
 3        A     Uh -- well --
 4        Q     That's a yes or no.
 5        A     Can I explain?
 6        Q     No.
 7        A     No.
 8        Q     You asked Jeanne to resign as personal
 9   representative of her mother's estate in 1996, did you not?
10              MR. SHURBERG:  Objection, relevance.
11              THE COURT:  Overruled.
12              THE WITNESS:  Me, Jeanne and Mr. Chasen, if I'm
13   not mistaken --
14   BY MR. TOULOUSE: (Resuming)
15        Q     Mr. Chasen?
16        A     -- spoke to Jeanne in regards to that topic.
17        Q     And you were going to be appointed personal
18   representative of her mother's estate, correct?
19        A     Yes.
20        Q     That was the idea.
21        A     That's what we discussed, yes.
22        Q     All right.
23        A     All three of us together.
24        Q     And you had told Mr. Chasen that you were
25   Henrietta's son, didn't you?
```

1    A    I was Henrietta's son.

2    Q    Excuse me?

3    A    I was Henrietta's son.

4    Q    I'm sorry, I --

5    A    I was Henrietta's son.

6    Q    Were you her blood relative?

7    A    No.

8    Q    You were her stepson.

9    A    Yes.  But if you knew the relationship that we

10   had, she wanted to adopt me and everything.  So as far as

11   I'm concerned, that was my mother and is still my mother.

12   Q    But you had signed a petition for probate at

13   Mr. Chasen's office wherein you claimed that you were

14   Henrietta's son, did you not?  That's a yes or no.

15   A    In my mind, yes, that's my mother.

16   Q    And you signed a petition --

17   A    Yes.

18   Q    -- for probate, under oath --

19   A    Yes.

20   Q    -- that you were her son.

21   A    Yes.

22   Q    And you weren't her son.

23        MR. SHURBERG:  Objection.

24        THE COURT:  Overruled.

25        THE WITNESS:  Technically speaking, no.

1  BY MR. TOULOUSE: (Resuming)

2      Q    And Jeanne wouldn't resign as personal

3  representative of her mother's estate, would she?

4      A    She did not resign, no.

5      Q    Some time went by, right?

6      A    Yeah, eleven years now.

7      Q    No, you asked her to resign in November of 1996.

8      A    We discussed her resigning in Mr. Chasen's office.

9  Don't be trying to make me a villain.  I'm not a villain.

10 That's my sister.

11     Q    At that time, you were going to get all the

12 money, right?

13     A    At that time I was going to get 84 percent.

14     Q    You didn't change that agreement?

15     A    No.

16     Q    I direct your attention to page 2 of the

17 complaint, paragraph 10.  Read it to yourself and tell me

18 when you're done.

19     A    I'm done.

20     Q    Subparagraph (1) says you would pursue the claim,

21 right?

22     A    Yes, that's what me and Jeanne agreed to.

23     Q    Subparagraph (2), that you, the money -- the

24 property would be the exclusive property of you, correct?

25     A    Excuse me, excuse me.  When you say

80

1   "subparagraph," I don't understand.

2       Q    Forgive me.  There's a parentheses there, one,

3   and then there's a parentheses two.

4       A    Okay.

5       Q    Read parentheses two.

6       A    "Such monies as were recovered would be exclusive

7   property of Plaintiff and not the Defendant."

8       Q    All yours, right?

9       A    That's what me --

10      Q    "Exclusive."

11      A    That's what me and Jeanne -- the first agreement

12  was about, yes.

13      Q    So you changed that agreement.

14      A    Yes.  We, all three of us did.  Me, her and

15  Mr. Chasen.  I don't have the power to change it alone.

16  I don't have that power.

17          THE COURT:  And you changed it to what?

18          THE WITNESS:  Me, Jeanne and Mr. Chasen had

19  changed it to the 84-16.

20  BY MR. TOULOUSE: (Resuming)

21      Q    You knew, didn't you, Mr. Bumbray, that you

22  needed Jeanne as personal representative of the estate to

23  pursue the claim, right?

24      A    Based on what Mr. Chasen told me, yes.

25          MR. SHURBERG:  Your Honor.  Let me just

1   (inaudible) if I could, place my objection on the record.

2   I want to object because, again, we are now way deep in --

3             THE WITNESS:  1996.

4             MR. SHURBERG:  -- re-litigating all the issues

5   that were the subject of a five-day trial in Superior Court

6   that were litigated, affirmative defenses were raised, I

7   will tell you -- I will proffer that _____ put

8   Ms. Duvall back on, put her answer into evidence, and her

9   answers to interrogatories into evidence, all of this was

10  heard --

11            THE COURT:  She's conceded today it's an

12  84 percent for the X number of siblings.

13            MR. SHURBERG:  And she raised issues of duress

14  and mistake and trickery and lies and fraud and everything

15  else (inaudible).

16            THE COURT:  Understand.  Overruled.

17  BY MR. TOULOUSE: (Resuming)

18      Q    You knew the money belonged to the estate, didn't

19  you, Mr. Bumbray.

20      A    No, I didn't.

21      Q    Did you ever meet with Mr. Chasen after the

22  hearing in the summer of 1997 to talk about the

23  distribution of the proceeds without Jeanne Duvall present?

24      A    I think me and Chasen met without Jeanne before,

25  yes.

82

1    Q    And at that time Mr. Chasen was Jeanne Duvall's

2    lawyer, was he not?

3    A    I'm not sure in regards to the timing when he

4    became her lawyer, when he didn't.  Again, I'm not an

5    attorney.  I just had an agreement with my sister.  We rode

6    back and forth to an attorney's office.  Went to

7    Baltimore's Workmen's Comp, we got a win, and we thought it

8    was over.

9    Q    Well, Mr. Chasen was your attorney at first, was

10   he not?

11   A    I hired him, yes.

12   Q    And then, at the meeting in March of 1997 --

13   A    Uh-huh.

14   Q    -- Mr. Chasen resided as your lawyer, didn't he?

15   A    I'm not sure.  I'm not sure how that all worked.

16   To be honest with you.

17   Q    But he did become Jeanne's lawyer as personal

18   representative at that meeting, right?

19   A    I thought -- well, now when I look back on it --

20   I thought if he became her attorney as personal

21   representative she would have to sign something over to

22   him?  I don't know if she did or not.  To be honest with

23   you.  I mean, like I said, that's 11 years ago.  This case

24   has been going on -- and our ups and down, Maryland, D.C.

25   Superior Court, there's five, six attorneys involved.  I

1  can't really keep up with it all.

2      Q    But Mr. Chasen, from that moment forward in March

3  of 1997, represented Jeanne as personal representative of

4  the estate in the workers compensation proceedings, right?

5          MR. SHURBERG:  Objection.  (Inaudible) already

6  testified (inaudible).

7          THE COURT:  I think it's a slightly different

8  question.  Overruled.  If the witness knows the answer,

9  fine.

10         THE WITNESS:  From what I recall, Mr. Chasen

11  represented us and he received the money.  So if -- and

12  then she got the money, so I guess -- excuse me -- it went

13  to her and, yeah, so I guess that was her attorney.

14  Because he received the money for her, she received the

15  money.  So in a simplistic way of thinking for myself, yes.

16         THE COURT:  You can deduce that.  All right.

17  Go ahead, Mr. Toulouse.  Stands to reason.  Anything else

18  of this witness?

19         MR. TOULOUSE:  One final question.

20  BY MR. TOULOUSE: (Resuming)

21      Q    You had two retainer agreements with Mr. Chasen?

22         MR. SHURBERG:  Your Honor, I'm going to

23  (inaudible) objection (inaudible) relevance.

24         THE COURT:  I can't hear your objection.

25         MR. SHURBERG:  (Inaudible)

1         THE COURT:  You need to get that microphone

2    turned towards you instead of --

3         MR. SHURBERG:  Just put an objection on the

4    record, Your Honor, on the grounds of relevance and for the

5    same reasons I've stated earlier, to the fact that all of

6    these issues were litigated fully in the Superior Court.

7         THE COURT:  Overruled.  Let's hear what he says,

8    for what it's worth.

9    BY MR. TOULOUSE: (Resuming)

10        Q     Let me break it up.  You have an agreement with

11   him to represent you in reference to the workers

12   compensation proceedings, correct?

13        A     Along with Jeanne Duvall.

14        Q     Well, but first you had hired Mr. Chasen --

15        A     Correct, right.

16        Q     -- way before --

17        A     No --

18        Q     -- you even brought Jeanne into the picture,

19   right?

20        A     It wasn't way before.  It was like a month or

21   two.

22        Q     A few months.

23        A     Right.

24        Q     Okay.

25        A     Okay.

1      Q     And you went down to Workers Comp with him,

2   right?

3      A     And her, yes.

4      Q     Well, the first time you went Mr. Chasen and you

5   couldn't move forward because you didn't have the personal

6   representative, right?  Remember that?

7      A     If I'm not mistaken, and I could be wrong, Jeanne

8   might have been there the -- there also.  I'm not sure.

9   And I'm not sure.  Because I know we were real close.

10  Actually, we were living together at the time.

11     Q     The second agreement was a contingency agreement,

12  right?  That if you won, Mr. Chasen would get a piece of

13  the action.  Right?

14           MR. SHURBERG:  Objection.

15           THE WITNESS:  Again --

16           THE COURT:  I don't see the relevance of that,

17  counsel.

18           MR. TOULOUSE:  Well, Your Honor, what I'm trying

19  to establish here is the background of what was going on

20  here in terms of my client, in terms of what was

21  transpiring during these months.  We have a lawyer

22  representing Mr. Bumbray with a workers comp retainer and

23  a contingency retainer, but then changes his hat, no longer

24  represents Mr. Bumbray, then represents Ms. Duvall, but

25  then meets with Mr. Bumbray after the money comes in,

1   without Ms. Duvall.  And I think that's relevant.

2           THE COURT:  Well, this witness can't remember

3   anything, so.

4           MR. TOULOUSE:  Well.

5           THE COURT:  Finish up.

6           MR. TOULOUSE:  Very well.  I have no further

7   questions, Your Honor.

8           MR. SHURBERG:  No redirect, Your Honor.

9           THE COURT:  You may step down.  Thank you.

10          THE WITNESS:  Thank you, Your Honor.

11          MR. SHURBERG:  Your Honor, can  Mr. Bumbray stay

12  in the courtroom at this point?  I don't anticipate

13  re-calling him for any reason.

14          THE COURT:  Mr. Toulouse, any objection?

15          MR. TOULOUSE:  I don't know what Mr. Shurberg's

16  going to do next.  Is he calling my client?  It might be --

17  I mean, I might re-call him, I don't know.

18          THE COURT:  If you could remain outside the

19  courtroom, Mr. Bumbray.  I think we're pretty close to

20  wrapping it up.  And we'll let you know when you can come

21  back in.

22          THE WITNESS:  (Inaudible).

23          THE COURT:  Thank you, sir.

24          MR. SHURBERG:  Your Honor, I would re-call Jeanne

25  Duvall to the stand.

1          THE COURT:  Ms. Duvall, the Court will remind you

2    that you've been sworn and you remain under oath in this

3    proceeding.

4          THE WITNESS:  Okay, yes, sir.

5                    **RECROSS EXAMINATION**

6    BY MR. SHURBERG:

7      Q    Ms. Duvall, you testified earlier that you did

8    make an agreement with Mr. Elmer Bumbray with respect to

9    the 84/16 split that we talked about earlier, correct?

10     A    Yes.

11     Q    And that that split was 84 percent for Elmer and

12   his siblings and 16 percent for you.

13     A    Correct.

14     Q    Correct.  And you filed an answer to the

15   complaint in the Superior Court, correct?

16     A    Yes.

17     Q    Okay.  And you also filed a counterclaim as part

18   of that answer, correct?

19     A    I guess so, yes.

20     Q    Okay.

21         THE COURT:  Why do you have to call this witness?

22   I'm not sure where you're --

23         MR. SHURBERG:  Your Honor, I just want to put --

24   for legal purposes, I want to put the pleadings, the answer

25   and her answers to interrogatories into evidence, and then

1  I'm going to be done.

2          THE COURT:  Well, there are no objections to the

3  pleadings that have been mentioned, Mr. Shurberg, are

4  there?

5          MR. SHURBERG:  And Your Honor, it's Exhibit 8

6  and -- Exhibit 9 is the response to interrogatories, and

7  Exhibit 11 is the amended third-party complaint against

8  Mr. Chasen.  And if there's no objection to those, then I'm

9  finished with the witness.

10         MR. TOULOUSE:  May I see them?

11         THE COURT:  Yes.

12         MR. TOULOUSE:  (Inaudible) have copies

13  (inaudible).

14         MR. SHURBERG:  Yes.

15         MR. TOULOUSE:  No objection.  Nine, eight and --

16         THE COURT:  Eight, nine and 11 are received into

17  evidence.

18                              (Whereupon, Claimants' Exhibits 8,

19                               9 and 11 were received into

20                               evidence.)

21         MR. SHURBERG:  Your Honor, I believe that

22  finishes my need for Ms. Duvall to be on the stand.  I do

23  have a couple of other exhibits that I want to discuss with

24  Your Honor, but Ms. Duvall does not need to be on the

25  stand.

1          THE COURT:  Thank you, Ms. Duvall.  You may step

2    down.

3          THE WITNESS:  Thank you.

4          MR. SHURBERG:  Your Honor, as I indicated

5    earlier, I do have a small portion of the transcript that

6    I had for purposes of the appeal back in, think it was

7    2003, that there -- and I have prepared an exhibit which is

8    some of the argument between Mr. Toulouse, myself, and

9    Judge Herbert Dixon in the Superior Court, dealing with the

10   issue of Mr. Bumbray acting on his own before, for the

11   siblings -- there's a segment there.  There's also a --

12   that's Exhibit 5, for the record.  Let me just --.

13         Exhibit 6 is a one-page segment of the

14   transcript, which is Judge Dixon's giving the instruction

15   that flows out of the conversation that he had with

16   Mr. Toulouse and myself in Exhibit 5.  Exhibit 5 is a

17   roughly 10-page excerpt from the discussion about jury

18   instructions in this, and I think it goes directly to this

19   issue.

20         And Exhibit 7, Your Honor, as I made reference to

21   earlier, the actual executed jury verdict form is not in

22   the file.  What I found is the -- my blank copy of the jury

23   verdict form.  I think it has some probative value, Your

24   Honor, in the sense that if you look at 5 and 6 and 7, and

25   I will save for argument what I believe flows out of --

1   from the complaint, Elmer Bumbray's complaint, how we get

2   to the siblings' claim, I think flows very logically

3   through Exhibits 5, 6 and 7.

4         I would ask Your Honor to receive those.  Again,

5   5 is a transcript, 6 is a transcript, and 7 is the jury

6   verdict form.

7         THE COURT:  Any objection?

8         MR. TOULOUSE:  I have to read them.  I don't know

9   what he's offering them for and I haven't had an

10  opportunity to read them, Your Honor.  Number 7 is blank.

11  A jury verdict form that's blank.

12        THE COURT:  I understand.

13        MR. TOULOUSE:  I don't know what his

14  proposition -

15        THE COURT:  But you don't question that that's

16  the jury form that was -- the verdict form that was handed

17  in to the jury?

18        MR. TOULOUSE:  Well, but I don't know what

19  Mr. Shurberg says -- position is as to how the jury

20  answered number 2, which is, and I'll quote, Your Honor,

21  "On whose behalf did Plaintiff Elmer Bumbray bring this

22  lawsuit?  Either on behalf of himself and the biological

23  siblings or on his own behalf to use at his sole

24  discretion?"  I mean, I don't know what Mr. Shurberg's

25  position is on that.

91

1              THE COURT:  And the answer the jury gave was that

2    it was on his own behalf.  They answered the second of the

3    two alternatives.  There's no dispute about that, right?

4              MR. TOULOUSE:  Oh, I don't know.  I haven't heard

5    it from Mr. Shurberg.

6              MR. SHURBERG:  That's correct, Your Honor.

7              THE COURT:  There's no dispute about that, right,

8    Mr. Toulouse?

9              MR. TOULOUSE:  I never know what's in dispute or

10   not, Your Honor, until I hear it from counsel.  If that's

11   his position, that the case was brought in his own behalf

12   to use at his sole discretion, so be it.

13              The other two, I really do need to read them.

14              THE COURT:  All right.  I'll take a recess.

15              MR. TOULOUSE:  Thank you.

16              THE CLERK:  All rise.  This Court will stand in

17   a brief recess.

18              (Whereupon, a brief recess was taken.)

19              THE CLERK:  All rise.  This Court is again in

20   session.  Please be seated and come to order.

21              THE COURT:  Any objection to Exhibits 5, 6 and 7?

22              MR. TOULOUSE:  Yes, Your Honor.  And they are

23   these.  Five is argument.  It's argument by Mr. Shurberg,

24   primarily, about what he wants the Court to do in reference

25   to jury instructions.  We have the jury verdict form.

1  You know, if Mr. Shurberg wants to make argument today,

2  by all means, he should do so.  But to submit ten pages of

3  his argument to the Court about jury instructions, I have no

4  idea how that helps this Court.

5          Number 6 is one page of the Court's instructions

6  to the jury, a selective page that apparently Mr. Shurberg

7  thinks benefits him.  I don't remember and I don't have a

8  copy of the rest of the transcript about what those

9  instructions were.

10          So 5 and 6 I would object to, especially in

11  light of the fact that I don't object to 7, with the

12  understanding that the blank that was filled in on 2 is

13  "On his own behalf to use at his sole discretion."  That

14  says it all.  That's what the jury found.  What we argued

15  is not really relevant to these proceedings, Your Honor.

16  Thank you.

17          MR. SHURBERG:  Your Honor, if Mr. Toulouse would

18  like the rest of the instructions, the reason I used the

19  transcript of that is because that was a special instruction

20  that the Court did not give us a written version of in

21  advance.  We discussed it at the bench.  The Court indicated

22  what he was going -- the Judge was going to do.  I think he

23  may have given it to us in writing, but he didn't -- but if

24  he wants the pattern instructions that were given into

25  evidence, so that Your Honor has all of the instructions,

93

1  not just one instruction in isolation, I think that's the

2  only one that's relevant to this proceeding, but if he wants

3  all of them I have all of them.  I don't have a problem with

4  that.

5        I think 5, Exhibit 5, which is the transcript,

6  yes, it's argument, but it gets us to -- gets you to have an

7  understanding of how we get to 7, which is the verdict

8  sheet.  It gets us -- we start out with a request by me, the

9  Judge had some concerns about it, and we discussed, and so

10  you can see what everybody was thinking.  Mr. Toulouse was

11  part of that colloquy as well, there's some back and forth

12  as to how we're going to address this issue of who

13  Mr. Bumbray was acting on behalf of in the lawsuit, which,

14  just to preview argument, is, that's different than who the

15  agreement was made for.  The question on the jury verdict

16  form was who was he acting for in the lawsuit, just to be -

17  well.  In other words, it was not who was the agreement made

18  for, it was who was he acting on behalf of in the lawsuit.

19        And we ended up with the result I was trying to

20  avoid in the discussion with Judge Dixon, but that's

21  unfortunately sometimes the way that it goes.  But I think

22  it gives Your Honor a flavor for how we get from where we

23  were to where we are.

24        So I would ask Your Honor to admit 5, 6 and 7.

25        If the question is the completeness of the jury

94

1   instructions, I do have the remainder of the pattern

2   instructions that were given by the Judge, as well.

3             THE COURT:  I'll receive Exhibit 7 into evidence.

4                       (Whereupon, Claimants' Exhibit 7

5                        was received into  evidence..)

6             THE COURT:  Exhibit 6 I'll receive into evidence

7   with the balance of the instructions.  You'll have to

8   substitute the entire instructions as Exhibit 6 in place of

9   the partial instructions.

10                      (Whereupon, Claimants' Exhibit 6,

11                       with modifications to be made,

12                       was received into evidence..)

13            THE COURT:  And Exhibit 5, even though it's

14  argument, which the objection is that it's argument and it

15  should be argued today, not back then, that objection is

16  overruled to the extent that it helps the Court understand

17  what the issues were in the Superior Court, I'll receive it

18  into evidence.

19                      (Whereupon, Claimants' Exhibit 5

20                       was received into evidence.)

21            MR. SHURBERG:  Your Honor, I'm going to just show

22  Mr. Toulouse I had -- these are the remainder of the

23  pattern instructions that I had.  I believe they're

24  complete, that they were all together in my file.  I can't

25  vouch for whether there might be one that fell off, but

1  they are ones that the Judge gave to us during the trial.

2           And I'm just going to append the first page -

3  or, excuse me, the transcript of 6 to the front, and then

4  the remainder of the pattern instructions to the back of

5  the existing exhibits.

6           THE COURT:  That's fine.

7           MR. TOULOUSE:  I mean, are they complete?  Are

8  they not complete?  Your Honor, I have no idea.  I may have

9  a file in storage somewhere that would have these

10 instructions.  I may not.  This was a long time ago.

11 Again, this is the first time I've seen this.  It's just

12 patently unfair, Your Honor, to say, "Well, these

13 instructions are relevant to this proceeding and here they

14 are, I think."

15          MR. SHURBERG:  Your Honor, I'm happy to have

16 Exhibit 6 without the remainder of the instructions.  I

17 thought there was a complaint, and I didn't have a problem

18 with it being all of them.  But I'm happy to have it stand

19 on its own.

20          MR. TOULOUSE:  Your Honor, Mr. Shurberg just said

21 he wasn't sure whether they were all (inaudible) and I'm not

22 either.

23          I would at least -- I mean, I don't want to take

24 up the Court's time now or the parties' and witnesses, but

25 I would at least like to have an opportunity to determine

1  whether these are in fact the instructions that were given,

2  to the extent that I can do that.  Which would mean I'll

3  have to, I suppose, retrieve the file from storage, see

4  what I've got in my file --

5           THE COURT:  Well, it's Mr. Shurberg's position

6  that Exhibit 6, the one-page Exhibit 6, is the only

7  pertinent instruction regarding Exhibit 7, the jury verdict

8  form, or the part of it that deals with the issue before

9  the Court today.  Correct?

10          MR. SHURBERG:  That's correct, Your Honor.

11          MR. TOULOUSE:  I don't know if that's accurate.

12  I don't know (inaudible) it's got one page, I mean, why not

13  have the whole thing?

14          MR. SHURBERG:  Your Honor?

15          THE COURT:  This is a ministerial matter.  I

16  could put Mr. Shurberg on the stand and have him testify to

17  it, and he -- that's his representation.  I don't see why

18  it ought not come into evidence.  If you want him to get on

19  the stand, I think he can do it without breaching the D.C.

20  ethics rules, because it's just a ministerial matter of

21  saying, "This is the instruction that was received on that

22  particular issue."

23          MR. TOULOUSE:  I'm not doubting him.  In fact,

24  I believe him then when he says he doesn't know if these

25  are all the instructions.  What if there's a significant

97

1    instruction that's missing?  That has a bearing on the one

2    that he's put in there?  I don't know.  You know?

3         THE COURT:  Well, he's representing this is the

4    only one he's found.  And I think that it's the best

5    evidence we've got, so I'll let Exhibit 6 come into

6    evidence.

7         MR. TOULOUSE:  Very well.

8         THE COURT:  With or without the additional

9    instructions.  It's up to you, Mr. Toulouse.  The

10   additional ones that he suggested might be appended to it

11   if you like.

12        MR. TOULOUSE:  Well, I won't take the Court's

13   time now to review them.  I'd just like --

14        THE COURT:  I'll just receive the one-page

15   exhibit in, then.

16        MR. TOULOUSE:  Very well.

17        THE COURT:  Exhibit 6 is received into evidence.

18   Thank you.

19                      (Whereupon, Claimants' Exhibit 6

20                       was received into evidence..)

21        MR. SHURBERG:  That's all I have, Your Honor, for

22   the Creditor.

23        THE COURT:  Anything else on behalf of the

24   Debtor?

25        MR. TOULOUSE:  No, Your Honor.

1          THE COURT:  All right.  All right, when you're

2     ready, Mr. Toulouse.

3          MR. TOULOUSE:  Very well, Your Honor.  The

4     Claimants' claims are based upon a theory that they are

5     somehow intended third-party beneficiaries of the agreement

6     between Ms. Duvall and Mr. Bumbray.  Now, to be an intended

7     third-party beneficiary the principals, the contracting

8     parties, have to, as the name suggests, intend for the

9     beneficiary to be a third-party beneficiary.  They have to

10    agree that somebody will benefit from their contract.

11          The evidence in this case is clear.  Ms. Duvall

12    testified that her understanding of the agreement, extracted

13    from her through fraud and misrepresentation by Mr. Bumbray

14    and Mr. Chasen, albeit but -- was that the agreement was a

15    split between -- the ultimate agreement, 16 percent and 84

16    percent for the siblings.  Mr. Bumbray, on the other hand,

17    as evidenced by his complaint and as evidenced by his

18    conduct and testimony throughout the Superior Court

19    proceedings and here, was of the view that the agreement was

20    for his benefit and his benefit alone -- the 84 percent,

21    that is.

22          The 16 percent was arrived at when Mr. Bumbray and

23    Mr. Chasen realized that they needed Jeanne Duvall and the

24    only way they could get her was to offer her some piece of

25    the action, and that's what they did.  All the while, she

1    thought that the siblings were entitled to these monies, she

2    was not.  Mr. Bumbray knew otherwise; Mr. Chasen knew

3    otherwise.  Be that as it may.  That's how she arrived at

4    that understanding about the siblings and her.  Her position

5    is, "I'm not entitled to it, so says the insurance company.

6    If you are, because you're his children, so be it."  "If."

7    And they weren't.  It belonged to the estate.

8            You don't even need to go there, Your Honor.

9    We don't even need to go there because how could these third

10   parties be beneficiaries if the two contracting parties

11   don't agree that they are beneficiaries.  It needs to be

12   mutual; it wasn't.

13           In any event -- and this is all in our reply to

14   the opposition to the objection to claim, Your Honor.

15   The law is in that document, and I'm outlining it for you.

16   Even if they were intended third-party beneficiaries --

17   let's say hypothetically they were -- the law of third-party

18   beneficiaries is that one of the parties can revoke that

19   status of beneficiary if the beneficiary does not know of

20   the agreement and has not relied upon the agreement in any

21   way, shape or form.  And what do we know here?

22           We know, in our hypothetical, that the parties

23   reached an agreement in 1995, the original agreement where

24   Elmer would receive everything.  So says Elmer.  And that

25   they reached another agreement in March of 1997 where we

1  would have this 16/4 split.

2         The dates are important, Your Honor.  Sharon

3  Bumbray and Kevin Bumbray knew nothing about this matter,

4  knew nothing about anything even remotely relating to a

5  claim in their behalf in regards to this matter, until after

6  the Superior Court trial.  They met with Mr. Shurberg in his

7  office, it was his idea, he's the lawyer, was his scheme

8  that now the siblings would get a bite -- try to take a bite

9  of the apple.  That was some time after 2001.  July of 2001

10 was the trial.  The testimony of Sharon Bumbray and Kevin

11 Bumbray was that this meeting in Mr. Shurberg's office

12 occurred after that time.

13        Again, assuming they were intended third-party

14 beneficiaries, can one of those contracting parties revoke

15 that status?  Yes.

16        Did one of those parties revoke that status?

17 Of course.

18        When Ms. Duvall came to see me in September of

19 1997 and found out the truth, that she -- that is, the

20 estate -- was entitled to all of these proceeds and that she

21 had been deceived, we immediately demanded all of the

22 proceeds from Mr. Chasen.  There are documents in evidence.

23 I think it's my letters to Mr. Chasen, I believe it's A and

24 B, and then my letter to the insurance company, which is C -

25 - the first letter was September 25, 1997, the second

1    October 1, 1997, the third October 7, 1997, and then

2    Ms. Duvall's letter discharging Mr. Chasen, October 8, 1997.

3    If that's not a revocation of this hypothetical benefit for

4    these hypothetical intended third-party beneficiaries, Your

5    Honor, I don't know what is.  If it existed ever, as

6    intended beneficiaries.

7            In 1997 she revoked.  They didn't even know about

8    this case or their, quote, "interest in this case," until

9    that scheme was cooked up by Mr. Shurberg after the trial

10   in 2001.  Some four years later.  They didn't talk to

11   Ms. Duvall, they knew nothing about this.  It was only as

12   a result of their meeting with Mr. Shurberg.

13           THE COURT:  She was trying to revoke the entire

14   agreement, not just the third-party beneficiary aspects of

15   it.

16           MR. TOULOUSE:  Well, absolutely.  I mean, if one

17   assumes that they were third-party beneficiaries -- and I

18   don't know how one can, when the parties don't agree that

19   they are --

20           THE COURT:  Assume they did.

21           MR. TOULOUSE:  Assume they were, she was revoking

22   everything.  She wanted the money and was entitled to it,

23   and got it.  That is obviously inconsistent with the

24   continuing status of a third-party beneficiary.  A

25   revocation is possible.  The case is Fields versus

1  Tillerson, Your Honor, I argued it in the D.C. Court of

2  Appeals; it established that principle in the District of

3  Columbia, that it can be revoked.  And it was revoked in

4  that case and it was revoked here.

5           It's an insurmountable hurdle for these two

6  claims.

7           THE COURT:  Well, it says "the parties repudiate

8  the third-party contract."  "Parties" meaning Elmer Bumbray

9  and the Debtor, Ms. Duvall.

10          MR. TOULOUSE:  Either --

11          THE COURT:  They didn't do that.  She did.

12          MR. TOULOUSE:  Either one, Your Honor.  The law

13  is that either one can revoke.  And if Your Honor would

14  prefer, I'll find the citations.

15          Well, Fields v. Tillerson stands for the

16  proposition that "The parties control whether the benefit

17  continues after it's made because the parties to a contract

18  entered into it with the intend to give rights to a third

19  party can rescind, modify or abrogate the contract without

20  the assent of a third-party beneficiary any time before the

21  third party accepts, adopts or acts on the contract.

22  Either one of them can revoke."

23          That's exactly what happened in Fields versus

24  Tillerson.  There was a settlement agreement.  It was

25  revoked.  And the third-party beneficiary lost status.

1          Remember, Your Honor, the difficulty that the

2    Claimants have here is that while in our hypothetical

3    Ms. Duvall is revoking any alleged third-party beneficiary

4    rights in September of 1997, Mr. Bumbray is of the view

5    that they never had them in the first place, as evidenced

6    by his complaint and his testimony.

7          If the Court finds that the Claimants are

8    intended third-party beneficiaries and further finds that

9    their status has not been revoked for some reason, then

10   their claims are barred by the claim preclusion branch of

11   res judicata.  Two things are required.  One, the claim or

12   cause of action must be the same and the parties must be

13   the same or in privity.  And if the parties are in privity,

14   none of the parties can re-litigate any issue arising out

15   of the same cause of action, whether or not the issues were

16   raised in the first proceeding.

17         The contract that the Claimants are attempting to

18   enforce is obviously the same contract that was the subject

19   matter of the Duvall-Bumbray litigation.  And if the

20   Claimants are third-party beneficiaries, as they claim,

21   then they are obviously, to be such, in privity with Elmer.

22   And we've cited the cases in our brief, Your Honor.

23   Privity has been described as mutual and successive

24   relationships to the same right or property.

25         Because they're claiming as third-party

1  beneficiaries of the contract, the Claimants represent the

2  same legal reg in respect of the contract as does Bumbray.

3  They may not re-litigate any issue arising out of the same

4  cause of action, whether or not the issues were raised in

5  the first proceeding.  They are barred, Your Honor.

6        I've saved the statute of limitations argument

7  for last because I don't think the Court even needs to get

8  there, although if the Court chooses to I guess it doesn't

9  have to get to the third-party beneficiary argument of the

10  Claimants.  The claim filed in this Court states that the

11  debt was incurred on August 6th, 1997.  That is around the

12  time that Jeanne Duvall -- it's really about one month

13  later -- that Jeanne Duvall demanded her funds from

14  Mr. Chasen.  August 1997, September 1997.

15        Their complaint, Your Honor, was filed on

16  February 14, 2003.  That's six -- over six years later.

17  Why was it filed so late?  Because they basically didn't

18  have a claim and Mr. Shurberg created it.

19        I don't think claimants, plaintiffs can sit on

20  their rights.  If they have a claim, they think it's a

21  claim, they need to bring a cause of action, they didn't do

22  that, over six years later the statute of limitations bars

23  their claims.

24        I have not found -- and perhaps Mr. Shurberg can

25  enlighten us -- but I have not found any discovery rule

1   that applies to contracts, Your Honor.  I've found

2   discovery rules that apply to torts.  And in my view, a

3   discovery rule does not apply to contracts.  The Claimants

4   themselves indicate the date of the breach.  The statute of

5   limitations in the District of Columbia is three years.

6        Do not make the mistake of misunderstanding the

7   assertion that was made by the Claimants, and they make

8   this assertion in their claim, that the agreement was made

9   for the benefit of Elmer Bumbray and his siblings.  There

10  was no such finding, Your Honor.  That's why I was somewhat

11  concerned about Mr. Shurberg putting in this jury verdict

12  form.  What was he offering it for?  The attachment to the

13  claims say just the opposite.

14       Now -- and that's essentially what I say in our

15  opposition, "Failing in their efforts to rewrite the jury

16  verdict in their original claims and faced with the statute

17  of limitations defense raised by the Debtor in her

18  objections, the Claimants now invent a discovery rule where

19  none exists, in order to avoid the bar."

20       Even if it did exist, they are not intended

21  third-party beneficiaries.  If they are intended third-

22  party beneficiaries, that status was revoked by the

23  Claimant years before they, quote, "learned of the status"

24  from Mr. Bumbray's lawyer, who is now their lawyer.

25       If you read their objection, Your Honor, they

1   say, the Claimants say, that Bumbray, and I quote, "did not

2   tell them that they were third-party beneficiaries of the

3   agreement between himself and the Debtor because it was his

4   view that in fact they were not beneficiaries."  How in the

5   world can they be intended third-party beneficiaries if one

6   of the principals does not intend them to be beneficiary

7   and they agree.

8           Thank you, Your Honor.

9           One other thing I would just simply like to say,

10  Your Honor, forgive me, is I'm going to ask the Court, if

11  it has not already done so -- and this was a source of the

12  confusion about that misstatement that was made in the

13  claim -- is what was cited was a Court of Appeals decision

14  in the lower, in the Bumbray versus Duvall case.  Attached

15  to the opposition to the claim was the Court's petition for

16  rehearing and order which documented that the agreement did

17  not provide that each of the five siblings was entitled to

18  anything.

19          So that is attached.  I have a copy.  If Your

20  Honor wants it, I have it here.

21          THE COURT:  All right.  Thank you.

22          MR. SHURBERG:  You read it, Your Honor?

23          THE COURT:  Yes.

24          MR. SHURBERG:  Okay.  Let me begin with Exhibit

25  Number 7, which is the jury verdict form.  There are three

 1  questions on the jury verdict form.  One of them is,

 2  "On the Plaintiff's claim of breach of contract against

 3  Defendant Jeanne Duvall the jury finds in favor --" it says

 4  "or" -- "of Plaintiff or the Defendant."  The answer was

 5  the Plaintiff.

 6          The second question is, "On whose behalf did

 7  Plaintiff Elmer Bumbray bring this lawsuit?"  And the

 8  answer was, "On his own behalf to use as his sole

 9  discretion."

10          And the third question was, "What sum of money

11  does the jury award as damages for breach of contract?"

12  And the answer was $26,960.98.

13          Now let me go back, Your Honor, for a moment to

14  the complaint which I believe was Debtor's Exhibit E, and

15  there was testimony, Your Honor, and that exhibit has the

16  number of $192,578.40.  That was the 84 percent.  Okay?

17  There was a higher number of which that was the 84 percent.

18  However, if you take the 192,578 and 40 cents and you

19  multiply that by 84 percent, you come up with -- bear with

20  me a moment, (inaudible) right number -- well, I don't

21  remember the intermediate number, but if you take that

22  84 percent of the 192, which the jury, I believe,

23  mistakenly did, and you divide it by six, because there

24  were six Elmer Bumbray siblings, you end up with

25  $26,960.98, right to the penny.

1              THE COURT:  Well, the Court of Appeals said the

2   jury found the agreement provided Elmer Bumbray was

3   entitled to 14 percent.  So --

4              MR. SHURBERG:  Well, it's --

5              THE COURT:  -- that's what they awarded.

6              MR. SHURBERG:  It's not, it's not --

7              THE COURT:  Fourteen percent.

8              MR. SHURBERG:  -- it is roughly 14 percent.

9   I'm doing the math the way I'm doing it, Your Honor,

10  because that's what the jury did.  In other words, that

11  number seems to come out of left field.  It's not one-sixth

12  of any of the numbers claimed.  It works out to 14 rather

13  than a  little bit higher number, I think, than it ought to

14  have been, but it's actually a little less than 14 percent

15  if you did the math.

16             The way I've just described it, it works out

17  exactly.  I mean, right down to the penny.  So in other

18  words, it's not a compromise verdict, it's not a dart

19  thrown at a wall, it's 84 percent of the wrong number, but

20  then divided by six as if there were six Bumbray siblings,

21  which there were, and then you end up with $26,960.98.

22             What the jury found, Your Honor, is that

23  Mr. Bumbray brought the lawsuit looking at question 2.  Not

24  entered into the agreement, but brought the lawsuit on his

25  own behalf.  It's titled in Elmer Bumbray's name, doesn't

1  say "for the benefit of."  There was testimony, Your Honor,

2  and you've heard it here today, from Ms. Duvall, from

3  Mr. Chasen, that that's what the agreement was.  That was

4  an issue to be resolved in the case.

5          Now, the jury could have, Your Honor, answered

6  questions 1 and 2 exactly the same as they did and come

7  back on number 3 and said, $192,578.40, if they believed

8  Mr. Bumbray's testimony that the agreement was for his sole

9  benefit to use the way he wanted to use it.  But they

10  didn't do that, Your Honor.  They could have.  It would

11  have been a perfectly logical, consistent thing; it would

12  have said, "We choose Mr. Bumbray's version of this

13  disputed fact over that of Ms. Duvall and Mr. Chasen on the

14  other side."  That would have been consistent, it would

15  have been logical, it would have made sense.

16          The one they did, with the slight math error as

17  to 84 percent of what, also makes sense.  It makes sense in

18  the terms of they believed that this was an agreement for

19  Mr. Bumbray and his siblings and that Mr. Bumbray was only

20  acting on his own behalf, therefore he only gets one-sixth

21  of what they considered to be the 84 percent, and it works

22  out to about 161,000 or thereabouts is the intermediate

23  number.  I don't -- I had it nicely written down and I

24  can't locate it right now.

25          So what we have, Your Honor, is pretty clearly

1    Ms. Duvall, by her own testimony, in her complaint, in her

2    answers to interrogatories, in her third-party complaint,

3    Your Honor, which are Exhibits 8, 9 and 11, she

4    acknowledged -- and in her deposition and at trial and here

5    today, that the agreement was an 84/16 agreement.  So if

6    Ms. Duvall gets 16, and Mr. Bumbray gets approximately 14 -

7    - let's just assume the number that the Court of Appeals

8    used is correct, I think it's a little bit off but it's

9    close enough -- and Your Honor, I will ask a question and

10   I want to hearken back, Your Honor.

11          You asked this question way back at one of the

12   earliest hearings in this matter.  "Where did the other

13   70 percent go?"  Where did it go?  Who was it to go to?

14   That was the question you asked, and we were very

15   preliminary, we hadn't gotten into anywhere near the

16   detail, you hadn't heard from the parties as you've heard

17   today, but I will hearken back to that question.  Who gets

18   the other 70 percent of this agreement?  Legally.

19          And the answer is, Your Honor, based on her

20   testimony, Ms. Duvall's testimony, based on Mr. Chasen's

21   testimony, it was for these other people.  Two of whom are

22   sitting here today in this courtroom, Your Honor, and I

23   submit not only is that the only way to make sense of the

24   way this came out, to allow the Debtor to argue what she

25   argued in the Superior Court that in fact this agreement

1   was not for Mr. Bumbray himself but for Mr. Bumbray and his

2   siblings to then prevail on that argument in terms of the

3   jury verdict form, and now to turn around and say, "That's

4   not really what I meant," that is the essence, Your Honor,

5   and we've cited it in our earlier briefs, of judicial

6   estoppel.  You can't say one thing in Court today, win, and

7   then say something else tomorrow and try to take the

8   contrary position.

9          Because that's what she's doing, Your Honor.

10  She's telling you that, "Yeah, that's what I testified to

11  there, but today they're not really third-party

12  beneficiaries.  Yeah, it was 84/16 for Elmer and his

13  siblings, but that was 2001 and now we're in 2006."  You

14  can't do that.  Not only is it collateral estoppel, but

15  it's a very -- you know, the unique branch of collateral

16  estoppel called judicial estoppel; you can't take contrary

17  positions, particularly when you've prevailed.

18          THE COURT:  But if I believe her testimony today

19  that it was 84 percent for the siblings, the six siblings,

20  that's academic.  Correct?

21          MR. SHURBERG:  Correct, Your Honor.  If you

22  believe the testimony and you believe that they were third-

23  party beneficiaries, which was her testimony right out of

24  her mouth, now --

25          THE COURT:  Well, let's move on.

1          MR. SHURBERG:  All right.  So as to, Your Honor,

2  the question of revocation, I think Your Honor hit it

3  exactly.  The parties can agree.  The parties mutually can

4  say --

5          THE COURT:  All right, what's the next issue.

6          MR. SHURBERG:  Your Honor, the statute of

7  limitations was, I believe, the last issue actually raised

8  in the objection to the claim by the Debtor, which was the

9  -- and the testimony today was exactly to the contrary and,

10  in fact, Mr. Toulouse's argument was that these people

11  didn't know until 2001, 2002 time period, the complaint was

12  filed in 2003, ergo the statute of limitations does not

13  apply, they knew.

14          Your Honor, we've cited the cases.  There was a

15  reference to there are no cases about contracts and the

16  discovery rule, Your Honor.  I cited third-party

17  beneficiary law from, I believe, Nevada and if I'm not

18  mistaken, I think it was New Jersey, which Your Honor

19  referred to at an earlier hearing and said, It seems to me

20  that if you don't know about your rights, you have to know

21  about them in order to enforce them, and as long as you do

22  that within three years of your knowledge that you have a

23  right to enforce, that then you are within the statute of

24  limitations.

25          There is no contrary law in the District of

1   Columbia, there's no law affirmatively saying that, but

2   I did cite, Your Honor, in the earlier briefs two cases.

3   I know one is from Nevada, I believe the other was from New

4   Jersey.  That deal with not just discovery rule, but third-

5   party beneficiaries and the discovery rule.

6           With that, Your Honor, I will conclude.

7           THE COURT:  Anything else, Mr. Toulouse?

8           MR. TOULOUSE:  Thank you, Your Honor.  Just very

9   briefly.

10          I don't think Mr. Shurberg was in the jury room,

11  Your Honor.  I didn't see him in there.  What I see is what

12  the Court of Appeals ruled, the stricken language.  The

13  jury did not find what the siblings were entitled to.  That

14  is the bottom line here.  Re-create -- for Mr. Shurberg to

15  divine what this jury verdict form means, what the jury,

16  how the jury arrived, the numbers --

17          THE COURT:  Well, you know, can somebody tell

18  Mr. Elmer Bumbray he's free to come back in?  Did he leave?

19          MS.          :  He left.

20          THE COURT:  He left.  All right, go ahead.

21          MR. TOULOUSE:  So, I mean, the Court of Appeals'

22  supplemental order speaks for itself.  That is exactly what

23  -- that's exactly what was found by the jury as it's stated

24  there.  It's not -- it's 40 percent for Elmer, 16 percent

25  for Jeanne Duvall, you divide the number in his complaint

1    by six, it comes out to something different.  I mean, we

2    can't just stand here and make up numbers and try to fit

3    square pegs into round holes.  We've got the jury verdict

4    form.  Know what it says.

5            Lastly, Mr. Shurberg says nothing about

6    res judicata.  And I would ask Your Honor to look carefully

7    at that argument in addition to the others that I've

8    raised, because that bars them.  If nothing else.  The

9    issue's been litigated and it's barred.  They're in

10   privity, the same cause of action, it's the same contract,

11   it's barred.  And for them to try to resurrect this case,

12   get another bite at the apple -- I commend Mr. Shurberg,

13   I mean, he's creative, if nothing else.  But there's no

14   cause of action here, Your Honor.

15           And this Debtor has been through enough.  She's

16   been through enough.  This has been going on for -- how

17   long?  '97 -- this is ten years.

18           Thank you, Your Honor.

19           THE COURT:  Thank you.  This was a hearing on an

20   objection to proofs of claims filed by two individuals,

21   Kevin Bumbray and his sister, Sharon Bumbray Watts.  They

22   and four others were siblings, the children of Edward

23   Bumbray.  And the Debtor, Jeanne Duvall, is their

24   stepsister.  She is the daughter of Henrietta Bumbray, now

25   deceased, who was the wife of Edward Bumbray, who is the

1    father of the six siblings I referred to.

2            Now, Edward Bumbray died in 1980 in an accident

3    at work.  He was entitled to -- his estate was entitled to

4    workers compensation.  Henrietta Bumbray, as his widow,

5    received workers compensation for several years, and died

6    in 1990.  And then the issue was whether there was any

7    entitlement to workers compensation after that date.

8            Elmer Bumbray approached Jeanne Duvall in 1990

9    saying that he thought the issue ought to be pursued.  She

10   showed him a letter from the insurance company saying that

11   there was no recovery available, and Elmer asked for

12   permission to pursue it and she said go ahead.

13           Well, it turned out, apparently, that Jeanne

14   Duvall had to be a party to any litigation, as the personal

15   representative of Henrietta Bumbray's estate, and the

16   parties struck a deal that in return for joining in the

17   litigation Jeanne Duvall would get 16 percent of the

18   proceeds and the six siblings who were children of Edward

19   Bumbray would get 14 percent each.  And eventually in the

20   litigation the estate of Henrietta Bumbray prevailed.  And

21   the two siblings here, Sharon Bumbray Watts and Kevin

22   Bumbray are suing to enforce the contract in their favor of

23   providing for them to receive 14 percent each of the

24   proceeds of that litigation.

25           The Debtor has objected to the proofs of claims

1   and I've heard evidence and the argument of counsel, and I

2   conclude that the objection should be overruled.

3          Eventually, Elmer Bumbray, who struck the deal

4   with Jeanne Duvall, sued Jeanne Duvall in the Superior

5   Court of the District of Columbia.  He took the position

6   that the agreement for 84 percent was 84 percent for him

7   alone.  She took the position that the agreement was for

8   Elmer Bumbray to recover 14 percent on behalf of himself

9   and other siblings.  In other words, it was 16 percent to

10  her and 14 percent for each of the siblings, of the six

11  siblings.

12         Her version was the correct version.

13         Now, in objecting to the proofs of claims

14  numerous arguments have been raised and I'll address them

15  one by one.  The first is that the claims are barred by the

16  statute of limitations.  It's a three-year statute of

17  limitations.  But if you apply the so-called discovery rule

18  to that statute of limitations these proofs of claim are

19  timely; the parties sued in the Superior Court within three

20  years of learning of the existence of the contract.  They

21  didn't learn about it until the litigation by Elmer Bumbray

22  in the Superior Court resulted in a jury verdict awarding

23  him only 14 percent, and that occurred in July of 2001,

24  I believe.  Their complaint against the Debtor was filed

25  within two years of the discovery of the existence of their

1   right to 14 percent of the proceeds.  Their claim is

2   timely.  They filed suit in the Superior Court in February

3   of 2003.

4           The Court sees no reason why the discovery rule

5   would not apply to third-party beneficiary contracts.

6   There is no specific District of Columbia case on it, but

7   the Claimants have cited case law from other jurisdictions

8   that apply the discovery rule in these circumstances.

9           The next argument that the Debtor raises is that

10  the Claimants are not intended third-party beneficiaries.

11  They take the position that Elmer Bumbray never formed an

12  intention that 14 percent be received by each of the

13  siblings, it was always Elmer Bumbray's intention that he

14  get the whole 84 percent.

15          I credit the Debtor's testimony that the

16  agreement was -- the 84 percent was to be divided equally

17  amongst the six siblings, and that's how the division came

18  about.  Six into 84 percent is 14 percent.  There remain

19  another 16 percent for the Debtor.  Obviously, the parties

20  agreed upon a share for the Debtor that would eliminate

21  fractional percentages for the other siblings.

22          The fact that Elmer Bumbray might have believed

23  that or have asserted that 84 percent was wholly for him is

24  irrelevant because I find that the parties had reached an

25  agreement for 84 percent to be divided six ways amongst the

1  six siblings.  And that there was indeed a third-party

2  beneficiary contract.

3       The next argument is that the third-party

4  beneficiary status was revoked.  For this proposition the

5  Debtor cites Fields versus Tillerson, 726 Atlantic 2d., 670

6  (D.C. 1999).  However, that decision refers to the parties

7  to the contract revoking the third-party beneficiary

8  contract, and that was not done here.

9       The Debtor seeks to have the best of all worlds

10  to limit Elmer Bumbray to only 14 percent and for the other

11  parties not to receive anything, the other siblings not to

12  receive anything, and even though the agreement clearly was

13  for her to receive only 16 percent and she'd get the

14  remaining 70 percent.  That's just not fair and it wasn't

15  the intention of the parties to revoke any third-party

16  agreement that existed.  You can't infer that from the fact

17  that the Debtor now says that there is no such agreement

18  that is enforceable, and that Elmer Bumbray took the

19  position that it was all for him.  You can't infer from

20  that that the two parties, Elmer Bumbray and the Debtor,

21  reached an agreement that they would revoke the third-party

22  beneficiary aspects of the contract.

23       And indeed, what happened in the Superior Court

24  was the Debtor took the position that Elmer was only

25  entitled to 14 percent, he wasn't entitled to the full

1   amount and was suing only in his own right, not on behalf

2   of the third-party beneficiaries, and therefore he ought to

3   be limited to 14 percent and that's what the jury

4   concluded.

5          It would certainly be a miscarriage of justice

6   for the Debtor now to turn around and say that her position

7   in the Superior Court should be disregarded and she should

8   be treated as having revoked the third-party beneficiary

9   status along with Elmer Bumbray, who took a position that

10  the third-party beneficiary contract didn't exist.  That's

11  just not an equitable argument.  It's distasteful and

12  repugnant to the Court's sense of equity.

13         The Debtor's position was that none of the

14  proceeds belonged to -- all of the proceeds belonged to

15  her.  It wasn't that if a contract existed it was not a

16  third-party contract.  Elmer's position was he was entitled

17  to the full 84 percent, but it was not a position that if

18  the Court accepted -- if the jury accepted the Debtor's

19  version that there was only a 14 percent interest in Elmer

20  that he was repudiating her position that the balance of

21  the agreement was for 14 percent to the other siblings as

22  well.  You just can't take the two of those positions and

23  tie them together and come up with a repudiation by the two

24  parties.  That's not what they were doing.

25         Finally, there's an argument that the third-party

120

1    beneficiary claims are barred by res judicata because there

2    was privity and the claim should have been raised by Elmer

3    Bumbray in the litigation.  But Elmer Bumbray was taking a

4    position adverse to the third-party beneficiaries who had a

5    right to sue in their own interest and were not aware of

6    their right to sue.  And I don't think that there is

7    privity in those circumstances.

8            Elmer was entitled to sue on his own rights.  He

9    was not obligated to sue in a representative capacity.  And

10   these siblings are entitled to sue in their own right in

11   enforcement of the third-party beneficiary contract.

12           The objections to the claims are overruled.

13   Thank you, counsel.

14           THE CLERK:  That concludes the matters that we

15   have for hearing today.  All rise.  This Court stands in

16   adjournment.

17           (Whereupon, proceedings were concluded.)

18

19

20

UNITED STATES OF AMERICA )
                                              )     Case No. 04-01519
DISTRICT OF COLUMBIA         )

        I, PAUL R. CUTLER, do hereby certify that a
recording of the foregoing proceedings in the above matter
was duplicated from an original recording by the Office of
the Clerk, United States Bankruptcy Court for the District
of Columbia, and that said duplicate recording of the
proceedings was transcribed under my direction to
typewritten form.


                            _____
                                PAUL R. CUTLER

        I do hereby certify that the foregoing transcript
was typed by me and that said transcript is a true record
of the recorded proceedings to the best of my ability.


                            _____
                                BONNIE FURLONG

PAUL M. TOULOUSE
ATTORNEY AT LAW
600 D STREET, N.W.
WASHINGTON, D.C. 20001
—
TELEPHONE
(202) 347-4020
TELECOPIER
(202) 347-1942

September 25, 1997

By Fax and Mail

Barry M. Chasen, Esq.
Chasen & Boscolo
Suite 411
6411 Ivy Lane
Greenbelt, MD 20770

Re: Estate of Henrietta Duvall
Administration 649-90
Bumbray v All Metal Erectors, Inc.
Claim # A798350

Dear Mr. Chasen:

I represent Jeanne A. Duvall both individually and in her capacity as Successor Personal Representative of the Estate of Henrietta Duvall, a/k/a Henrietta Duvall Bumbray.

I understand from Ms. Duvall and from our conversation last week that the Estate's claim to workers compensation benefits in the above matter has been adjudicated in the Estate's favor and that the time for appeal of the Compensation Order has expired.

In that regard, I would appreciate your providing me with copies of the original Compromise and Settlement Agreement, as well as any subsequent Orders, Agreements or documents which are relevant to the estate's claim. Also, please provide me with the names and phone numbers of the carrier's representatives in this matter.

As we discussed last week and as I confirmed with your associate earlier this week, all proceeds from the above workers compensation claim must be payable to Jeanne A. Duvall as Personal Representative of the Estate and deposited into a District of Columbia fiduciary account.


DEBTOR
DEFT RESP.
EXHIBIT    A
CASE # 04-1510

BMC 0051

Barry M. Chasen, Esq.
September 25, 1997
Page 2

Accordingly, if you already have the draft for the lump sum arrears in your possession, please forward the draft to me on Ms. Duvall's behalf as Personal Representative of the Estate. If you do not have the draft in your possession, please advise the carrier's representatives (I believe you told me the carrier was the Hartford) to have the lump sum draft and all future drafts forwarded to me on Ms. Duvall's behalf as Personal Representative of the Estate.

Please call me if you have any questions.  Thank you.

Sincerely,

Paul M. Toulouse

cc:  Jeanne A. Duvall
PMT/wp

PAUL M. TOULOUSE
ATTORNEY AT LAW
503 D STREET. N.W.
WASHINGTON. D.C. 20001
——
TELEPHONE
(202) 347-4020
TELECOPIER
(202) 347-1942



October 1, 1997

By Fax and Mail

Barry M. Chasen, Esq.
Chasen & Boscolo
Suite 411
6411 Ivy Lane
Greenbelt, MD 20770

                     Re: Estate of Henrietta Duvall
                          Administration 649-90
                          Bumbray v All Metal Erectors, Inc.
                          Claim # A798350

Dear Mr. Chasen:

Further to my letter of September 25, 1997. Since that letter, I have left at least two phone messages for you and would appreciate hearing from you in regards to the following matters which I raised in my earlier letter.

Whether the Estate's claim to workers compensation benefits in the above matter has been adjudicated in the Estate's favor and whether the time for appeal of the Compensation Order has expired.

Your providing me with copies of the original Compromise and Settlement Agreement, as well as any subsequent orders, agreements or documents which are relevant to the Estate's claim.

Your providing me with the names and phone numbers of the carrier's representatives in this matter.

Whether you already have a draft for the lump sum arrears in your possession and if so, when I can expect to receive it from you on Ms. Duvall's behalf as Personal Representative of the Estate.

If you do not have a draft in your possession, whether you have advised the carrier's representative to have the lump sum draft and all future drafts forwarded to me on Ms. Duvall's behalf as Personal Representative of the Estate.

BMC 0047

Barry M. Chasen, Esq.
October 1, 1997
Page 2

Although not formally raised in my previous letter, please also advise as to whether the carrier has already agreed upon the amount of the lump sum arrears, the amount and duration of future payments and that all payments will be payable to Jeanne Duvall as Personal Representative of the Estate. If so and if that agreement has been reduced to writing, I would appreciate receiving a copy of the agreement.

Finally, if negotiations are not concluded with the insurance carrier, please advise as to where the negotiations now stand so that I can pass this information along to Ms. Duvall in her capacity as Personal Representative of the Estate.

Sincerely,

Paul M. Toulouse

cc:  Jeanne A. Duvall
PMT/wp

PAUL M. TOULOUSE
ATTORNEY AT LAW
503 D STREET. N.W.
WASHINGTON. D.C. 20001
——
TELEPHONE
(202) 347-4020
TELECOPIER
(202) 347-1942



October 1, 1997

By Fax and Mail

Barry M. Chasen, Esq.
Chasen & Boscolo
Suite 411
6411 Ivy Lane
Greenbelt, MD 20770

Re: Estate of Henrietta Duvall
Administration 649-90
Bumbray v All Metal Erectors, Inc.
Claim # A798350

Dear Mr. Chasen:

Further to my letter of September 25, 1997. Since that letter, I have left at least two phone messages for you and would appreciate hearing from you in regards to the following matters which I raised in my earlier letter.

Whether the Estate's claim to workers compensation benefits in the above matter has been adjudicated in the Estate's favor and whether the time for appeal of the Compensation Order has expired.

Your providing me with copies of the original Compromise and Settlement Agreement, as well as any subsequent orders, agreements or documents which are relevant to the Estate's claim.

Your providing me with the names and phone numbers of the carrier's representatives in this matter.

Whether you already have a draft for the lump sum arrears in your possession and if so, when I can expect to receive it from you on Ms. Duvall's behalf as Personal Representative of the Estate.

If you do not have a draft in your possession, whether you have advised the carrier's representative to have the lump sum draft and all future drafts forwarded to me on Ms. Duvall's behalf as Personal Representative of the Estate.

Barry M. Chasen, Esq.
October 1, 1997
Page 2

Although not formally raised in my previous letter, please
also advise as to whether the carrier has already agreed upon the
amount of the lump sum arrears, the amount and duration of future
payments and that all payments will be payable to Jeanne Duvall as
Personal Representative of the Estate.  If so and if that agreement
has been reduced to writing, I would appreciate receiving a copy of
the agreement.

Finally, if negotiations are not concluded with the insurance
carrier, please advise as to where the negotiations now stand so
that I can pass this information along to Ms. Duvall in her
capacity as Personal Representative of the Estate.

Sincerely,

Paul M. Toulouse

cc:  Jeanne A. Duvall
PMT/wp

**PAUL M. TOULOUSE**

**ATTORNEY AT LAW**

**803 D STREET. N.W.**

**WASHINGTON, D.C. 20001**

———

**TELEPHONE**

**(202) 347-4020**

**TELECOPIER**

**(202) 347-1942**

October 1, 1997

By Fax and Mail

Barry M. Chasen, Esq.
Chasen & Boscolo
Suite 411
6411 Ivy Lane
Greenbelt, MD 20770

                    Re: Estate of Henrietta Duvall
                        Administration 649-90
                        Bumbray v All Metal Erectors, Inc.
                        Claim # A798350

Dear Mr. Chasen:

    Further to my letter of September 25, 1997.  Since that
letter, I have left at least two phone messages for you and would
appreciate hearing from you in regards to the following matters
which I raised in my earlier letter.

    Whether the Estate's claim to workers compensation benefits in
the above matter has been adjudicated in the Estate's favor and
whether the time for appeal of the Compensation Order has expired.

    Your providing me with copies of the original Compromise and
Settlement Agreement, as well as any subsequent orders, agreements
or documents which are relevant to the Estate's claim.

    Your providing me with the names and phone numbers of the
carrier's representatives in this matter.

    Whether you already have a draft for the lump sum arrears in
your possession and if so, when I can expect to receive it from you
on Ms. Duvall's behalf as Personal Representative of the Estate.

    If you do not have a draft in your possession, whether you
have advised the carrier's representative to have the lump sum
draft and all future drafts forwarded to me on Ms. Duvall's behalf
as Personal Representative of the Estate.

Barry M. Chasen, Esq.
October 1, 1997
Page 2

Although not formally raised in my previous letter, please also advise as to whether the carrier has already agreed upon the amount of the lump sum arrears, the amount and duration of future payments and that all payments will be payable to Jeanne Duvall as Personal Representative of the Estate.  If so and if that agreement has been reduced to writing, I would appreciate receiving a copy of the agreement.

Finally, if negotiations are not concluded with the insurance carrier, please advise as to where the negotiations now stand so that I can pass this information along to Ms. Duvall in her capacity as Personal Representative of the Estate.

Sincerely,

Paul M. Toulouse

cc:  Jeanne A. Duvall
PMT/wp

**PAUL M. TOULOUSE**

**ATTORNEY AT LAW**

**503 D STREET. N.W.**

**WASHINGTON. D.C. 20001**

——

**TELEPHONE**

**(202) 347-4020**

**TELECOPIER**

**(202) 347-1942**

October 1, 1997

By Fax and Mail

Barry M. Chasen, Esq.
Chasen & Boscolo
Suite 411
6411 Ivy Lane
Greenbelt, MD 20770

Re: Estate of Henrietta Duvall
Administration 649-90
Bumbray v All Metal Erectors, Inc.
Claim # A798350

Dear Mr. Chasen:

Further to my letter of September 25, 1997. Since that letter, I have left at least two phone messages for you and would appreciate hearing from you in regards to the following matters which I raised in my earlier letter.

Whether the Estate's claim to workers compensation benefits in the above matter has been adjudicated in the Estate's favor and whether the time for appeal of the Compensation Order has expired.

Your providing me with copies of the original Compromise and Settlement Agreement, as well as any subsequent orders, agreements or documents which are relevant to the Estate's claim.

Your providing me with the names and phone numbers of the carrier's representatives in this matter.

Whether you already have a draft for the lump sum arrears in your possession and if so, when I can expect to receive it from you on Ms. Duvall's behalf as Personal Representative of the Estate.

If you do not have a draft in your possession, whether you have advised the carrier's representative to have the lump sum draft and all future drafts forwarded to me on Ms. Duvall's behalf as Personal Representative of the Estate.

Barry M. Chasen, Esq.
October 1, 1997
Page 2

Although not formally raised in my previous letter, please also advise as to whether the carrier has already agreed upon the amount of the lump sum arrears, the amount and duration of future payments and that all payments will be payable to Jeanne Duvall as Personal Representative of the Estate. If so and if that agreement has been reduced to writing, I would appreciate receiving a copy of the agreement.

Finally, if negotiations are not concluded with the insurance carrier, please advise as to where the negotiations now stand so that I can pass this information along to Ms. Duvall in her capacity as Personal Representative of the Estate.

Sincerely,

Paul M. Toulouse

cc: Jeanne A. Duvall
PMT/wp

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Civil Division

SHARON BUMBRAY WATTS,
11204 Cherry Hill Road, #202
Beltsville, MD 20705

and

ERIC BUMBRAY,
11204 Cherry Hill Road, #202
Beltsville, MD 20705

and

SANITA BUMBRAY,
1238 18th Street, N.E.
Washington, DC 20002

and

KEVIN BUMBRAY,
11204 Cherry Hill Road, #202
Beltsville, MD 20705

and

SHARON BUMBRAY WATTS,
personal representative of the Estate of
    GLENN BUMBRAY,
11204 Cherry Hill Road, #202
Beltsville, MD 20705

            Plaintiffs,

    v.

JEANNE A. DUVALL,
2615 Newton Street, N E
Washington, DC 20010

            Defendant.

Civil Action No. _____

RECEIVED
Civil Clerk's Office

FEB 1 4 2003

Superior Court of the
Dist. Of Columbia
Washington DC


DEPT. OF P.
EXHIBIT F
CASE # 04-1540

## COMPLAINT FOR DAMAGES
(Breach of Contract – Collateral Estoppel)

COME NOW the Plaintiffs, SHARON BUMBRAY WATTS, ERIC BUMBRAY, SANITA BUMBRAY, KEVIN BUMBRAY, and SHARON BUMBRAY WATTS, personal representative of the Estate of GLENN BUMBRAY, by undersigned counsel, Jonathan S. Shurberg, Steven M. Katz, and Isadore B. Katz, and sue the Defendant, JEANNE A. DUVALL, and for their cause of action state as follows:

### Parties, Jurisdiction and Venue

1.    Plaintiff SHARON BUMBRAY WATTS is a resident of Prince George's County, Maryland.

2.    Plaintiff ERIC BUMBRAY is a resident of Prince George's County, Maryland.

3.    Plaintiff SANITA BUMBRAY is a resident of the District of Columbia.

4.    Plaintiff KEVIN BUMBRAY is a resident of Prince George's County, Maryland.

5    Plaintiff SHARON BUMBRAY WATTS, personal representative of the Estate of GLENN BUMBRAY, is a resident of Prince George's County, Maryland.

6.    Defendant JEANNE DUVALL is a resident of the District of Columbia.

7.    This Court has jurisdiction over the Defendant herein pursuant to D.C. Code, § 11-921 et seq.

### Facts

8.    Plaintiffs reallege ¶¶ 1 through 7 as if fully set forth herein.

9.    Plaintiffs are all siblings of ELMER BUMBRAY, Plaintiff in a prior action in this

- 2 -

Court captioned Elmer Bumbray v. Jeanne Duvall, Case No. 99-CA002434. On July 13, 2001, following a five-day trial, a jury returned a verdict in that case finding in favor of ELMER BUMBRAY and against JEANNE DUVALL, and awarded damages of $26,960.98. Final judgment was entered by this Court on October 4, 2002.

10.    ELMER BUMBRAY had sued for $192,578.40.

11.    The jury expressly found that the contract sued upon by ELMER BUMBRAY was not for his own sole benefit, but was for the joint benefit of all of his siblings, the Plaintiffs herein. As a result, the jury's verdict necessarily left the remaining $165,617.42 claimed by ELMER BUMBRAY in the prior case, to be awarded to the Plaintiffs herein.

12.    Final judgment in favor of ELMER BUMBRAY was entered by this Court on October 4, 2002. Although the case has been appealed to the District of Columbia Court of Appeals, the judgment remains presumptively valid, *Bell v. United States*, 806 A.2d 228, 232 (D.C. 2002); *Van Durr v. Kator & Scott, Chartered*, 788 A.2d 579, 580 (D.C. 2002), and no appeal bond has been filed.

13.    Assuming that the judgment is not overturned by the Court of Appeals, Plaintiffs herein, jointly and severally, respectfully submit that they are entitled to a summary award of $165,617.42, representing the remaining amount due to the "Bumbray siblings" as determined conclusively by the jury in the earlier case.

14.    None of the Plaintiffs herein has ever dealt directly with Defendant JEANNE DUVALL with respect to the issues in this case. As a result, Plaintiffs' claims, being entirely derivative of those raised by ELMER BUMBRAY in the prior case, and those claims having been

LAW OFFICES
JONATHAN S. SHURBERG, P.
FEDERAL PARK AVENUE
SUITE 300
SILVER SPRING, MARYLAND 20910
(301) 495-0707
FAX: (301) 495-9074

- 3 -

found to be meritorious by the jury in that case, the claims raised herein are not subject to any defenses that Defendant JEANNE DUVALL may have raised in the prior case, as those claims were necessarily and thoroughly rejected by the jury.

15.     Principles of collateral estoppel bar Defendant JEANNE DUVALL from relitigating any of the issues either raised and decided in the prior case, or that necessarily are encompassed by the jury's verdict in that case. *See Newell v. District of Columbia*, 741 A.2d 28, 36 (D.C. 1999); *Ali Baba Co. Inc. v. WILCO, Inc.*, 482 A.2d 418, 422-423 (D.C. 1984) (applying four factor test for offensive collateral estoppel set forth in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329-332, 99 S. Ct. 645, 650-652 (1979)).

WHEREFORE, for the reasons set forth herein, Plaintiffs SHARON BUMBRAY WATTS, ERIC BUMBRAY, SANITA BUMBRAY, KEVIN BUMBRAY, and SHARON BUMBRAY WATTS, personal representative of the Estate of GLENN BUMBRAY, by undersigned counsel, respectfully request this Court to enter judgment against Defendant JEANNE A. DUVALL for breach of contract, and to impose damages in the amount of $165,617.42, plus court costs, prejudgment interest and postjudgment interest at the legal rate, and for such other and further relief as the nature of the cause may require.

- 4 -

Date:  February 14, 2003

Respectfully submitted,

JONATHAN S. SHURBERG, P.C.

By: Jonathan S. Shurberg, #440439
8720 Georgia Avenue
Suite 700
Silver Spring, MD 20910
(301) 585-0707

- 5 -



1

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

2

3       ---------------------------x
                                   :
4    ELMER BUMBRAY,                :
                                   :
5            Plaintiff,            :
                                   :
6            v.                    :        Civil Action No.
                                   :           2434-99
7    JEANNE DUVALL,                :
                                   :
8                 Defendant. :
                                   :
9       ---------------------------x

10                                       Washington, D. C.
                                         Thursday
11                                       July 12, 2001

12           The above-entitled action continued in Trial
     before the Honorable HERBERT B. DIXON, JR., Associate
13   Judge, and a Jury, previously impaneled and sworn, in
     Courtroom Number 220, commencing at approximately 9:40
14   a.m.

15    THIS TRANSCRIPT REPRESENTS THE PRODUCT OF AN OFFICIAL
       REPORTER, ENGAGED BY THE COURT, WHO HAS PERSONALLY
16       CERTIFIED THAT IT REPRESENTS THE TESTIMONY AND
            PROCEEDINGS OF THE CASE AS RECORDED.

17

18                     APPEARANCES:

19                     On behalf of the Plaintiff:

20                     ISADORE KATZ, Esquire
                       JONATHAN SHURBERG, Esquire
21                     Washington, D.C.

22                     On behalf of the Defendant:

23                     PAUL TOULOUSE, Esquire
                       Washington, D. C.
24
     Lyndon L. Rust                    Official Court Reporter
25                     Tel:  202-879-1042



PLAINTIFF
CLAIMANTS
EXHIBIT   5
CASE # 04-1500

1

1      (Thereupon, the proceedings were recessed at

2                approximately 1:30 p.m.)

3                    AFTERNOON SESSION

4      (Thereupon, the proceedings were reconvened at

5                approximately 2:15 p.m.)

6           THE DEPUTY CLERK:   Recalling the matter of

7    Elmer Bumbray versus Jeanne A. Duvall, Civil Action

8    Number 2434-99.

9           THE COURT:  Mr. Toulouse, I have your

10   memorandum in front of me.  Do you have a copy of the

11   rule in front of you?

12          MR. TOULOUSE:  I'll get -- oh --

13          THE COURT:  Here, take mine.  I've highlighted

14   a portion of the rule where this language is taken from.

15          MR. TOULOUSE:  The parties with whom or in

16   whose name a contract has been made for the benefit of

17   another.

18          THE COURT:  Yeah.  But that's one of the

19   categories of individuals who may sue in their own name.

20          MR. TOULOUSE:  But it's never been pled.  Have

21   you looked at the complaint, Your Honor?  It's never

22   been pled.

23          THE COURT:  Oh, I see what you're saying.

24          MR. TOULOUSE:  I mean I have had no notice.

25   None.

59

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1          THE COURT:  You're saying that because it

2     wasn't specifically mentioned in the complaint.  Okay.

3          MR. TOULOUSE:  I mean I have had no discovery.

4     What's happened is they -- here's what happened.  He

5     said it's all mine.  We got discovery from Mr. Chasen.

6     It showed -- it impeached that they had to change their

7     story to say oh, no, it was me and the siblings because

8     they knew what was coming with -- I was -- we -- we were

9     going to impeach him.  And now they've adopted her

10    theory and tried to amend the pleadings in the middle of

11    the trial.  That's what they're doing.  It was never

12    pled.

13         THE COURT:  You're saying if it had been pled

14    we would have a different --

15         MR. TOULOUSE:  If it was pled I would have,

16    could have moved to dismiss.  Then they could have moved

17    to add the parties.  Then we could have had some

18    discovery.  I could have had six other people who would

19    be parties here, Your Honor.  I mean it is so

20    unbelievably unfair to even suggest that.  You know,

21    it's not in the pretrial, it's nowhere.  It's nowhere.

22         THE COURT:  Okay.  I understand your point.  I

23    actually prepared a second version of the same

24    instruction that added another sentence.  The Court has

25    the means to see that the other persons for whom a

60

1    lawsuit is brought will receive their rightful share

2    without subjecting Ms. Duvall to double liability.

3             MR. TOULOUSE:  You're going to add that?

4             THE COURT:  No, no.  That was a second version

5    I had drafted.  That's not your concern about double

6    liability as to Ms. Duvall.

7             MR. TOULOUSE:  We have got one plaintiff, Your

8    Honor.  He's filed a pleading.  I've spent two, three

9    years working on those pleadings.  I'm not prepared to

10   bring anybody else into this case at this late date,

11   Your Honor.  It's just, you know, it's just too

12   prejudicial, just so unbelievably prejudicial.

13            THE COURT:  I understand your point, sir.

14            MR. SHURBERG:  Your Honor, may I respond just

15   very briefly?

16            THE COURT:  Yes, sir.

17            MR. SHURBERG:  Mr. Bumbray testified this was

18   his contract for his benefit.  He did not, as

19   Mr. Toulouse stated, adopt the position of the

20   defendant.  Mr. Chasen says it was for the benefit of

21   these other people.  Ms. Duvall didn't -- you know, the

22   jury could choose to believe Mr. Bumbray.  The jury

23   could choose to believe them.  And what is happening

24   here, quite honestly, is that the defendant, I suspect

25   the reason, we submit, is that they're going to argue

1    Mr. Bumbray should only get his share, not anybody

2    else's share, based on their, their theory that he was

3    doing this for the benefit of these other people.

4         And the rule is very clear that that can't

5    happen.  The rule is also very clear, implicitly if not

6    explicitly, that what happens is that the party who

7    thinks the wrong person is in should file a motion to

8    dismiss or an objection to this party being here, at

9    which point the plaintiff, anybody else, is given an

10   opportunity to respond.  Discovery was had on this

11   issue.  Certain of the siblings were identified as

12   witnesses to the transaction and nothing was done.

13   There were requests for admissions about what was going

14   on, in whose name it was brought.  The issue was, was

15   there, but it was not followed up on by filing a motion

16   to dismiss or an objection to this person being here.

17        THE COURT:  Mr. Shurberg, I can't let you have

18   it both ways.  Now, to allow -- I was given -- I was

19   responding to your request for this instruction on the

20   understanding that you were pursuing a theory that the

21   suit was being brought by Mr. Bumbray on behalf of

22   himself and all others.  Now, if you're saying that your

23   theory is that Mr. Bumbray is entitled to the entire

24   amount, then I don't need to give this instruction.

25        MR. SHURBERG:  No, Your Honor, and, and I'm

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    sorry if I mis-spoke.  Mr. Bumbray is bringing this suit

2    on behalf of those people.  But his testimony was that

3    he was the only person who made this agreement.  And

4    what I'm concerned about and the reason we submitted the

5    instruction is to not have the defendant argue that

6    Mr. Bumbray should only get that share which would go to

7    him based on the testimony of Ms. Duvall, Mr. Chasen and

8    Mr. Bumbray that we ought to carve that 84 percent up by

9    six, give Mr. Bumbray 14 percent and then there will

10   have to be potentially five more lawsuits to get what

11   rightfully should be these people's lawsuits.  I mean

12   the idea is if there was an agreement -- everybody

13   agrees, quite honestly, what the nature of the agreement

14   was.  There is questions as to the enforceability and

15   all that.  Putting that aside, the defendant should not

16   be permitted to argue to this jury that Mr. Bumbray, if

17   he prevails, should get only 14 percent of the money.

18   And that's what that instruction is for, is that he did

19   bring this for the benefit of his family members.  But

20   what I said initially or what I tried to say initially,

21   and perhaps didn't say it very well, is that he was the

22   only party here.  It's undisputed that none of the other

23   siblings ever spoke to Ms. Duvall.  They were never

24   involved in any of the transactions that bring us here

25   today.  Certainly he's the party and he's doing so in

63

1   his representative capacity for the benefit of these

2   other people.  So I think that it's clear that

3   instruction will prevent what I think would be a

4   manifestly unjust result, which would be the potential

5   of the jury, urged on by the defendant, to say let's

6   just give Mr. Bumbray his share.  If you don't buy any

7   of our other arguments, the last ditch argument would be

8   well, he should only get 14 percent because where are

9   the other people.  Because that's not what the testimony

10  was.  The testimony was that he was doing this on behalf

11  of those other people, not that they made a contract.

12  All six of them sat down with Ms. Duvall and made a

13  contract.  It's all six together or one, each one, one

14  at a time.  It was one person on behalf of the other

15  five.  And I think there is actually -- I think it's one

16  person on behalf of the other four because I think the

17  testimony was that one of the siblings is now deceased.

18  But as far as how the agreement came about, it was 84

19  percent for Mr. Bumbray and his siblings.

20          THE COURT:  Mr. Shurberg, I'm still concerned,

21  I really am, because if I give this instruction I'm

22  inserting myself into, as a matter of law, with the

23  jury's deliberations in terms of guiding them that this

24  suit is on behalf of Mr. Bumbray and his biological

25  siblings --

64

1          MR. SHURBERG:  Your Honor, actually --

2          THE COURT:  And it's just really on behalf of

3     him.  With his discretion as to what to do, it seems to

4     me, it's properly Mr. Toulouse's right to argue to the

5     jury that, if it's his discretion to do what he wants to

6     do, then they should reduce it.

7          MR. SHURBERG:  Your Honor, I think the

8     instruction actually cures that problem because I don't

9     think you're saying that as a matter of law, because the

10    second sentence of the instruction is if you find that

11    Elmer Bumbray brought this action on behalf of some or

12    all, not I am telling you that Elmer brought this on

13    behalf of some or all.  It's a question that the jury

14    must decide as to what Elmer Bumbray was or was not

15    doing.  One argument is that he brought it on behalf of

16    his siblings.  That's what Ms. Duvall says.  And I think

17    that's what the testimony of Mr. Chasen from the two

18    readings of the deposition was.  This is giving the jury

19    the choice.  If the jury doesn't find that he brought it

20    on behalf of any of the siblings and they follow the

21    instruction, then anything that follows after that

22    statement, they won't do it, they will say if you find

23    that Elmer Bumbray brought this action on behalf of all

24    or some of the siblings, well, we don't find that, then

25    they won't follow the rest of the instruction.

1          THE COURT:  What about adding if you find that

2   Elmer Bumbray brought this action on his own behalf, not

3   on behalf of others, then that fact is the basis for

4   reducing the amount awarded to him?

5          MR. SHURBERG:  I don't have a problem with

6   that, Your Honor, because there is an either or

7   proposition.  It's this or it's that.  And I mean what

8   Your Honor is suggesting is that there is enough

9   evidence that the jury could conclude either way on that

10  point, then I think that's appropriate.  Certainly

11  Ms. Duvall's testimony was that it was Elmer on behalf

12  of the siblings.  I mean that is pretty clear.

13         THE COURT:  Okay.

14         MR. SHURBERG:  So I don't have a problem with

15  either or.  In other words, I've given -- I've given

16  one-half -- I've given the either, but on the or -- I

17  don't have a problem if Your Honor wants to put in the

18  other half of the branch that if they find to the

19  contrary from that, certainly that that would be a basis

20  for reducing the damages.

21         THE COURT:  Mr. Toulouse.

22         MR. TOULOUSE:  It wasn't pled.  I mean if

23  you're going to argue -- if he's going to plead

24  alternatively, let him plead alternatively.  This is the

25  first I know about this, the very first.  It's not pled.

1    The <u>Francis</u> (Phonetic spelling) case, which is the case

2    cited in the memorandum, says the Court -- and in that

3    case the Court considered how far the case had

4    progressed, whether the rule 17 issue, 17A issue was

5    first raised by the plaintiff, how far -- I mean where

6    we're about to instruct the jury, I haven't even had an

7    opportunity, I haven't -- I have had no opportunity for

8    discovery on this issue.  It wasn't raised at pretrial.

9    It's worse than 11th hour.  It's 11th --

10    THE COURT:  But the evidence is there.  Chasen

11    said it and your client said it.

12    MR. TOULOUSE:  Said what?  He's going to back

13    door this, Your Honor.  Basically he's trying to back

14    door.  He's trying to have it both ways.  He's saying

15    oh, well, we're going to take the position that it's all

16    his, despite the fact that his testimony is well, I was

17    doing this for me and my siblings and I'm going to, I'm

18    going to -- I guess the implication being I'm going to

19    divvy it up to everybody the way I see fit.  And so he's

20    going to be able to have it both ways.  And I mean I

21    just don't -- to, to divine what we're going to say,

22    which is what Mr. Shurberg is suggesting, and use that

23    as a basis for an instruction which we object to as

24    being absolutely prejudicial to us I just think is, is

25    absolutely improper.

1          THE COURT:  Okay.  The objection is noted.

2    I'm going to amend the instruction to reflect the

3    additional language that I just referenced to

4    Mr. Shurberg.  I'll let both of you know what it says

5    specifically before it's given to the jury.

6          MR. TOULOUSE:  Your Honor, then I must ask for

7    a special instruction.  I would like -- I need -- the

8    jury, I think, needs to tell us how much he gets and how

9    much everybody else gets then if that's the way they're

10   going to go, because somebody has got to be able to

11   review this and say well, this amount, he gets X amount,

12   they get X amount.  If that's the way we're going to go

13   with this, I think we need a special instruction that

14   delineates who gets what.  Because how else are we going

15   to know, how else will we know what the jury's

16   deliberations are on that issue?  I think if that's the

17   way you're going to go, Your Honor, I think we're

18   entitled to a special instruction as to who gets what

19   amount, if we're going to go down that road.

20         THE COURT:  Your request is noted, but I'm not

21   going with that special interrogatory, Mr. Toulouse.

22         Other issues with respect to instructions?

23         MR. TOULOUSE:  An awful lot were left out,

24   Your Honor, of the ones that were jointly requested.

25   And also --

68

```
 1              SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
                             CIVIL DIVISION
 2


 3      ------------------------x
                                 :
 4      ELMER BUMBRAY,           :
                                 :
 5                Plaintiff,     :
                                 :
 6             v.                :        Civil Action No.
                                 :            2434-99
 7      JEANNE DUVALL,           :
                                 :
 8                Defendant. :
                                 :
 9      ------------------------x

10                                    Washington, D. C.
                                      Thursday
11                                    July 12, 2001

12           The above-entitled action continued in Trial
        before the Honorable HERBERT B. DIXON, JR., Associate
13      Judge, and a Jury, previously impaneled and sworn, in
        Courtroom Number 220, commencing at approximately 9:40
14      a.m.

15       THIS TRANSCRIPT REPRESENTS THE PRODUCT OF AN OFFICIAL
           REPORTER, ENGAGED BY THE COURT, WHO HAS PERSONALLY
16          CERTIFIED THAT IT REPRESENTS THE TESTIMONY AND
                 PROCEEDINGS OF THE CASE AS RECORDED.

17

18                      APPEARANCES:

19                      On behalf of the Plaintiff:

20                      ISADORE KATZ, Esquire
                        JONATHAN SHURBERG, Esquire
21                      Washington, D.C.

22                      On behalf of the Defendant:

23                      PAUL TOULOUSE, Esquire
                        Washington, D. C.
24
        Lyndon L. Rust              Official Court Reporter
25                       Tel:  202-879-1042
```

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

PLAINTIFF
CLAIMANTS
EXHIBIT ___6___
CASE# 04-1510

1

1    the sort that would flow naturally and obviously from

2    the breach of contract.

3            A party to a contract made for the benefit of

4    other parties not named in the lawsuit may sue in that

5    person's own name without joining the parties for whose

6    benefit the action is brought.  If you find that Elmer

7    Bumbray brought this action on behalf of some or all of

8    his siblings, you should award him the amount of

9    damages, if any, that you find to have been rightfully

10   due to either Mr. Bumbray or to his siblings.  The fact

11   that the action was brought solely by Mr. Bumbray

12   standing alone is not a proper basis for reducing the

13   amount of money awarded to him.

14           If you find that Elmer Bumbray brought this

15   action in his own behalf to use at his sole discretion,

16   you may use that fact as a basis for reducing the amount

17   of money awarded to Mr. Bumbray.

18           Okay.

19           Ladies and gentlemen, that is the last

20   instruction that I told counsel I would give before we

21   started the arguments in this case.  I'm going to take a

22   very short recess, it's really going to be five minutes.

23   It's really going to be five minutes.  Then we're going

24   to start with the arguments in this case.  So please be

25   ready.

118

1-1

My responsibility has been to conduct the trial of the case in an orderly, fair, and efficient manner; to rule on questions of law that arose during the trial; and to instruct you as to the law that applies to this case. It is your duty to accept the law as I state it to you. You should consider all the instructions as a whole. You may not disregard any instruction, or give special attention to any one instruction, and you may not question the wisdom of any rule of law.

1-2

Your responsibility as the jury is to decide the facts. You and only you, are the judges of the facts. You alone determine the weight, the effect, and the value of the evidence, as well as the believability -- the credibility -- of the witnesses.

You should determine the facts without prejudice, without fear, without sympathy, and without favor, and only from a fair consideration of the evidence. You should consider the evidence in the light of your own observations and experience in the affairs of life. In other words, you should use your own common sense.

The actions that I have taken during the trial in ruling on motions or objections by the lawyers, in comments to the lawyers, in questions to witnesses, or in setting forth the law in these instructions, are not to be taken by you as any indication of my opinion as to how you should decide the issues of fact. Indeed, as I told you at the beginning of the trial, I try not to have any opinion as to the facts. Nevertheless, if you believe that I have expressed or even hinted at any opinion I might have as to the facts, you should entirely disregard it. What the verdict shall be is your sole and exclusive duty and responsibility.

1-3

The attitude and conduct of jurors at the outset of their deliberations are matters of considerable importance.  It is not appropriate for a juror entering the jury room, to voice a strong expression of an opinion on the case or to announce a determination to stand for a certain verdict.  When one does that at the outset, a sense of pride may cause that juror to hesitate to back away from an announced position if and when shown that it is wrong.  Remember that you are not partisans or advocates in this matter, but are judges.  The final test of the quality of your service will lie in the verdict that you return to this courtroom, not in the opinions any of you may hold before agreement on a verdict.  Bear in mind that you will make a definite contribution to efficient judicial administration if you arrive at a just and proper verdict in this case.  To that end, the Court reminds you that in your deliberations in the jury room your purpose should be not to support your own opinion but to ascertain and declare the truth.

**1-6**

You must treat and consider all of these instructions as a whole. You must not single out any particular instruction or sentence while ignoring others. You must give each instruction equal importance and consider each one equally with all other instructions.

**2-1**

You may consider only the evidence properly admitted in the case. Evidence includes the sworn testimony of witnesses, exhibits admitted into evidence, and facts stipulated and agreed to by counsel. You may consider any facts to which all counsel have agreed or stipulated to be undisputed evidence.

*Need Deposition 3-5*

**2-3**

In arriving at your verdict, you are to consider only the evidence in the case. When you are considering the evidence, however, you are not limited solely to the statements of the witnesses. You are permitted to draw from the evidence any inferences or conclusions that reason and common sense lead you to make.

2-4

It is the duty of the lawyers to object when the other side offers testimony or other materials which a lawyer believes are not properly admissible in evidence.

If, during the course of the trial, I sustained an objection by one lawyer to a question asked by the other lawyer, you are to disregard the question and you must not guess about what the answer would have been. If a question was asked and the witness answered it, and I ruled that you should not consider the answer, then you must disregard both the question and the answer in your deliberations just as if the question and answer had never been spoken.

Likewise, if I sustained an objection to any exhibits or ordered them stricken, then those stricken exhibits are not evidence and you must not consider them.

2-5

Statements and arguments of the lawyers, such as their opening statements and closing arguments, are not evidence. They are only intended to help you understand and interpret the evidence from each party's perspective.

The questions that the lawyers ask are not evidence. A lawyer's question that contains an assertion of a fact does not provide evidence of that fact.

2-6

During this case, I or the lawyers may have called your attention to certain evidence. If you remember that evidence differently from the way I or the lawyers stated it, then you should disregard our characterization of the evidence and rely upon your own memory.

2-8a

The party who makes a claim has the burden of proving it. This burden of proof means that the plaintiff must prove every element of his/her claim by a preponderance of the evidence. To establish a fact by a preponderance of the evidence is to prove that it is more likely so than not so. In other words, a preponderance of the evidence means that the evidence produces in your mind the belief that the thing in question is more likely true than not true.

If, after considering all of the evidence, the evidence favoring the plaintiff's side of an issue is more convincing to you, and causes you to believe that the probability of truth favors the plaintiff on that issue, then the plaintiff will have succeeded in carrying the burden of proof on that issue.

The term "preponderance of the evidence" does not mean that the proof must produce absolute or mathematical certainty. For example, it does not mean proof beyond a reasonable doubt as is required in criminal cases.

Whether there is a preponderance of the evidence depends on the quality, and not the quantity, of evidence. In other words, merely having a greater number of witnesses or documents bearing on a certain version of the facts does not necessarily constitute a preponderance of the evidence.

If you believe that the evidence is evenly balanced, on an issue the plaintiff had to prove, then the plaintiff has not carried the burden of proof and your finding on that issue must be for the defendant.

2-9

In determining whether any fact has been proved by a preponderance of the evidence, you should consider all the evidence bearing upon that fact, regardless of who produced it.  A party is entitled to benefit from all evidence that favors him/her whether he/she produced it or his/her adversary produced it.

3-1

In evaluating the evidence and deciding what the facts are, you must consider and weigh the testimony of all the witnesses who have appeared before you. You are the sole judges of the credibility of the witnesses. In other words, you alone are to determine whether to believe any witness and to what extent any witness should be believed. If there is any conflict in the testimony between a witness's testimony and other evidence, it is your function to resolve the conflict and to determine where the truth lies.

In deciding the credibility of any witness, you may consider any matter that may have a bearing on the subject. You may consider the appearance and the behavior of the witness on the witness stand; whether the witness impresses you as a truthful individual; whether the witness impresses you as having an accurate memory and recollection; whether the witness has any motive for not telling the truth; whether the witness had full opportunity to observe the matters about which he or she has testified; whether the witness has any interest in the outcome of this case; or whether the witness has any friendship or animosity toward other persons concerned in this case.

You may consider the reasonableness or unreasonableness, and the probability or improbability, of the testimony of a witness in determining whether to accept it as true and accurate. You may consider whether the witness has been contradicted or corroborated by other credible evidence.

If you believe that any witness has shown himself to be biased or prejudiced, either for or against either side in this trial, you may consider and decide whether that bias or prejudice has colored the testimony of the witness so as to affect the witness's desire and capability to tell the truth.

You should give the testimony of each witness as much weight as in your judgment it is fairly entitled to receive.

**3-5**


During the trial of this case, certain testimony has been read to you. You should give to this testimony the same consideration, as to its weight and credibility, as you give to the testimony of witnesses who testified here in court. You must not discount any testimony merely because it was read to you.

3-8

The testimony of a witness may be discredited or impeached by showing that he or she has previously made statements which are inconsistent with his or her present courtroom testimony. It is for you to decide whether a witness made a statement on an earlier occasion and whether it was in fact inconsistent with the witness's testimony in court here.

If a witness at trial has been confronted with a prior statement which that witness made, and that prior statement is inconsistent with his/her testimony here in court, then you may consider the prior statement when you assess the truthfulness of the testimony he/she gave in court.

If the witness made the prior inconsistent statement under oath and subject to cross-examination at a deposition, then you may also treat the prior statement as evidence in this case -- that is, as testimony that what was said in the prior statement was true.

If the witness was not under oath and subject to cross examination was not at a deposition when he/she made the statement, then you may not treat the prior statement as evidence of the facts in the statement. You may consider the statement only to evaluate the witness's credibility, that is, to determine whether to believe the witness's present testimony in court.

If you believe that any witness has been discredited or impeached, then you should give his or her testimony the weight, if any, that you judge it is fairly entitled to receive.

**11-1**

A contract is an agreement between two or more parties to do or not to do something.

11-2a

In this case, there is a claim for breach of contract. However, before deciding that claim, you must first determine if a contract was formed between the parties, and, if so, what the terms of that contract were.

To find that there was a contract, you must find three things. First, you must find that the parties came to a meeting of the minds on the terms and conditions of the contract. A "meeting of the minds" occurs when both parties have the same understanding of the essential terms of the contract and agree to those terms. Ordinarily, when one party makes an offer, and the other accepts that offer, there is a "meeting of the minds."

Second, you must find that the parties intended to be bound by the contract. Third, you must find that the contract was supported by consideration. I will explain more about "intent" and "consideration" in a moment. Just because the parties may have negotiated for a contract, or even signed a document that purports to be a contract, does not necessarily establish that an enforceable contract was created.

If you find that there was no contract, then your verdict must be for the defendant on the breach of contract claim. However, if you find that there was a contract, then you must consider what the terms of the contract were and whether there was a breach of those terms. In a moment, I will instruct you on how to determine the terms of a contract and whether there was a breach of those terms.

**11-3**

A person makes an offer when that person proposes certain contract terms and communicates them to another party for the purpose of entering into a contract. To be a valid offer, the terms of the offer must be clearly stated. Also, the offer must invite an acceptance by the party to whom the offer is made. If the other party accepts the offer, then each party has a legal duty to proceed with the contract.

11-4

A person accepts an offer when that person makes an unconditional promise to be bound by the terms of the offer. A person can make an acceptance by words or conduct. Ordinarily, a person can make an acceptance in any reasonable manner designed to communicate to the offering party that he/she agrees with the offer's terms.

However, if the party making the offer requests that acceptance be made in a certain specified manner, then acceptance must be made in the requested manner. Acceptance in any other manner constitutes a rejection of the offer or a counteroffer.

Some offers require performance of a specific act to constitute acceptance. If the terms of the offer require the accepting person to perform an act rather than to make a promise, then the performance of the requested act constitutes acceptance of the offer. If a person fails to perform in the manner requested by the offering party, then there is no acceptance regardless of the other's intent to accept.

11-5

To decide if there is a contract, you must determine whether there was consideration for the contract. Consideration is something of value given by each party to the contract. Consideration can fall into one of three categories. Consideration can be a transfer of money or goods. Consideration can be a promise to do or not to do something. Consideration can be the performance of a requested act.

You are not to concern yourself about whether the consideration given by one party was "adequate," "enough," or "fair." You are only to consider whether there was any consideration for the contract.

In this case, if you find that there was no consideration, then you must find that no contract existed between these parties. If you find that there was consideration, and that all of the other necessary elements to a contract existed, then you may find that a contract existed between the parties.

11-8

To be legally enforceable, the essential terms of a contract must be reasonably certain. You may find that the terms are reasonably certain if they are definite and clear enough for both parties to understand them. Not all of the contract terms need to be certain, only the essential terms need to be certain.

If the terms of a proposed agreement are vague and uncertain, then the parties may not understand the terms in the same way. If, because of vagueness, the parties do not understand the terms in the same way, then they may not necessarily agree on whether the contract was adequately performed or breached. If you find that the terms of the proposed agreement in this case were vague and uncertain, then you must find that the parties did not enter into a legally enforceable contract.

11-10

      The defendant/the plaintiff has alleged that there was an oral contract between the parties.

      A valid oral contract can exist between parties.  The elements of an oral contract are no different from those of any other contract.

11-102a

A party to a contract made in part for the benefit of other parties not named in the lawsuit may sue in that person's own name without joining the parties for whose benefit the action is brought. If you find that Elmer Bumbray brought this action on behalf of some or all of his siblings, you should award him the amount of damages, if any, that you find to have been rightfully due to either Mr. Bumbray or to his siblings. The fact that the action was brought solely by Mr. Bumbray, standing alone, is not a proper basis for reducing the amount of money awarded to him.



11-102b


A party to a contract made in part for the benefit of other parties not named in the lawsuit may sue in that person's own name without joining the parties for whose benefit the action is brought. If you find that Elmer Bumbray brought this action on behalf of some or all of his siblings, you should award him the amount of damages, if any, that you find to have been rightfully due to either Mr. Bumbray or to his siblings. The fact that the action was brought solely by Mr. Bumbray, standing alone, is not a proper basis for reducing the amount of money awarded to him.

If you find that Elmer Bumbray brought this action on his own behalf to use at his sole discretion, you may use that fact as a basis for reducing the amount of money awarded to Mr. Bumbray.

**11-13**


In determining the terms of a contract, you should first consider what a reasonable person in the position of the parties would have believed was the meaning of the words. Next, you may consider the circumstances that existed at the time the contract was made, including the apparent purpose of the parties in entering into the contract, the history of negotiations leading up to the contract and the statements of the parties about their understanding of the contract.  In addition, you may consider the statements of any agent for a party about his/her actions in negotiating or drafting the contract, or about his/her understanding of the language of the contract.

11-17a

In this case, the plaintiff claims that there was a contract between the plaintiff and the defendant.  The plaintiff claims that the defendant breached this contract.

Under the law, if one party, without legal excuse, fails to fully perform a duty owed under a contract, then that party has breached the contract.  If you find that the defendant breached the contract with the plaintiff, then the defendant is liable to plaintiff for damages.

There are two types of breach of contract.  One is called a "material breach" or "total breach" of contract.

If one party breached the contract by failing to perform a contractual duty so important that it affects the central purpose of the contract, then that party has committed a "material or total breach" of the contract.  If the defendant committed a "material" or "total" breach of contract, then the plaintiff has the right to terminate the contract.

If you find that the defendant committed a "material" or "total" breach of contract, then the plaintiff could terminate the contract and receive damages, and the plaintiff had no further duty to perform under the contract.

The other type of breach of contract is called a "simple" or "partial" breach.  If you find that the plaintiff received substantially what he/she bargained to receive under the contract, then the breach was a "simple breach." If the defendant committed a "simple" or "partial" breach of contract, then the contract remained in force and the plaintiff could not terminate the contract.  In that case, the plaintiff would still be entitled to receive damages caused by the breach.

**11-24**

In this case the plaintiff claims that he is entitled to receive compensation from the defendant due under the contract.

If the plaintiff fully performed all duties under the contract, then the plaintiff is entitled to full compensation under the contract.

If the plaintiff did not fully perform all duties under the contract, then you must decide whether the plaintiff substantially performed those duties. A party has substantially performed when the defects in that party's performance are of minor importance and the failure to perform fully was not willful.

If you find that the plaintiff substantially performed the obligations under the contract, then the plaintiff is entitled to receive all payments due under the contract, minus compensation to the defendant for the defects in performance.

You must make your findings concerning full or substantial performance based upon a preponderance of the evidence.

11-31

If you find that the defendant breached the contract with the plaintiff, and the defendant's breach was not excused, then you must award the plaintiff damages.

The measure of damages for a breach of contract is that amount of money necessary to place the injured party in the same economic position he/she would have been in if the contract had not been breached. To calculate the damages, first determine the amount of money the plaintiff would have received had the contract not been breached. Next, add both incidental damages and consequential damages, if any. Lastly, subtract from that any money he/she saved because he/she did not have to complete the contract.

Incidental damages include any costs the plaintiff incurred while making reasonable efforts to avoid losses, whether the efforts were successful or not. Consequential damages include damages resulting from the breach, such as injury to persons or property.

The plaintiff has the burden of proving all elements of damages by a preponderance of the evidence. You are to award the plaintiff damages to fully compensate him/her for the defendant's breach. You must not award the plaintiff damages for present or future harm which are speculative or remote, or which are based on guesswork or conjecture.

The plaintiff is entitled to damages that were foreseeable at the time the contract was made. Damages are foreseeable if they are the sort that the parties would have reasonably envisioned, or are the sort that would flow naturally and obviously from the breach of the contract.

**11-31 A**

If you find that the defendant breached the contract with the plaintiff, and the defendant's breach was not excused, then you must award the plaintiff damages.

The measure of damages for a breach of contract is that amount of money necessary to place the injured party in the same economic position he/she would have been in if the contract had not been breached. To calculate the damages, determine the amount of money the plaintiff would have received had the contract not been breached.

The plaintiff has the burden of proving all elements of damages by a preponderance of the evidence. You are to award the plaintiff damages to fully compensate him/her for the defendant's breach. You must not award the plaintiff damages for present or future harm which are speculative or remote, or which are based on guesswork or conjecture.

The plaintiff is entitled to damages that were foreseeable at the time the contract was made. Damages are foreseeable if they are the sort that the parties would have reasonably envisioned, or are the sort that would flow naturally and obviously from the breach of the contract.

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

### CIVIL DIVISION

**ELMER BUMBRAY,**      :
             :
   **Plaintiff,**     :
             :    **Civil Action No. 2434-99**
             :
**JEANNE A. DUVALL,**     :
             :
   **Defendant.**    :

### JURY VERDICT FORM

1. On the plaintiff's claim of Breach of Contract against defendant Jeanne

  Duvall, the jury finds in favor or (place a mark on the appropriate line):

  The Plaintiff _____   The Defendant _____

  **[If the jury finds in favor of plaintiff, go to questions #2 and #3.  If the jury finds in favor of defendant, then stop; do not answer question #2 or #3.]**

2. On whose behalf did plaintiff Elmer Bumbray bring this lawsuit ?

  **[Place a mark on the appropriate line.]**

  _____ On behalf of himself and his biological siblings

  _____ On his own behalf to use at his sole discretion

3. What sum of money does the jury award as damages for Breach of

  Contract?

       $_____

_____
**FOREPERSON'S JUROR NUMBER**

_____
**DATE**



SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

ELMER BUMBRAY,

     Plaintiff,                     CA No. 99-2434
                                    Calendar 5
     v.                         Judge Judith Bartnoff
                                    Next Event: 10/6/99
JEANNE A. DUVALL,           Discovery Requests Due

     Defendant.

### ANSWER TO COMPLAINT FOR DAMAGES

     COMES NOW defendant Jeanne A. Duvall, by and through counsel, to Answer the Complaint for Damages.

     1. Defendant does not contest the subject matter jurisdiction of this Court.

     2. Defendant admits the allegations in paragraphs 1 and 2 of the Complaint for Damages.

     3. Defendant denies the allegations in paragraph 3 of the Complaint for Damages.

     4. Although defendant does not contest the subject matter jurisdiction of this Court pursuant to D.C. Code § 11-921, defendant denies the other grounds cited by the plaintiff for assertion of subject matter jurisdiction in paragraph 4 of the Complaint for Damages.

     5. With reference to the allegations in paragraph 5 of the Complaint for Damages, defendant incorporates her responses above.

     6. Defendant admits the allegations of paragraphs 6 and 7 of the Complaint for Damages, except defendant denies the accuracy of the dates alleged in the Complaint for Damages.



PLAINTIFF
EXHIBIT   8
CASE #  05-1510

7. Defendant admits she is the sole heir of the Estate of Henrietta Duvall, but she denies the balance of the allegations of paragraph 8 of the Complaint for Damages.

8. Defendant admits the allegations of paragraph 9 of the Complaint for Damages.

9. Defendant admits that plaintiff visited her home in summer 1995, but she denies the balance of the allegations of paragraph 10 of the Complaint for Damages and demands strict proof.

10. Defendant admits that plaintiff retained Barry Chasen, Esquire, as his attorney but contends the purpose of the representation was an effort by plaintiff to appropriate for himself sums which had been awarded to Henrietta Duvall. Defendant denies the balance of the allegations of paragraph 11 of the Complaint for Damages. Defendant further asserts that plaintiff lacked standing to perform any of the work necessary to pursue benefits belonging to the Estate of Henrietta Duvall.

11. Defendant denies the allegations of paragraphs 12 and 13 of the Complaint for Damages.

12. In reference to the allegations of paragraph 14 of the Complaint for Damages, defendant states that the Commission Order dated August 6, 1997, speaks for itself.

13. Defendant denies the allegations of paragraph 15 of the Complaint for Damages.

14. Defendant admits the allegations in paragraph 16 of the Complaint for Damages but further asserts that Mr. Toulouse demanded and received the funds solely in his capacity as attorney for the Estate of Henrietta Duvall and not in any personal capacity.

15. Defendant admits that plaintiff has made numerous demands on her for payment of monies and admits she has paid nothing to the plaintiff, but defendant denies the balance of the allegations in paragraph 17 of the Complaint for Damages.

16. Defendant admits that defendant filed a Request for Compensation of Services in the Estate of Henrietta Duvall, and she admits she gave plaintiff no notice, but she denies the balance of the allegations in paragraph 18 of the Complaint for Damages, and she further denies that plaintiff was entitled to any notice whatsoever.

17. Defendant denies the allegations in paragraph 19 of the Complaint for Damages.

18. Defendant states that the Request for Compensation speaks for itself and denies the balance of the allegations of paragraph 20 of the Complaint for Damages.

19. Defendant denies the allegations of paragraph 21 of the Complaint for Damages.

20. With reference to the allegations in paragraph 22 of the Complaint for Damages, defendant incorporates her responses above.

3

21. Defendant denies the allegations of paragraph 23 of the Complaint for Damages.

22. Defendant denies the allegations of paragraph 24 of the Complaint for Damages.

23. Defendant denies the allegations of paragraph 25 of the Complaint for Damages.

24. With reference to the allegations in paragraph 26 of the Complaint for Damages, defendant incorporates her responses above.

25. Defendant denies the allegations of paragraph 27 of the Complaint for Damages.

26. Defendant denies the allegations of paragraph 28 of the Complaint for Damages.

27. Defendant denies the allegations of paragraph 29 of the Complaint for Damages.

28. Defendant denies all allegations in the Complaint for Damages Complaint not specifically admitted above.

29.    Defendant asserts that the plaintiff is not entitled to the relief he requests or to any relief whatsoever.

### First Defense

30. The Complaint for Damages fails to state a claim upon which relief can be granted.

### Second Defense

31. Plaintiff lacks standing to bring the Complaint for Damages.

### Third Defense

32. Plaintiff's remedies, if any he has, are cognizable only in the Probate Division of this Court, not in the Civil Division of this Court.

### Fourth Defense

33. Plaintiff's remedies, if any he has, may be maintained only against Estate of Henrietta Duvall, not against defendant individually.

### Fifth Defense

34. Plaintiff is barred from recovery by the doctrines of res judicata and/or collateral estoppel.

### Sixth Defense

35. Plaintiff is barred from recovery by the doctrine of statute of limitations.

### Seventh Defense

36. Plaintiff is barred from recovery by the doctrine of the statute of frauds.

### Eighth Defense

37. Plaintiff is barred from recovery by the doctrine of waiver

### Ninth Defense

38. Plaintiff is barred from recovery by the doctrine of failure of consideration.

## Tenth Defense

39. Plaintiff is barred from recovery by the doctrine of duress and/or undue influence.

## Eleventh Defense

40. The contract plaintiff asserts was lacking because there was no meeting of the minds.

## Twelfth Defense

41. If there was a contract, defendant is excused from performance of the contract because of defendant's mistake as to a basic assumption concerning the essence of the contract, and such mistake was caused by the plaintiff or under the circumstances that make the contract unconscionable.

## Thirteenth Defense

42. If any agreement was reached between the parties, the agreement was the product of plaintiff's knowing or negligent misrepresentations of material facts upon which the defendant reasonably relied to her detriment.

43. Some of plaintiff's misrepresentations of material facts were done through plaintiff's agent, Barry M. Chasen.

44. Among the facts which the plaintiff misrepresented or failed to inform defendant under circumstances in which plaintiff (or his agent) had a duty to inform defendant were the terms of the workers compensation order, the existence of the plaintiff's own settlement in the workers compensation case and plaintiff's

6

relationship with Barry M. Chasen, the non-existence of any
status of plaintiff in relationship to the Estate of Henrietta
Duvall, that after 1982 plaintiff possessed no legal entitlement
of his own to receive further workers compensation benefits
related to his father's death, that defendant was not in jeopardy
of losing the home she had inherited, that defendant was under no
legal obligation to sign a retainer agreement with Barry M.
Chasen on behalf of her mother's estate, and that defendant was
under no legal obligation to give away her inheritance to the
plaintiff.

### Fourteenth Defense

45. Defendant specifically denies misrepresenting material
facts to the plaintiff.

### Fifteenth Defense

46. Any statements which may have been made by defendant to
plaintiff were not of a factual nature, and a claim of
misrepresentation does not lie for such statements.

### Sixteenth Defense

47. Even if defendant made false statements to the
plaintiff, defendant did not know the statements were false and
did not make the statements recklessly.

### Seventeenth Defense

48. Defendant did not make any false statements to the
plaintiff with the intent to deceive the plaintiff.

### Eighteenth Defense

49. Even if defendant made false statements to the plaintiff, plaintiff did not reasonably rely on defendant's statements, particularly since plaintiff was in a superior position to learn the facts.

### COUNTERCLAIM

Defendant, as counter plaintiff, by and through counsel, files a Counter Claim against the plaintiff, as counter defendant, as follows:

1. Jurisdiction is founded upon D.C. Code 11-921, et. seq. (1981 edition).

2. Counter plaintiff is an adult resident of the District of Columbia.

3. Counter defendant is an adult resident of the District of Columbia.

4. Ms. Duvall is the sole heir of Henrietta Duvall who died on January 1, 1990, (the "Decedent"), and she is the successor personal representative of the Decedent's estate.

5. The decedent was a party to a claim before the Workman's Compensation Commission of Maryland in Claim No. A-798350 based on the death of her husband, Edward D. Bumbray. ("Claim").

6. The Claim resulted in a settlement which was approved by an Order entered July 14, 1982 ("Order"). The Order provided an annuity paid monthly to the Decedent during her lifetime and to the Decedent's estate upon her death.

8

7. Ms. Duvall was unaware of the terms of the Order which provided that benefits would accrue to the Decedent's estate in the event of the death of the Decedent.

8. Plaintiff Elmer Bumbray was a party to the Claim, and as a result of the Order, he received the sum of $5,000.00, in settlement of his claim.

9. By settling. Mr. Bumbray waived any further workers compensation benefits from the Claim.

10. Mr. Bumbray was aware of the terms of the Order, and he knew that benefits would accrue to the Decedent's estate in the event of the death of the Decedent.

11. Mr. Bumbray attempted to deceive Ms. Duvall with the purpose of appropriating the Decedent's estate benefits to himself.

12. Mr. Bumbray misled Ms. Duvall into believing that Mr. Bumbray had a claim to the benefits stemming from his father's death. Although he knew that Ms. Duvall, as sole heir of the Decedent's estate, would be entitled to the net distribution of all of the proceeds of any existing Workers' Compensation claim, he failed to inform her of these facts.

13. Mr. Bumbray retained Third Party Defendant Barry M. Chasen as his own counsel and agent to personally recover the benefits which belonged to the Decedent's Estate and Mr. Chasen acted as Mr. Bumbray's agent at all times in that regard.

14. Mr. Chasen first attempted to recover the benefits for Mr. Bumbray directly without involving Ms. Duvall or the Decedent's

estate, but he was unsuccessful.

15. Mr. Chasen did so by falsely representing that Mr. Bumbray had status before the Maryland Workers' Compensation Commission as a "potential heir of the estate." In fact, Mr. Bumbray was not a potential heir of the Decedent's estate, and Mr. Chasen knew it. Mr. Bumbray had no relationship whatsoever to the Decedent's estate.

16. The Workers' Compensation Commission refused to accord standing to Mr. Bumbray.

17. Mr. Chasen proceeded to persuade, confuse, mislead, intimidate and threaten Ms. Duvall into giving up the benefit belonging to her as the heir to the Decedent's estate.

18. In early November 1996, Mr. Chasen attempted to convince Ms. Duvall to withdraw as personal representative of the Estate so Mr. Bumbray or Mr. Chasen could petition to become her successor. Ms. Duvall failed to sign the necessary papers.

19. In late November 1996, despite the clear conflict of interest between Mr. Bumbray and Ms. Duvall, Mr. Chasen attempted to induce Ms. Duvall to retain him to represent her in her capacity as personal representative. Ms. Duvall did not do so.

20. Mr. Bumbray and Mr. Chasen continued to hound Ms. Duvall and lie to her.

21. They finally induced Ms. Duvall to attend a meeting with them in Mr. Chasen's office on March 4, 1997.

10

22. At that meeting, Mr. Chasen and Mr. Bumbray told Ms. Duvall that if she did not cooperate with them she would face the loss of her home which she had acquired as an inheritance from her mother's estate. In fact, her home was not at all in jeopardy.

23. Although Ms. Duvall would be entitled to all the net distribution of any Workers Compensation claim as sole heir of the Decedent's estate, they led her to believe that all of the children of Edward D. Bumbray were entitled to the majority share of any remaining Workers' Compensation claim.

24. They told her that they would give Ms. Duvall a one-seventh share of any Workers' Compensation award received.

25. Being led to believe the offer made to her conferred a benefit on her and that she would risk the loss of her home should she fail to cooperate, at that meeting Ms. Duvall signed a retainer agreement with Mr. Chasen in her capacity as personal representative of the Decedent's estate. The retainer agreement was limited to the Claim before the Maryland Workers' Compensation Commission.

26. Mr. Chasen never disclosed to Ms. Duvall the conflict of interest between herself and his client, Mr. Bumbray.

27. Although the proposition Mr. Chasen presented to Ms. Duvall would divest her of approximately six-sevenths of the benefit to which she was entitled to receive, Mr. Chasen never informed Ms. Duvall that she had a right to seek the advice of independent counsel before retaining him as counsel under the terms

11

he proposed to her.

28. Mr. Chasen failed to put into writing the terms of the proposition made to Ms. Duvall.

29. Mr. Chasen then acted as the counsel in the Workers' Compensation case for Ms. Duvall in her capacity as personal representative of the Decedent's estate.

30. On August 6, 1997, the Workers' Compensation Commission issued an Order providing payments to the Decedent's estate.

31. Ms. Duvall subsequently sought independent counsel, and she learned that Mr. Bumbray and Mr. Chasen had attempted to compromise her rights.

32. Mr. Bumbray's intentional infliction of emotional distress upon Ms. Duvall, his fraudulent misrepresentations, omissions of material facts and deceptive conduct, and those of his attorney and agent, Mr. Chasen, have caused Ms. Duvall damage and expense, including emotional distress and the costs and attorney fees associated with defending the Complaint for Damages in the Civil Division of this Court and the proceedings in the Probate Division of this Court which he has filed against her.

Wherefore, defendant and counter plaintiff prays for the following relief:

A. Dismiss the Complaint for Damages against defendant with prejudice, all costs to be paid by the plaintiff.

B. Grant Judgment against the counter defendant for compensatory and punitive damages, in an amount to be determined

by the jury, including the costs and attorney fees of this action.

C. Interest at the legal rate until the judgment is paid and costs of this litigation, and

D. Grant such other and further relief as may seem just and equitable to this Honorable Court.

Respectfully submitted,

Paul M. Toulouse (205526)
Judiciary Square
503 D Street, N.W.
Washington, D.C.  20001
(202) 347-4010

Counsel for Defendant
and Counter Plaintiff

13

## JURY DEMAND

Plaintiff and Counter Defendant demands a jury trial as to all issues triable by a jury.

_Paul M Toulouse_

Paul M. Toulouse

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the Answer to Complaint for Damages and Counterclaim was mailed first class, postage prepaid, this _10_ day of _September_____, 1999, to:

Jonathan S. Shurberg, Esq.
Steven M. Katz, Esq.
401 E. Jefferson Street
Suite 208
Rockville, MD 20850

Isadore Katz, Esq.
5335 Wisconsin Avenue, N.W.
Suite 960
Washington, D.C. 20015-2030

_Paul M Toulouse_

Paul M. Toulouse

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

ELMER BUMBRAY,

      Plaintiff,

                        CA No. 99-2434
                        Calendar 5
      v.                     Judge Judith Bartnoff

JEANNE A. DUVALL, et al.

      Defendant

## DEFENDANT'S RESPONSES TO PLAINTIFF'S INTERROGATORIES

Q1.    State your full name, address, date of birth, social security number, present occupation, present employer's name and address, and your current marital status, including spouse's name.

A1.    Jeanne A. Duvall, 2615 Newton Street, N.E., Washington, DC 20018, DOB 5/6/58, occupation: accountant at National Breast Cancer Coalition, 1707 L Street, N.W., Suite 1060, Washington, DC 20036, separated, Wayne Calhoun.

Defendant objects to providing her social security number for reasons of privacy and because her social security number is not relevant to the subject matter in the pending action, and it is not reasonably calculated to lead to the discovery of admissible evidence.

Q2.    Identify all of your employers for each of the three (3) years preceding the occurrence in question, and for each year thereafter up to the present time, the nature of such employment and the reason for termination of any employment during this period of time.

A2.    Defendant objects to this Interrogatory on the ground that the word "occurrence" is not defined. The events which form the basis of plaintiff's complaint occurred over a period of years and it is impossible to know what occurrence plaintiff is making reference to. Defendant also objects to this Interrogatory because the discovery requested is not relevant to the subject matter in the pending

PLAINTIFF
CLAIMANTS
EXHIBIT____9
CASE # 05-1510

action, and it is not reasonably calculated to lead to the discovery of admissible evidence. Without waiving said objections: Washington Area Council on Alcoholism and Drug Abuse, left because the organization went out of business; Temp agency, left for permanent position and National Breast Cancer Coalition (see Interrogatory answer no. 1).

Q3.    Identify those persons who have given you signed or recorded statements concerning the occurrence, and attach a copy of any signed statement or transcription of recorded statement in your control which was made by this defendant.

A3.    Defendant objects to this Interrogatory on the ground that the word "occurrence" is not defined. The events which form the basis of plaintiff's complaint occurred over a period of years and it is impossible to know what occurrence plaintiff is making reference to. Moreover, the interrogatory is overbroad, vague and not specific. Without waiving said objections: None.

Q4.    Do you know of any statement, conversation, comment, report, admission, admission of liability, admission against interest, or any statement under Rules of Evidence 803 and/or 804 made by this Plaintiff at the time of, or following, the occurrence of facts relevant to any issue in this case. If your Answer is "yes," state the content of said statement, conversations, comment or report, the place where it took place, the name, address and telephone number of the person to whom each statement was made, and in whose presence it was made.

A4.    Defendant objects to this Interrogatory on the ground that the word "occurrence" and the phrase "occurrence of facts relevant to any issue in this case." are not defined The events which form the basis of plaintiff's complaint occurred over a period of years and it is impossible to know what occurrence plaintiff is making reference to. Moreover, the interrogatory is overbroad, vague and not specific. In addition, the interrogatory calls for the application of a wide range of legal analysis and

legal conclusions concerning the Federal Rules of Evidence. Without waiving said objections: Elmer Bumbray and I had a number of conversations concerning the workers compensation claim, some of them were at my home, some were over the phone and some were in Mr. Chasen's office. When Mr. Bumbray and I first talked about the workers compensation case I told him that the insurance company had advised me that the payments stopped at my mother's death and therefore I thought that my mother's estate had no further claim. Mr. Bumbray said that he wanted to see if he and his siblings could pursue the claim and I told him that I had no objection to his pursuing the claim if he and his siblings were entitled to it.

Mr. Bumbray never told when he retained Mr. Chasen and initiated a claim with the Workers Compensation Commission, falsely claiming that he was an heir of my mother's estate. Mr. Bumbray later misled me into believing that he and his siblings did have a claim and persuaded me to meet with him and his lawyer. At that meeting, both Mr. Chasen and Mr. Bumbray continued to misled me into believing that Mr. Bumbray and his siblings had a claim and that neither I nor my mother's estate had a claim. They thereafter bullied me, coerced me, intimidated me, and threatened me with the loss of my home if I did not cooperate with them based upon my earlier "agreement" with Mr. Bumbray that he could pursue the claim. As an incentive for my cooperation, I was told that I would receive 16% of $103,000 and Mr. Bumbray and his siblings would share 84% of $103,000. Fearing the loss of my home and thinking that 16% of $103,000 was better than nothing, I agreed to their proposal.

When I learned that my mother's estate was entitled to the proceeds and that the agreement was unenforceable, the proceeds were demanded from Mr. Chasen. After Mr. Chasen released the proceeds Mr. Bumbray continued having conversations with me, during which he demanded that I give

3

him some of the proceeds, being alternately conciliatory or threatening and verbally abusive to me.

I don't recall any witnesses to my conversations with Mr. Bumbray other than Mr. Chasen who was present for some of them.

Q5.    If you contend that this Plaintiff committed any acts and/or omissions that deviated from the appropriate standard of care with respect to any of the occurrences alleged in the pleadings, please state with specificity and particularity all the facts and circumstances supporting your contention.

A5.    Defendant objects to this Interrogatory on the ground that the word "occurrences" is not defined. T he events which form the basis of plaintiff's complaint occurred over a period of years and it is impossible to know what occurrences plaintiff is making reference to. Moreover, the interrogatory is overbroad, vague and not specific. In addition, it is unclear what "appropriate standard of care" plaintiff is referring to.   Without waiving said objections: See objections and answer to Interrogatory no. 4. Mr. Bumbray misled me, lied to me, deceived me, confused me, coerced me, threatened me, withheld material information from me and intentionally caused me emotional distress; he also made material and fraudulent misrepresentations to m e, the Workers Compensation Commission and this Court.

Q6.    With respect to any acts and/or omissions set forth in your answer to Interrogatory No. 5, please identify with specificity and particularity what you contend was the appropriate standard of care (i.e., the acts that you contend should have been performed by the Plaintiff)?

A6.    Defendant incorporates herein her earlier answer and objections to interrogatory no. 5. Without waiving said objections: Mr. Bumbray should not have misled me, lied to me, deceived me, confused me, coerced me, threatened me, withheld material information from me and intentionally caused me emotional distress; h m . e also should not have made material fraudulent misrepresentations to

4

me, the Workers Compensation Commission and this Court.

Q7.    If you contend that a person or party other than this Plaintiff committed any acts and/or omissions that deviated from the appropriate standard of care with respect to any of the occurrences alleged in the pleadings, please state with specificity and particularity all the facts and circumstances supporting your contention.

A7.    Defendant objects to this Interrogatory on the ground that the word "occurrences" is not defined. The events which form the basis of plaintiff's complaint occurred over a period of years and it is impossible to know what occurrences plaintiff is making reference to. Moreover, the interrogatory is overbroad, vague and not specific. In addition, it is unclear what "appropriate standard of care" plaintiff is referring to. Without waiving said objections: See defendant's third party complaint against third party defendants Barry Chasen and Chasen & Boscolo, Chtd. and objections and answer to Interrogatory no. 4.

Q8.    With respect to any acts and/or omissions set forth in your answer to Interrogatory No. 7, please identify with specificity and particularity what you contend was the appropriate standard of care (i.e., the acts that you contend should have been performed by the appropriate party)?

A8.    Defendant incorporates herein her earlier answer and objections to interrogatory no. 7. Without waiving said objections: Mr. Chasen (and his law firm) should not have misled me, lied to me, deceived me, confused me, coerced me, threatened me, withheld material information from me; should not have made material misrepresentations to me and the Workers Compensation Commission; should have disclosed to me his professional conflict of interest; should have advised me to seek independent counsel; should have correctly advised Mr. Bumbray and me of our rights and responsibilities and the estate's rights and responsibilities in regards to the alleged agreements and

the workers compensation proceeding and proceeds; should not have wrongfully involved me in litigation with Mr. Bumbray and should not have inflicted emotional distress upon me.

Q9.    State the amount reported as earned income in your income tax returns for each of the three (3) years preceding the occurrence, and for each year thereafter up to the present time, and the District in which the returns were filed.

A9.    Defendant objects to this Interrogatory on the ground that the word "occurrence" is not defined. The events which form the basis of plaintiff's complaint occurred over a period of years and it is impossible to know what occurrence plaintiff is making reference to. Moreover, the interrogatory is vague, overbroad and not specific. Defendant also objects to this Interrogatory on the ground that the discovery requested is not relevant to the subject matter in the pending action, and it is not reasonably calculated to lead to the discovery of admissible evidence. In addition, defendant objects because disclosure of information from an individual's income tax returns typically is not required in discovery except upon a showing not only of relevance but also of compelling need.

Q10.    Identify any and all persons whom you expect to call as an expert witness at the trial of this case. As to each expert named herein, state the subject matter on which the expert is expected to testify, the substance of the findings and opinions to which the expert is expected to testify, a summary of the grounds for each opinion, and attach hereto copies of all reports received from each expert witness.

A10.    Defendant has not yet identified any experts. Defendant will do so in compliance with the timetable set forth in the Scheduling Order in this case which sets forth a date upon which defendant's Rule 26(b)(4) Statement is due.

Q11.    State the name, address and telephone number of all persons known to you, who have

personal knowledge of facts regarding the occurrence or the damages claimed to result therefrom.

A11.    Defendant objects to this Interrogatory on the ground that the word "occurrence" is not defined. The events which form the basis of plaintiff's complaint occurred over a period of years and it is impossible to know what occurrence plaintiff is making reference to. Moreover, the interrogatory is vague, overbroad and not specific. Without waiving said objections: Myself, Elmer Bumbray, Barry Chasen and the medical providers who have treated me for my ulcer, high blood pressure and stress.

Q12.    State whether you have been convicted of any crimes other than minor traffic violations since you have reached the age of eighteen (18) years. If your answer is "yes," then state the nature of each such crime, the date(s) of conviction, and the name and location of the court(s).

A12.    No.

Q13.    Describe fully any and all injuries, conditions, symptoms or disabilities which you claim were caused by the Plaintiff giving the date when your recovery was complete or approximating any anticipated date of recovery.

A13.    lcer, high blood pressure, stress and emotional distress.

Q14.    Are any of the injuries described in your answer to Inter . rogatory No. 13 permanent? If so, give a detailed description of all injuries and conditions you claim to be permanent.

A14.    I don't know.

Q15.    Describe each and every duty, function or activity; the performance of which has been impaired by your condition or injury, and describe the impairment and whether you are now able to will be able to do the activity in the future.

A15.    Defendant does not allege any physical disability.

7

Q16.    State the name, address and tel . ephone number of every doctor, counselor, therapist, hospital, clinic or other health care provider that you have consulted during the last three (3) years, and state after each:

a.    The inclusive dates for treatment, care or examination and the names of each treating or attending physicians;

b.    The medical condition, injury, problem, or symptom complained of;

c.    Description of the treatment, care or examination; and

d.    The effect, if any, of the treatment or care of the particular condition.

A16.    George Washington niversity Medical Faculty Associates, 2150 Pennsylvania Ave., N.W., Washington, D.C. 20037 (202) 994-2222.

a. 1997-present.

b.    lcer, high blood pressure and stress

c. Office visits, examination and medication.

d. Treatment and medication helps.

Q17.    If you claim that a previous injury, disease or condition has been aggravated or made worse by the acts or omissions of the Plaintiff, identify the specific injury, disease or condition and describe how it has been aggravated or made worse.

A17.    Defendant makes no such claim.

Q18.    Provide an itemization of the amount you intend to seek at trial for the following categories of damages:

a.    Medical expenses incurred to date of trial (itemized by name of provider, date(s) of treatment, and amount charged);

8

b.    Future medical expenses.

c.    Wages and income loss through date of trial;

d.    Future lost wages or income;

e.    Loss of earn 'm . ing capacity; and

f.    Any and all other expenses and damages you contend were the result of Plaintiff's acts and/or omissions with respect to the occurrence giv . ing rise to this case.

A18.    a.    $10-$20 per visit co-pay @ 8-10   visits. Reasonable value of services is being claimed, has been requested and will be provided upon receipt.

b.    nknown at this time.

c.    None.

d.    None.

e.    None.

f.    Attorney fees and costs.

Q19.    If you contend that you did not make an agreement of the type claimed by the Plaintiff in the Complaint, please state with specificity and particularity all facts and circumstances supporting your contention.

A19.    Objection, defendant is unclear as to what plaintiff means by "an agreement of the type claimed by the Plaintiff in the Complaint" as the plaintiff mentions at least two agreements in the complaint as well as defendant's retainer agreement with third party defendants Barry Chasen and his firm.    Thus, the interrogatory is vague and not specific. Without waiving said objections: See objections and answer to Interrogatory no. 4.

Q20.    If you contend that any agreement between you and  the Plaintiff in this matter is barred

9

from enforcement for any legal or equitable reason, including but not limited to affirmative defenses, please state with specificity all facts and circumstances supporting your contention.

A20.    See objections and answer to Interrogatory no. 4.

Q21.    If you contend that any agent\employee of Plaintiff made any oral or written statements which you intend to introduce in support of your allegations, give a detailed summary of each such statement, including but not limited to the date when the statement was made and the substance of the statement. (A copy of each written statement or transcript of every oral statement may be attached in the alternative.)

A21.    See objections and answer to Interrogatory no. 4. Also see answer to complaint, third party complaint and document production.

Q22.    Identify by name, address and telephone number every individual who has made oral or written statements to you or to another person and on which you intend to rely to support your allegations, stating after each the substance, content, date and time of day of the supporting statement. (A copy of each written statement or transcript of every oral statement may be attached in the alternative) If you contend that any privilege exempts the statement from production, state the factual basis for your contention.

A22.    See objections and answer to Interrogatory no. 4. Also see answer to complaint, third party complaint and document production.

Jeanne A. Duvall

SUBSCRIBED AND SWORN to before me this 14 day of December, 1999.

Notary Public

My Commission Expires:
July 14, 2002

10

Paul M. Toulouse (205526)
Judiciary Square
503 D Street, NW
Washington, DC 20001
(202) 347-4020


Attorney for Defendant
& Third Party Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the Defendant's Responses to Plaintiff's Interrogatories was mailed first class, postage prepaid, this _14_ day of December, 1999, to Paige A. Levy, Esquire & J. Jonathan Schraub, Esquire, Schraub & Company, Chtd., 1481 Chain Bridge Road, Suite 200, McLean, VA 22101; Jonathan S. Shurberg, 401 E. Jefferson Street, Suite 208, Rockville, MD 20850, and Isadore Katz, 5335 Wisconsin Avenue, N.W., Suite 960, Washington, D.C. 20015-2030.

Paul M. Toulouse

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

ELMER BUMBRAY,
800 Fourth Street, S.W. # S624
Washington, DC 20024,

      Plaintiff,

      v.

JEANNE A. DUVALL,
2615 Newton Street, N.E.
Washington, D.C. 20018,

      Defendant and
      Third Party Plaintiff,

        v.

BARRY M. CHASEN
Chasen & Boscolo, Chartered
6411 Ivy Lane
Suite 411
Greenbelt, Maryland 20770,

      Third Party Defendant,

and

CHASEN & BOSCOLO, Chartered
6411 Ivy Lane
Suite 411
Greenbelt, Maryland 20770

      Third Party Defendant

CA No. 99-2434
Calendar 5
Judge Judith Bartnoff

AMENDED THIRD PARTY COMPLAINT

Comes now Third Party Plaintiff, Jeanne A. Duvall, by counsel

and files this Amended Third Party Complaint before the filing of

a responsive pleading by Third Party Defendants and which Amended

Third Party Complaint relates back to the date of filing of Third

PLAINTIFF
CLAIMANTS
EXHIBIT 11
CASE # 05-1510

Party Plaintiff's original Third Party Complaint filed herein.

1. Jurisdiction is founded upon 11 D.C. Code 921, as amended.

2. Third Party Plaintiff Jeanne A. Duvall is and was at all times relevant a resident of the District of Columbia and resides at 2615 Newton Street, N.E., Washington, D.C. 20018.

3. Plaintiff Elmer Bumbray has filed a Complaint for Damages against defendant Jeanne A. Duvall. A copy of the Complaint is attached as Exhibit A.

4. Upon information and belief, Third Party Defendant Barry Chasen is and was at all times relevant a Maryland resident and attorney licensed to practice law in the State of Maryland and the District of Columbia.

4. Upon information and belief, Third Party Defendant Chasen & Boscolo is and was at all time relevant a professional corporation of attorneys authorized to practice law in the state of Maryland and the District of Columbia.

6. Upon information and belief, Third Party Defendant Barry M. Chasen is and was at all times relevant a principal and shareholder of Chasen & Boscolo.

7. All representations, conduct and omissions of material fact made or performed by Third Party Defendant Barry M. Chasen relevant to the allegations made in this Third Party Complaint were made or performed as an agent of Chasen & Boscolo or were authorized and/or ratified by Chasen & Boscolo.

8. Ms. Duvall is the sole heir of Henrietta Duvall who died

2

on January 1, 1990, (the "Decedent"), and she is the successor personal representative of the Decedent's estate.

9. The decedent was a party to a claim before the Workman's Compensation Commission of Maryland in Claim No. A-798350 based on the death of her husband, Edward D. Bumbray. ("Claim").

10. The Claim resulted in a settlement which was approved by an Order entered July 14, 1982 ("Order"). The Order provided an annuity paid monthly to the Decedent during her lifetime and to the Decedent's estate upon her death.

11. Ms. Duvall was advised in writing by the employer's insurance carrier, The Hartford, that the workers compensation benefits payable pursuant to the Order terminated at the time of the decedent's death.

12. Plaintiff Elmer Bumbray was a party to the Claim, and as a result of the Order, he received the sum of $5,000.00 in settlement of his claim.

13. By settling, Mr. Bumbray waived any further workers compensation benefits from the Claim.

14. Ms. Duvall and Mr. Bumbray orally agreed that Mr. Bumbray would pursue the Claim on behalf of himself and his siblings if the estate, including Jeanne Duvall, as personal representative and sole heir of the Decedent's estate, was not entitled to the Claim.

15. Mr. Bumbray and Ms. Duvall were mutually mistaken, at the time of their agreement, that the estate, including Jeanne Duvall,

3

as personal representative and sole heir of the Decedent's estate, was not entitled to the Claim.

16. Mr. Bumbray knew at the time of the agreement or later knew, after he retained Mr. Chasen and was informed by Mr. Chasen, that the workers compensation benefits payable pursuant to the terms of the Order did not terminate at the death of the decedent.

17. Mr. Bumbray knew at the time of the agreement or later knew, after he retained Mr. Chasen and was informed by Mr. Chasen, that the estate, including Jeanne Duvall, as personal representative and sole heir of the Decedent's estate, was entitled to the Claim.

18. Mr. Bumbray attempted to deceive Ms. Duvall that he and his siblings were entitled to the compensation benefits stemming from his father's death and arising from the Claim after Henrietta Duvall's death with the purpose of appropriating the Decedent's estate benefits to himself and although he knew that Ms. Duvall, as sole heir of the Decedent's estate, would be entitled to the net distribution of all of the proceeds of any existing Workers' Compensation claim, he failed to inform her of these facts.

19. Mr. Bumbray retained Third Party Defendant Barry M. Chasen as his own counsel and agent in behalf of himself and/or his siblings in order to recover the benefits which belonged to the Decedent's Estate and Mr. Chasen acted as Mr. Bumbray's attorney and agent in that regard.

20. Mr. Chasen first attempted to recover the benefits for

4

Mr. Bumbray without involving Ms. Duvall or the Decedent's estate, but he was unsuccessful.

21. Mr. Chasen represented in writing to the Maryland Workers Compensation Commission that Mr. Bumbray had status before the Maryland Workers' Compensation Commission as a "potential heir of the estate."

22. The representation made by Mr. Chasen in allegation 21 was false.

23. Mr. Bumbray was not a potential heir of the Decedent's estate.

24. Mr. Chasen knew that Mr. Bumbray was not a potential heir of the Decedent's estate

25. Mr. Chasen should have known that Mr. Bumbray was not a potential heir of the Decedent's estate.

26. Mr. Chasen knew that the Claim had to have been brought by the personal representative of the decedent's estate

27. Mr. Chasen should have known that the Claim had to have been brought by the personal representative of the decedent's estate

28. Mr. Chasen asked Mr. Bumbray if he was the personal representative of the decedent's estate.

29. Mr. Chasen asked Mr. Bumbray who was the personal representative of the decedent's estate.

30. Mr. Bumbray told Mr. Chasen that Ms. Duvall was the personal representative of the decedent's estate.

5

31. The Workers' Compensation Commission refused to accord standing to Mr. Bumbray as a claimant.

32. The Workers' Compensation Commission required the personal representative of the decedent's estate to pursue the claim.

33. Mr. Bumbray and Mr. Chasen proceeded to intentionally and recklessly persuade, confuse, mislead, intimidate and threaten Ms. Duvall into giving up the benefit belonging to her as the sole heir of the Decedent's estate.

34. In late November 1996, while representing Mr. Bumbray, Mr. Chasen forwarded a Chasen & Boscolo retainer agreement to Ms. Duvall which, had she signed it, would have resulted in Mr. Chasen and Chasen & Boscolo being retained by Ms. Duvall in her capacity as personal representative.

35. Mr. Bumbray and Mr. Chasen continued to hound Ms. Duvall and lie to her.

36. Mr. Bumbray and Mr. Chasen finally induced Ms. Duvall to attend a meeting with them in Mr. Chasen's office on March 4, 1997.

37. At that meeting, Mr. Chasen and Mr. Bumbray misled Ms. Duvall to believe that based upon her earlier agreement with Mr. Bumbray, if she did not cooperate with them she would face the loss of her home which she had acquired as an inheritance from her mother's estate.

38. The Decedent's estate was entitled to all the net

distribution of any Workers Compensation claim.

39. Ms. Duvall was entitled to all the net distribution of any Workers Compensation claim as sole heir of the Decedent's estate.

40. Mr. Chasen and Mr. Bumbray misled Ms. Duvall to believe that neither the estate nor Ms. Duvall, as sole heir of the Decedent's estate, was entitled to the claim, and that the rights to the claim belonged to Mr. Bumbray and his five siblings.

41. Being led to believe by Mr. Chasen and Mr. Bumbray that the rights to the claim belonged to Mr. Bumbray and his five siblings and that the offer made to her conferred a benefit on her and that she would risk the loss of her home should she fail to cooperate with them, at that meeting Ms. Duvall signed a retainer agreement with Mr. Chasen to pursue the claim in her capacity as personal representative of the Decedent's estate.

42. Mr. Chasen never disclosed to Ms. Duvall the conflict of interest between herself and his client, Mr. Bumbray.

43. Mr. Chasen never informed Ms. Duvall that she had a right to seek the advice of independent counsel.

44. Although the wording of the retainer agreement was limited to the Third Parties' representation of Ms. Duvall in her capacity as personal representative of the Decedent's estate in pursuing the claim before the Commission, based upon all of the circumstances, Mr. Chasen was under a professional obligation to provide additional, complete and correct professional advice to

7

Ms. Duvall concerning her own rights, the estate's rights and the rights of Mr. Bumbray and his siblings to the claim, but in fact Mr. Chasen provided materially incorrect professional advice and failed to provide materially correct professional advice, all of which has caused and will continue to cause Ms. Duvall damage.

45. Mr. Chasen and Mr. Bumbray told Ms. Duvall that Mr. Bumbray would offer Ms. Duvall a one-seventh share of $103,000 if she cooperated with them.

46. Ms. Duvall entered into an oral agreement with Mr. Bumbray and his siblings whereby she was to receive 16% of $103,000 and he and his five siblings were to equally share 84% of $103,000, the then outstanding arrears due pursuant to the claim and that she was to receive all future proceeds due pursuant to the claim.

47. Mr. Chasen then acted as counsel in the Workers' Compensation case for Ms. Duvall in her capacity as personal representative of the Decedent's estate.

48. On August 6, 1997, the Workers' Compensation Commission issued an Order providing payments to the Decedent's estate

49. Ms. Duvall subsequently sought independent counsel, and she learned that Mr. Bumbray and Mr. Chasen had attempted to compromise her rights

50. As counsel for the estate, Mr. Chasen received $10,800 from the employer's insurance company, The Hartford, for his services rendered pursuing the claim before the Maryland Workers

8

Compensation Commission.

51. Mr. Chasen's attorney fee was deducted from the proceeds due to the estate pursuant to the Claim.

52. As counsel for the estate, Mr. Chasen received drafts from the employer's insurance company, The Hartford, as proceeds from the claim.

53. Ms. Duvall terminated Mr. Chasen's and his firm's representation of her and the estate.

54. After being terminated and upon demand, Mr. Chasen delivered the drafts he had received from the employer's insurance company, The Hartford, as proceeds from the claim to Ms. Duvall, by her new counsel, Paul M. Toulouse.

55. Ms. Duvall has denied the terms of the agreement as alleged by Mr. Bumbray in his complaint, has raised various defenses to that agreement, has raised various defenses to the agreement alleged in paragraph 46 herein and has further alleged that both the agreement alleged in paragraph 46 and Mr. Bumbray's version of the agreement, as stated in his complaint, are unenforceable.

56. If it is found that Ms. Duvall and Mr. Bumbray did enter into an agreement pursuant to the agreement alleged in paragraph 46 herein,, pursuant to the terms of the agreement alleged in Mr. Bumbray's complaint or pursuant to any other terms and that the agreement so found is enforceable against her, then Mr. Chasen negligently and/or intentionally breached professional standards

of care as her attorney by providing incorrect legal advice and/or failing to provide correct legal advice to Ms. Duvall which has caused and will continue to cause her damage.

57. Ms. Duvall refers to and incorporates herein paragraphs 1-56, and further states that Third Party Defendants intentionally inflicted emotional distress upon Ms. Duvall and their conduct, representations and omissions of material facts were negligent, fraudulent and deceptive, and wrongfully involved her in litigation with Mr. Bumbray, all of which have caused Ms. Duvall damage and expense, including costs and attorney fees.

58. If Ms. Duvall suffers damages and is required to pay a judgment to the plaintiff in this action, then because of its actions, the Third Party Defendants are liable to Ms. Duvall for all damages awarded to the plaintiff.

WHEREFORE, Third Party Plaintiff respectfully requests the following relief of this Honorable Court:

A. Grant judgment to Ms. Duvall against Third Party Defendants for all sums that may be adjudged against Ms. Duvall in favor of plaintiff in this litigation.

B. Grant judgment against Third Party Defendants for compensatory and punitive damages, in an amount to be determined by the jury, including the costs and attorney fees of this action.

C. Interest at the legal rate until the judgment is paid and costs of this litigation.

Respectfully submitted,

Paul M. Toulouse (205526)
Judiciary Square
503 D Street, N.W.
Washington, D.C.  20001
(202) 347-4010

Counsel for Third Party Plaintiff

JURY DEMAND

Plaintiff and Counter Defendant demands a jury trial as to all issues triable by a jury.

Paul M. Toulouse

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this Amended Third Party Complaint was mailed first class, postage prepaid, this _16_ day of _December_, 1999, to:

Paige Levy, Esq.
Schraub & Co., Chtd.
Suite 200
1481 Chain Bridge Road
McLean, VA 22101

Jonathan S. Shurberg
Steven M. Katz
401 E. Jefferson Street
Suite 208
Rockville, MD 20850

Isadore Katz
5335 Wisconsin Avenue, N.W.
Suite 960
Washington, D.C. 20015-2030

Paul M. Toulouse